**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSEPH R. BIDEN, JR.,

     *Plaintiff*,

     v.

U.S. DEPARTMENT OF JUSTICE,

     *Defendant*.

Civil Action No. _____

## **COMPLAINT**

1.     Every American, including a sitting or former Vice President, has a right to privacy in the personal conversations he has within his own home.  And when the U.S. Department of Justice (the "Department") obtains that private information through a criminal investigation, the Department bears a particular responsibility to protect it from disclosure.

2.     This lawsuit seeks to halt the Department's plan to abandon its defense of these core tenets of American justice by disclosing President Biden's private information—information the Department has long maintained is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA")—in response to a purported request from the House Judiciary Committee (the "Committee").  That request is pretextual, lacks a legitimate legislative purpose, is outside the scope of the Committee's investigative powers, and is invalid and unenforceable. Nonetheless, the Department has announced its intention to provide President Biden's private information to the Committee on **June 15, 2026**, absent a court order barring release.  President Biden now seeks judicial review to stop the Department's proposed end-run around pending FOIA

litigation and to hold the Department to its obligations to safeguard sensitive and highly personal law enforcement information.

3.    The materials at issue are audio recordings and transcripts of President Biden's private, sensitive conversations with his writing partner, Mark Zwonitzer, which took place at President Biden's home in 2016 and 2017.  The Department obtained these materials in 2023, in connection with the investigation of Special Counsel Robert K. Hur into President Biden's handling of classified records.  President Biden cooperated fully in that investigation, and the Special Counsel ultimately concluded that criminal charges were not warranted.

4.    The conversations reflected in these audio recordings and transcripts were part of the writing process for President Biden's 2017 memoir, *Promise Me, Dad: A Year of Hope, Hardship, and Purpose*, in which he recounted the politically consequential and personally painful year of his life that began on Thanksgiving in 2014.  That year, President Biden navigated a range of foreign and domestic policy challenges as Vice President and weighed a run for the Presidency in 2016.  All the while, President Biden's eldest son, Beau, fought brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six.  The public and private dimensions of President Biden's life have always been intertwined, but perhaps never more so than during that difficult year.  President Biden and Zwonitzer recorded their conversations for use in writing *Promise Me, Dad*, and they both understood that they were speaking privately.

5.    In 2024, the Heritage Foundation and Mike Howell (the "Heritage Plaintiffs") submitted a FOIA request and ultimately sued the Department, seeking the audio recordings and transcripts of President Biden's conversations with Zwonitzer.  *See Heritage Found. v. U.S. Dep't of Just.*, No. 24-cv-645 (D.D.C) ("*Heritage v. DOJ*" or the "FOIA Action").

2

6.     Through two years of litigation, the Department properly withheld those materials under FOIA, arguing forcefully and correctly that they were exempt from disclosure under Exemptions 5, 6, and 7(C).  In public court filings, for example, the Department acknowledged that the "privacy interests" at stake in these materials are "undoubtedly enormous" and that releasing them would be the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone—despite no charges having ever been brought, let alone charges relating to that private content."

7.     Under President Trump, however, the Department has reversed that position.  In February 2026, without any formal explanation for its about-face, the Department notified President Biden of its intention to release the audio recordings and transcripts to the plaintiffs in the FOIA Action.

8.     For weeks, President Biden's counsel engaged with the Department's attorneys with the goal of resolving this matter without resort to litigation.

9.     While these conversations were ongoing, the Department—faced with the striking weaknesses of its new legal position in the FOIA Action—took a new tack and secured a pretextual "request" for the records at issue from the Committee.  The Department informed President Biden's counsel of this supposed request on March 19, 2026, but the written document is dated four days later—March 23, 2026.

10.     The Department now plans to release audio recordings and transcripts of President Biden's private, sensitive conversations from 2016 and 2017 to both the Heritage Plaintiffs and the Committee on June 15, 2026, absent a court order blocking the disclosures.

11.     On May 12, 2026, President Biden sought to intervene in the FOIA Action to prevent unlawful disclosure to the Heritage Plaintiffs and the Committee.  Consistent with the

3

Court's decision of May 21, 2026, which granted intervention as to some but not all of President Biden's proposed cross-claims, President Biden now brings this action to assert additional claims against the Department.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, Freedom of Information Act, 5 U.S.C. § 552, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the United States Constitution.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2), 28 U.S.C. § 1391 (e)(1), and 5 U.S.C. § 552a(g)(5).  Defendant U.S. Department of Justice is a federal agency headquartered in Washington, D.C.; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial part of property that is the subject of the action is situated in this District.

**PARTIES**

14.     Plaintiff Joseph R. Biden, Jr., is a citizen of the United States and a resident of Delaware.  He was the forty-seventh Vice President of the United States and the forty-sixth President of the United States.  He is currently a private citizen.

15.     Defendant U.S. Department of Justice is a department of the executive branch of the United States government and an "agency" within the meaning of 5 U.S.C. § 552(f)(1) and 5 U.S.C. § 552a(a)(1).  The Department has possession of and control over the records at issue.

**FACTUAL ALLEGATIONS**

**The Records at Issue, the Special Counsel's Investigation, and the Operative Agreement**

16.     Beginning in the spring of 2016, President Biden met periodically with his writing partner, Mark Zwonitzer, to discuss what would become President Biden's 2017 memoir, *Promise*

4

*Me, Dad: A Year of Hope, Hardship, and Purpose*.  These were private conversations, often involving sensitive subject matter, that took place in President Biden's home.

17.    Zwonitzer recorded the conversations for his personal use in assisting President Biden with writing his memoir.  President Biden and Zwonitzer both understood that the recordings would be used only for that purpose and would not be disseminated to the public.

18.    In President Biden's conversations with Zwonitzer and, ultimately, in his memoir, he recounted the year of his life that began during the Thanksgiving holiday in 2014.  That year was among the most consequential of President Biden's political life and the most painful of his personal life.  Then-Vice President Biden served the final year of his term in that office and considered a run for the Presidency in 2016.  All the while, President Biden's eldest son, Beau, fought brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six.

19.    In reflecting on these events, President Biden and Zwonitzer discussed a range of sensitive topics, including the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; the many other voices and events that factored into that difficult, highly personal decision; and the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family.

20.    Years later, in 2020, President Biden ran for and was elected President.

21.    On November 2, 2022, President Biden's personal counsel discovered classified documents within boxes of materials from his Vice Presidency, which were stored at the Penn Biden Center for Diplomacy and Global Engagement in Washington, D.C.  Through counsel, President Biden immediately reported the discovery.  He cooperated fully with the resulting investigation.

22. On January 12, 2023, Attorney General Merrick Garland appointed Special Counsel Robert K. Hur to investigate the possible unauthorized removal and retention of classified documents by President Biden. As Attorney General Garland explained, "[t]his appointment underscore[d] for the public the Department's commitment to both independence and accountability in particularly sensitive matters, and to making decisions indisputably guided only by the facts and the law."

23. In the course of the investigation, the Special Counsel's Office ("SCO") obtained from Zwonitzer an external hard drive containing materials related to his conversations with President Biden.

24. The Department obtained these materials subject to an agreement between the White House Counsel's Office and Special Counsel Hur, which provided that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office." Ex. A ¶ 1 (the "Agreement"); Ex. B.

25. The Agreement also required the Special Counsel's Office to provide President Biden "advance notice and a sufficient opportunity to challenge [any] disclosure" of the materials "outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public." *Id.* ¶ 5.

26. The SCO used forensic tools to recover deleted audio recordings of Zwonitzer's conversations with President Biden from the external hard drive that Zwonitzer produced.

27. Special Counsel Hur ultimately concluded that criminal charges against President Biden were unwarranted.

28.     Special Counsel Hur explained his decision in a 345-page report to the Attorney General, in which Hur "conclude[d] that the evidence d[id] not establish Mr. Biden's guilt beyond a reasonable doubt."  The report contained a detailed description of the investigation and provided fulsome explanations for Special Counsel Hur's decisions.

29.     Special Counsel Hur also explained that there were "several material distinctions" between the facts that Special Counsel Hur had found with respect to President Biden and the allegations in the indictment charging President Trump with mishandling classified documents. For example, President Trump "not only refused to return [classified] documents for many months" after being given the opportunity to do so to avoid prosecution, "but he also obstructed justice by enlisting others to destroy evidence and then to lie about it."  "In contrast," President Biden "turned in classified documents to the National Archives and the Department of Justice, consented to the search of multiple locations including his homes, sat for a voluntary interview, and in other ways cooperated with the investigation."

30.     Special Counsel Hur's report cited limited excerpts of President Biden's conversations with Zwonitzer.  All of these excerpts focused on President Biden's notes and other records related to official business as Vice President.

31.     On February 8, 2024, the Department published Special Counsel Hur's report on its website.

32.     In addition to releasing Special Counsel Hur's report to the public, the Department helped facilitate Special Counsel Hur's public testimony before Congress on March 12, 2024, concerning his investigation and decision to decline prosecution.  The day of Special Counsel Hur's congressional testimony, the Department also provided to Congress a transcript of President Biden's five-hour interview with Special Counsel Hur.

7

**The FOIA Request and Resulting Litigation**

33.     On February 9, 2024, Mike Howell, the President of the Oversight Project, submitted a FOIA request to the Department, seeking all "records relied upon by Special Counsel Hur in drafting [six particular] passages in the [Hur] Report relating to President Joseph R. Biden's memory and mental faculties." *Heritage v. DOJ*, ECF No. 6 ("Am. Compl.") ¶¶ 8-9;[1] *id.*, ECF No. 6-3 (the "FOIA Request").

34.     On March 6, 2024, the Heritage Plaintiffs filed the FOIA Action.  The Heritage Plaintiffs filed an amended complaint on March 13, 2024.

35.     After the Heritage Plaintiffs and the Department (collectively, the "FOIA Action Parties") completed partial summary judgment briefing on the adequacy of the Department's search for responsive records, ECF Nos. 21-22, 24-25, the Heritage Plaintiffs withdrew their challenge to the search's adequacy, ECF No. 28 at 2.

36.     On October 16, 2024, the Department issued a final response to the FOIA Request and released 117 pages of transcripts of conversations between President Biden and Zwonitzer. ECF No. 33-2 ("Weinsheimer Decl.").  These conversations took place on six occasions between October 10, 2016, and April 26, 2017.  The transcripts were heavily redacted pursuant to FOIA Exemptions 5, 6, and 7(C).  5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C).  They were created from audio recordings that the SCO obtained from Zwonitzer pursuant to the Agreement and were prepared by a court reporting service at the direction of the SCO, to facilitate the SCO's review of evidence.

37.     In November 2024, the FOIA Action Parties filed cross-motions for summary judgment on the Department's withholdings.  ECF Nos. 33-34.  The FOIA Action Parties completed briefing on their cross-motions in December 2024.  ECF Nos. 37-38.

---

[1] Unless otherwise indicated, citations to "ECF No. __" are to docket entries in *Heritage v. DOJ*.

38. In the Department's motion for summary judgment on its withholdings, the Department correctly described the "privacy interests" at stake in these materials as "undoubtedly enormous"—the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone . . . despite no charges having ever been brought, let alone charges relating to that private content." ECF No. 33-1 ("Def.'s Mem.") at 18.

39. Further, given the Department's publication of Special Counsel Hur's report and the "voluminous information" about the Special Counsel investigation already in the public domain—including hours of congressional testimony by Special Counsel Hur and transcripts of President Biden's and Zwonitzer's interviews with Special Counsel Hur—the Department asserted that "release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions." *Id.* at 14-15.

40. The Department concluded that disclosure of the audio recordings and transcripts would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." *Id.* at 1.

41. The summary judgment briefing involved the Department's withholdings of: (1) transcripts of President Biden and Zwonitzer's conversations that the SCO directed a court reporting service to prepare and (2) the corresponding audio recordings. By agreement of the FOIA Action Parties, the Heritage Plaintiffs sought the transcripts in their entirety but sought only the portions of audio recordings of President Biden and Zwonitzer's conversations that were quoted directly in the Hur Report. ECF No. 33-3 ¶ 28.

42. On September 23, 2025, the Court in the FOIA Action entered a minute order stating: "In light of the public release of other audio from the Special Counsel's investigation and developments in No. 24-cv-700, the parties shall file, on or before September 26, 2025, a joint

9

status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records." *Heritage v. DOJ*, Min. Order (Sept. 23, 2025).

43.    On September 26, 2025, the FOIA Action Parties filed a joint status report explaining that the Department had not made additional releases of records and was reviewing its withholdings.  ECF No. 42 at 1, 3.

44.    On September 27, 2025, the Court stayed the FOIA Action "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues." *Heritage v. DOJ*, Min. Order (Sept. 27, 2025).

45.    For more than seven months, the FOIA Action Parties conferred and filed periodic joint status reports.  Neither party has sought to lift the stay or requested any other relief from the Court.

**President Biden's Privacy Interests and the Department's Prior Position**

46.    President Biden—like every American—has a right to privacy in personal conversations he had within his own home.  That is particularly true here, where the Department obtained this information through a criminal investigation.

47.    For President Biden, his son Beau's battle with cancer played a role in the major decisions that President Biden faced during the consequential year that he recounted to Zwonitzer, including the decision whether to run for President in 2016.  As President Biden wrote in *Promise Me, Dad*, "[r]unning for the Democratic nomination was all tied up with Beau. . . . The thought of doing it without him was painful.  But as the days passed, the idea of not running started to feel like letting him down, like letting everybody down."

48.     The Department obtained Zwonitzer's recordings of his private conversations with President Biden as part of the Special Counsel's investigation.  That investigation resulted in no charges against President Biden.

49.     Bradley Weinsheimer, then an Associate Deputy Attorney General for the Department, provided a declaration setting forth the basis for the Department's withholdings in this action.  *See* Weinsheimer Decl.  Weinsheimer served for over twenty years as an Assistant United States Attorney in Washington, D.C.  He also served in the Department's National Security Division and Office of Professional Responsibility.  In 2018, Attorney General Jeff Sessions appointed Weinsheimer to serve as Associate Deputy Attorney General, the highest-ranking career position in the Department.

50.     Weinsheimer's conclusions were based in part on direct conversations with Special Counsel Hur and members of his staff.  *Id.* ¶ 2.

51.     As Weinsheimer explained, "[w]hen no charges are filed, . . . evidence gathered from private individuals that reveals their private conduct can be expected to be kept confidential, especially when that information may be highly personal."  *Id.* ¶ 24.  "For that reason, the Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties."  *Id.*  Weinsheimer further stated that "[r]elease of law enforcement records that reveal non-public private conduct poses substantial threats to [a] core tenet of American justice."  *Id.* ¶ 21.  These statements were, and continue to be, accurate.

52.     Weinsheimer also recognized that, in general, "conversations with a writing assistant to aid with drafting a memoir are analogous to an audio version of a personal diary."  *Id.* ¶ 22.  "Moreover, the conversations at issue are unusually sensitive," because "[t]hey were created

11

for the purpose of helping create a memoir that focused on a highly emotional period in President Biden's life." *Id.*  These statements were, and continue to be, accurate.

53.   The Department stated in its summary judgment brief that "[t]he privacy interests here are undoubtedly enormous."  Def.'s Mem. at 11.  This statement was, and continues to be, accurate.

54.   On the other side of the balance, Weinsheimer explained that "release of the recording would do very little (if anything) to advance the public's understanding of Special Counsel Hur's activities due to the substantial amount of information already in the public record." Weinsheimer Decl. ¶ 27; *see, e.g.*, *supra* ¶¶ 31-32.  These statements were, and continue to be, accurate.

55.   Accordingly, the Department represented to the Court that disclosure of the materials "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  Def.'s Mem. at 1.  This statement was, and continues to be, accurate.

56.   Put simply, the Department's career attorneys did not view the issues presented in this action as remotely close.

**The Department's About-Face and Present Intent to Disclose the Materials**

57.   The FOIA statute has not changed since the Department set forth its position on withholding in late 2024.

58.   The case law interpreting the relevant FOIA exemptions has not materially changed since the Department set forth its position on withholding in late 2024.

59.   President Trump was inaugurated on January 20, 2025.  At no point in the following year did the Department withdraw its summary judgment filings or notify the Court in the FOIA

Action of any change in its position. The FOIA Action was largely dormant until September 2025, when the Court entered a minute order directing submission of a joint filing regarding the case status.

60. Since briefing on the FOIA Action Parties' summary judgment motions concluded, the balance of interests has only tipped more sharply against disclosure.

61. President Biden is a private citizen who does not hold, and is not seeking, any government office.

62. Additionally, more information about Special Counsel Hur's investigation has entered the public record. For example, on May 19, 2025, the Department released the full audio recording of President Biden's interview with Special Counsel Hur.

63. On February 25, 2026—after defending the privacy interests underlying Exemptions 6 and 7(C) for approximately two years—the Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce certain audio recordings and transcripts, with limited redactions, to the Heritage Plaintiffs.

64. The Agreement required the Department to provide such notice to President Biden.

65. The Department provided no official explanation that reflected the consummation of the Department's decisionmaking for reversing its position in this action.

66. By phone, an attorney in the Department's Office of the Deputy Attorney General informed counsel for President Biden that the Department had reversed its position on withholding and intended to release 117 pages of transcript and the corresponding audio recordings.

67. President Biden's counsel and other representatives of the President promptly reviewed the materials at the Department. In the weeks that followed, President Biden's counsel

13

engaged with the Department's attorneys, with the goal of resolving this matter without resort to litigation.

68.    On the evening of March 19, 2026, an attorney in the Department's Office of the Deputy Attorney General called President Biden's counsel and stated that the Department had received a request from Congress and intended to produce the materials to Congress regardless of the outcome of the FOIA Action.

69.    The next day, President Biden's counsel asked the Department attorneys to provide the congressional request of which they had notified President Biden's counsel the previous evening.

70.    On March 23, 2026, the Department sent to President Biden's counsel a request from the Chair of the House Committee on the Judiciary, Representative Jim Jordan, for "[a]ll audio recordings of any interviews or conversations between Mark Zwonitzer and President Biden relating to Zwonitzer's ghostwriting work on President Biden's memoirs, *Promise Me, Dad* and *Promises to Keep*." Ex. C at 1. The stated purpose of the request is "to advance [the Committee's] oversight of the politicization of the Biden-Garland Department of Justice." *Id.* The written request is dated March 23, 2026, and the Department represented to President Biden's counsel on March 23 that this request was "received from House Judiciary today."

71.    March 23 is four days after March 19, the date on which the Department informed President Biden's counsel of its supposed existence.

72.    The Department ultimately refused to make most of the redactions to the materials that President Biden requested. These redactions were necessary to adequately protect the privacy interests of President Biden and third parties.

73.     On May 5, 2026, the Office of the Deputy Attorney General informed President Biden, through counsel, that the Department had made a final decision to release the materials, with limited redactions, to the Heritage Plaintiffs and to Congress on June 15.  The Department represented that its decision constitutes final agency action for the purposes of the APA.

74.     On May 8, the Department stated in a joint status report that it "intends to disclose the written transcript and audio recordings at issue in this matter, with redactions" (the "Materials"), to both the Heritage Plaintiffs and Congress on June 15, 2026.  *See* ECF No. 50 at 1.

75.     To date, President Biden has not received an official explanation that reflects the consummation of the Department's decisionmaking regarding the basis for the Department's reversal of position.  *See supra* ¶ 65.

76.     While President Biden's counsel have exchanged emails with Department attorneys regarding the issues in this action in the course of attempting to negotiate a resolution, those emails do not reflect the consummation of the Department's decisionmaking.  Moreover, their substance cannot be squared with binding Supreme Court and D.C. Circuit precedent.

77.     On May 12, 2026, Representative Jim Jordan—who signed the purported request dated March 23, 2026—gave an interview to Fox News.  He stated in part: "I think it's just important for the American people to know exactly where the President of the United States was. . . . [W]e'd like to see all that information, I think, to underscore what the Democrats were trying to hide just a few years ago."

78.     In that May 12 interview, Representative Jordan appeared to misunderstand the materials at issue.  For example, when asked about redacted transcripts and audio recordings from President Biden's conversations with Zwonitzer, he incorrectly stated that the Department had

"already released the transcript," that the Committee already "ha[d] the written transcript," and that the Committee was merely seeking "the audio recording as well."

**The Proposed Disclosure and the Requirements of the Privacy Act**

79.     The Privacy Act prohibits federal agencies from disclosing certain information about an individual to any person, or to another agency, without the individual's written consent, unless specified conditions are met.  5 U.S.C. § 552a.

80.     The Department has stated that it intends to disclose the Materials to the Heritage Plaintiffs and Congress on June 15, 2026.

81.     The Materials constitute a "record" or "record[s]" contained in one or more "system[s] of records" maintained by the Department of Justice, as defined in the Privacy Act, 5 U.S.C. § 552a(a)(4)-(5).   For example, FOIA processing records are maintained in DOJ-004: Freedom of Information Act, Privacy Act, and Mandatory Declassification Review.

82.     The Department may also have maintained the Materials in the following systems of records, among others: DOJ-003: Correspondence Management Systems for the Department of Justice; DOJ-006: Personnel Investigation and Security Clearance Records for the Department of Justice; FBI-002: FBI Central Records System; and CRM-001: Central Criminal Division Index File and Associated Records.

83.     On information and belief, at all relevant times, the Department maintained the Materials in one or more systems of records.

84.     On information and belief, Department of Justice officials retrieved the Materials from a system or systems of records using one or more personal identifiers.   President Biden's name is one such personal identifier.

85.    In addition, on information and belief, Department of Justice officials generally used personal identifiers to retrieve information about individuals from the relevant systems of records during the period in question.

86.    President Biden has not consented to disclosure of the Materials to the Heritage Plaintiffs or Congress.

87.    Disclosure of the materials would cause harm to President Biden, including in the form of costs to respond to the disclosure and other financial losses.

**COUNT I**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**

88.    Plaintiff Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 87, as if fully restated herein.

89.    The content, timing, and context of the Committee's purported request for the Materials suggest that the Department solicited the request from the Committee to circumvent FOIA's protection of law enforcement materials implicating personal privacy interests and to make an end-run around the pending FOIA Action.

90.    The Department's proposed disclosure is a pretextual attempt to disclose records reflecting President Biden's private conversations for the sake of exposure, among other improper purposes.

91.    The Materials long predate the Special Counsel investigation over which the Committee purports to be conducting oversight and could not possibly shed light on the "politicization of the Biden-Garland Department of Justice"—the Committee's stated purpose.

92.    The Committee's purported request is pretextual, lacks a legitimate legislative purpose, is outside the scope of the Committee's investigative powers under Article I of the Constitution, and is invalid and unenforceable.

93.    The Department failed to rationally explain the basis for its decision to voluntarily produce the Materials pursuant to an invalid and unenforceable congressional request.

94.    The Department's decision to release the Materials to the Committee is thus arbitrary and capricious.  5 U.S.C. § 706(2)(A).

### COUNT II
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Abuse of Discretion**

95.    Plaintiff Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 87, as if fully restated herein.

96.    The content, timing, and context of the Committee's purported request for the Materials suggest that the Department solicited the request from the Committee to circumvent FOIA's protection of materials implicating personal privacy interests and to make an end-run around the pending FOIA Action.

97.    The Department's proposed disclosure is a pretextual attempt to disclose records reflecting President Biden's private conversations for the sake of exposure, among other improper purposes.

98.    The Materials long predate the Special Counsel investigation over which the Committee purports to be conducting oversight and could not possibly shed light on the "politicization of the Biden-Garland Department of Justice"—the Committee's stated purpose.

99.     The Committee's purported request is pretextual, lacks a legitimate legislative purpose, is outside the scope of the Committee's investigative powers under Article I of the Constitution, and is invalid and unenforceable.

100.    The Department's decision to voluntarily produce the Materials to the Committee pursuant to an invalid and unenforceable congressional request has no rational basis.

101.    The Department's decision to release the Materials to the Committee is thus an abuse of discretion.  5 U.S.C. § 706(2)(A).

### COUNT III
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Contrary to Law Under the Privacy Act, 5 U.S.C. § 552a**

102.    Plaintiff Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 87, as if fully restated herein.

103.    The Department is an "agency" within the meaning of the Privacy Act and maintains one or more relevant "system[s] of records" as defined in the Privacy Act, 5 U.S.C. § 552a(a)(1), (5).

104.    At all relevant times, those "system[s] of records" contained "record[s]," as defined in 5 U.S.C. § 552a(a)(4), that pertain to and are about Plaintiff Joseph R. Biden, Jr., including audio recordings and transcripts associated with the investigation of Special Counsel Hur.

105.    The Privacy Act states: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ."  5 U.S.C. § 552a(b).  The Act provides a private cause of action "[w]henever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual."  5 U.S.C. § 552a(g)(1)(D).

19

106.    The Department has stated that it "intends to disclose the written transcript and audio recordings at issue in this matter, with redactions," to both the Heritage Plaintiffs and Congress on June 15, 2026.  Such disclosures would be willful and intentional.

107.    The proposed disclosure described in Paragraph 106 is not covered by any statutory exception or exemption.  In particular, while the statute permits disclosures "to either House of Congress, or, to the extent of the matter within its jurisdiction, any committee or subcommittee thereof," 5 U.S.C. § 552a(b)(9), the proposed disclosure is not covered by that exception because the Committee's purported request is pretextual, lacks a legitimate legislative purpose, is outside the scope of the Committee's investigative powers under Article I of the Constitution, and is invalid and unenforceable.  The Department's proposed disclosure is thus not a disclosure to "any [congressional] committee" as contemplated by the statute's exception for congressional disclosures.

108.    The proposed disclosure is not compatible with the purpose for which the records were collected and is not otherwise a permissible "routine use" of the records under the Privacy Act.  5 U.S.C. § 552a(b)(3).  For instance, while the records were collected for law enforcement purposes, the Department now proposes disclosing them for political purposes.

109.    The proposed disclosure would constitute an unwarranted invasion of President Biden's privacy.  President Biden's privacy interest is not outweighed by any public interest in the records' release.

110.    The Department's willful and intentional disclosure of records pertaining to and about President Biden would adversely affect him, including in the form of costs to respond to the disclosure and other financial losses.

**PRAYER FOR RELIEF**

WHEREFORE, on the basis of the foregoing, Plaintiff Joseph R. Biden, Jr., respectfully requests that the Court:

a)      Declare that the purported request from the Committee is pretextual, lacks a legitimate legislative purpose, is outside the scope of the Committee's investigative powers under Article I of the Constitution, and is invalid and unenforceable;

b)      Set aside the Department's decision to disclose the Materials to the Committee as arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A);

c)      Issue a preliminary injunction barring the Department and its officers, agents, and employees from disclosing the Materials to the Committee;[2]

d)      Permanently enjoin the Department and its officers, agents, and employees from disclosing the Materials to the Committee;

e)      Award Plaintiff reasonable attorney's fees and costs; and

f)      Grant such other and further relief as may be deemed just and proper.

*      *      *

---

[2] The Department has stated in a joint status report in the FOIA Action that it intends to disclose the Materials to the Heritage Plaintiffs and the Committee on June 15, 2026. *Heritage v. DOJ*, ECF No. 50 at 1. Plaintiff intends to file preliminary injunction motions in both actions, and he is conferring with the Department and the Heritage Plaintiffs regarding a proposed briefing schedule.

Dated: May 26, 2026                    Respectfully submitted,


                                       _____/s/ Amy Jeffress_____
                                       Amy Jeffress (D.C. Bar No. 449258)
                                       Kaitlin Konkel (D.C. Bar No. 1021109)
                                       Taisa M. Goodnature (D.C. Bar No. 90044537)*
                                       Jared M. Hirschfield (N.Y. Bar No. 6296933)*
                                       HECKER FINK LLP
                                       1050 K Street NW, 10th Floor
                                       Washington, D.C. 20001
                                       Tel: (212) 763-0883
                                       ajeffress@heckerfink.com
                                       kkonkel@heckerfink.com
                                       tgoodnature@heckerfink.com
                                       jhirschfield@heckerfink.com

                                       *Counsel for Plaintiff Joseph R. Biden, Jr.*

                                       \*Application for *pro hac vice* admission
                                       forthcoming

22