**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSEPH R. BIDEN, JR., | |
| *Plaintiff*, | |
| v. | No. 26-cv-1818 (TSC) |
| U.S. DEPARTMENT OF JUSTICE, | |
| *Defendant*. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION BY PLAINTIFF JOSEPH R. BIDEN, JR.</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .......................................................................................................................... 4

I.    The Records at Issue and the Special Counsel's Investigation........................................... 4

II.    Developments in the FOIA Action, the Department's About-Face, and the Purported Congressional Request........................................................................................................ 6

III.    The Coordinated Effort to Disclose President Biden's Private Information for Political Ends ............................................................................................................. 9

LEGAL STANDARD.................................................................................................................. 11

ARGUMENT .............................................................................................................................. 12

I.    President Biden Is Likely to Succeed on the Merits of His Claims Challenging the Department's Proposed Disclosure of His Private Information to the House Judiciary Committee.................................................................................................................... 12

    A.    The Department's Decision Is a Final Agency Action Subject to Review........... 12

    B.    The Department's Reliance on a Purported Request from the Committee Is Pretextual and Therefore Lacks a Reasoned Basis ................................................ 13

    C.    The Proposed Disclosure Is Otherwise Arbitrary and Capricious and an Abuse of Discretion ................................................................................ 21

    D.    Disclosure to the Committee Would Violate the Privacy Act ............................. 33

II.    President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction............. 41

III.    The Balance of Equities and the Public Interest Weigh Strongly in Favor of Preliminary Injunctive Relief........................................................................................... 43

IV.    The Bond Requirement Should Be Waived or Set to a Nominal Amount ....................... 44

CONCLUSION............................................................................................................................ 45

## TABLE OF AUTHORITIES

**CASES**

*AAR Airlift Grp., Inc. v. U.S. Transp. Command*,
    161 F. Supp. 3d 37 (D.D.C. 2015) ................................................................. 30, 31

*\*AFL-CIO v. Dep't of Lab.*,
    No. 25 Civ. 339, 2026 WL 879518 (D.D.C. Mar. 31, 2026) ............................ 34

*AFL-CIO v. Dep't of Lab.*,
    No. 25 Civ. 339, 2025 WL 1783899 (D.D.C. June 27, 2025) ........................... 42

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
    663 F.3d 476 (D.C. Cir. 2011) ........................................................................ 40

*All. for Retired Ams. v. Bessent*,
    770 F. Supp. 3d 79 (D.D.C. 2025) ......................................................... 9, 41, 42

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014) ...................................................................... 32

*Ames v. U.S. Dep't of Homeland Sec.*,
    861 F.3d 238 (D.C. Cir. 2017) .................................................................. 36, 38

*Armstrong v. Geithner*,
    608 F.3d 854 (D.C. Cir. 2010) ........................................................................ 40

*Barenblatt v. United States*,
    360 U.S. 109 (1959) ........................................................................................ 18

*Bartel v. FAA*,
    725 F.2d 1403 (D.C. Cir. 1984) ...................................................................... 36

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................ 13

*Brennan Ctr. for Just. v. U.S. Dep't of Just.*,
    697 F.3d 184 (2d Cir. 2012) ........................................................................... 32

*Brunotte v. Johnson*,
    892 F. Supp. 2d 199 (D.D.C. 2012) ............................................................... 36

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) .................................................................................. 14, 22

*Canning v. U.S. Dep't of Just.*,
  919 F. Supp. 451 (D.D.C. 1994)................................................................................ 24

*CASA, Inc. v. Trump*,
  793 F. Supp. 3d 687 (D. Md. 2025)........................................................................... 44

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006).................................................................................. 41

*Chichakli v. Tillerson*,
  882 F.3d 229 (D.C. Cir. 2018)............................................................................ 34, 38

*\*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979).................................................................................................. 14

*Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs.*,
  844 F. Supp. 770 (D.D.C. 1993)............................................................................... 21

*Comm. on Ways & Means v. U.S. Dep't of the Treasury*,
  45 F.4th 324 (D.C. Cir. 2022)............................................................................. 19, 21

*\*Conserve Sw. Utah v. U.S. Dep't of the Interior*,
  No. 26 Civ. 317, 2026 WL 569034 (D.D.C. Mar. 1, 2026)................................. 22, 24

*Council on Am.-Islamic Rels. v. Gaubatz*,
  667 F. Supp. 2d 67 (D.D.C. 2009)...................................................................... 42, 44

*Creed v. Nat'l Transp. Safety Bd.*,
  758 F. Supp. 2d 1 (D.D.C. 2010)............................................................................... 13

*Ctr. for Taxpayer Rts. v. IRS*,
  815 F. Supp. 3d 1 (D.D.C. 2025)........................................................................ 42, 43

*\*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)......................................................................................... *passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)...................................................................................................... 31

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999).................................................................................... 44

*Eagle Broad. Grp., Ltd. v. FCC*,
  563 F.3d 543 (D.C. Cir. 2009).................................................................................. 21

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ........................................................................................ 20

*Escobar Molina v. U.S. Dep't of Homeland Sec.,*
    811 F. Supp. 3d 1 (D.D.C. 2025) .................................................................... 44

*\*Exxon Corp. v. FTC,*
    589 F.2d 582 (D.C. Cir. 1978) ........................................................................ 20

*\*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................. 22, 24, 32, 33

*FTC v. Grolier Inc.,*
    462 U.S. 19 (1983) .......................................................................................... 23

*Gomez v. Trump,*
    485 F. Supp. 3d 145 (D.D.C. 2020) ................................................................ 33

*Henke v. U.S. Dep't of Com.,*
    83 F.3d 1453 (D.C. Cir. 1996) ........................................................................ 40

*Hill v. U.S. Dep't of the Interior,*
    151 F.4th 420 (D.C. Cir. 2025) ...................................................................... 13

*Hosp. Staffing Sols., LLC v. Reyes,*
    736 F. Supp. 2d 192 (D.D.C. 2010) ................................................................ 42

*Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.,*
    394 F. Supp. 3d 67 (D.D.C. 2019) .................................................................. 25

*Jud. Watch v. Nat'l Archives & Recs. Admin.,*
    876 F.3d 346 (D.C. Cir. 2017) ........................................................................ 41

*Jud. Watch v. U.S. Dep't of Just.,*
    No. 24 Civ. 700 (D.D.C. May 20, 2025) .......................................................... 7

*\*League of United Latin Am. Citizens v. Exec. Off. of the President,*
    818 F. Supp. 3d 34 (D.D.C. 2026) .................................................................. 34

*League of Women Voters of the U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................................................ 11, 12, 43

*Londrigan v. FBI,*
    670 F.2d 1164 (D.C. Cir. 1981) ...................................................................... 34

*Maydak v. United States*,
        630 F.3d 166 (D.C. Cir. 2010) ................................................................................ 39, 40

*McCready v. Nicholson*,
        465 F.3d 1 (D.C. Cir. 2006) ........................................................................................ 38

*McGrain v. Daugherty*,
        273 U.S. 135 (1927) ............................................................................................ 18, 43

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
        778 F. Supp. 3d 1 (D.D.C. 2025) ................................................................................ 11

*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
        463 U.S. 29 (1983) ..................................................................................... 14, 22, 30

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
        783 F. Supp. 3d 290 (D.D.C. 2025) ............................................................................ 44

*\*Nat'l Archives & Records Admin. v. Favish*,
        541 U.S. 157 (2004) .................................................................................................... 25

*Nat'l Tel. Coop. Ass'n v. FCC*,
        563 F.3d 536 (D.C. Cir. 2009) .................................................................................... 14

*Nken v. Holder*,
        556 U.S. 418 (2009) ............................................................................................ 11, 43

*Northern Mariana Islands v. United States*,
        686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................................ 43

*Northrop Grumman Sys. Corp. v. NASA*,
        346 F. Supp. 3d 109 (D.D.C. 2018) ............................................................................ 13

*NTEU v. Trump*,
        No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ....................................... 44

*Paige v. DEA*,
        665 F.3d 1355 (D.C. Cir. 2012) .................................................................................. 39

*Pilon v. U.S. Dep't of Just.*,
        73 F.3d 1111 (D.C. Cir. 1996) .................................................................................... 36

*Prill v. NLRB*,
        755 F.2d 941 (D.C. Cir. 1985) .................................................................................... 33

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ........................................................................... 11

*Quinn v. United States*,
   349 U.S. 155 (1955) ............................................................................................ 18

*Roth v. U.S. Dep't of Just.*,
   642 F.3d 1161 (D.C. Cir. 2011) ......................................................................... 23

*SafeCard Servs. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ......................................................................... 24

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) .............................................................................................. 14

*\*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ............................................................................... 22, 31, 31

*Simms v. District of Columbia*,
   872 F. Supp. 2d 90 (D.D.C. 2012) ..................................................................... 44

*In re Smith*,
   656 F.2d 1101 (5th Cir. 1981) ........................................................................... 28

*\*Tijerina v. Walters*,
   821 F.2d 789 (D.C. Cir. 1987) ...................................................................... 35, 36

*Tobey v. NLRB*,
   40 F.3d 469 (D.C. Cir. 1994) ............................................................................. 38

*Troy Corp. v. Browner*,
   120 F.3d 277 (D.C. Cir. 1997) ........................................................................... 21

*Trump v. Mazars USA, LLP*,
   39 F.4th 774 (D.C. Cir. 2022) ............................................................................ 19

*\*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020) ...................................................................................... *passim*

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021) .............................................................................. 21

*Truong v. U.S. Citizenship & Immigr. Servs.*,
   No. 21 Civ. 316, 2022 WL 17356865 (D.D.C. Dec. 1, 2022) .......................... 40

*Venetian Casino Resort, LLC v. EEOC,
530 F.3d 925 (D.C. Cir. 2008) ........................................................................... 15

Waterkeeper All., Inc. v. Wheeler,
330 F.R.D. 1 (D.D.C. 2018) ............................................................................ 9, 41

Watkins v. United States,
354 U.S. 178 (1957) ....................................................................................... 19, 20

Whitmore v. U.S. Dep't of Just.,
132 F. Supp. 3d 69 (D.D.C. 2015) ..................................................................... 24

**STATUTES**

5 U.S.C. § 552 ................................................................................................... 1, 23

5 U.S.C. § 552a ............................................................................................... passim

5 U.S.C. § 704 ....................................................................................................... 12

5 U.S.C. § 706 ................................................................................................... 2, 31

26 U.S.C. § 6103 .................................................................................................. 21

**FEDERAL RULES**

Fed. R. Civ. P. 65 ................................................................................................. 44

**FEDERAL REGULATIONS**

28 C.F.R. § 600.9 ................................................................................................. 33

**OTHER AUTHORITIES**

Application of Privacy Act Congressional-Disclosure Exception to Disclosures to
Ranking Minority Members,
25 Op. O.L.C. 289 (2001) .................................................................................. 36

Everyone Knew that Biden Wasn't 'Up for the Job' as President,
Says Rep. Jim Jordan, Fox Business,
(June 5, 2025), https://www.foxbusiness.com/video/6373928443112 ...................... 10, 37

FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y,
https://www.justice.gov/oip/available-documents-oip ......................................... 7

Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review—*
*Review of District Court Decisions & Agency Actions* (2007) ......................................... 21

*History of Refusals by Executive Branch Officials to Provide*
*Information Demanded by Congress*,
6 Op. O.L.C. 782 (1983) ...................................................................................... 27, 29

Letter from Carlos Felipe Uriarte, Asst. Att'y Gen., to Jim Jordan,
Chairman, H. Comm. on the Judiciary, and James Comer,
Chairman, H. Comm. on Oversight & Accountability
(Apr. 25, 2024), https://www.justice.gov/ola/media/1385541/dl ..................................... 28

*Response to Congressional Requests for Information Regarding*
*Decisions Made Under the Independent Counsel Act*,
10 Op. O.L.C. 68 (1986) ................................................................................................ 26

*Trump Eyes 'Project Freedom' Revival*
*as Iran Tensions Surge in Strait of Hormuz*, Fox Business,
(May 12, 2026), https://www.foxbusiness.com/video/6395325807112 ........................... 16

**INTRODUCTION**

President Biden seeks a preliminary injunction to stop the U.S. Department of Justice (the "Department") from disclosing sensitive law enforcement records—recordings and transcripts of personal conversations that took place at his home in 2016 and 2017—to members of Congress without restrictions and with insufficient redactions. These conversations were never intended to be shared with a wider audience, and the Department has them only because it collected the recordings as part of a criminal investigation that resulted in no charges. Indeed, the Department agreed in writing that these materials would "be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation" of Special Counsel Robert K. Hur regarding President Biden's handling of classified documents. That Special Counsel investigation concluded in February 2024.

Absent a court order prohibiting it, the Department plans to produce the recordings and transcripts at issue to the House Judiciary Committee (the "Committee") on June 15, 2026. On the same day, the Department plans to disclose the materials to the Heritage Foundation and Mike Howell (the "Heritage Plaintiffs") in connection with a lawsuit they filed under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, in early 2024. *See Heritage Found. v. U.S. Dep't of Just.*, No. 24-cv-645 (DLF) (D.D.C.) ("*Heritage v. DOJ*" or the "FOIA Action").

Under ordinary circumstances, the Department would vigorously defend the privacy and law enforcement interests at stake in these records, including by applying long-settled principles to withhold them from disclosure under FOIA. In fact, in litigating the FOIA Action for almost two years, the Department did exactly that. The Department's decision to defend these longstanding principles was unremarkable—it was the kind of straightforward application of the law that is the daily work of any independent Justice Department. Government lawyers reviewed the case, determined that the FOIA exemptions applied, produced material that was not exempt,

and explained their reasoning in detailed declarations filed with the Court.

But these are not ordinary circumstances, and the Department is not operating through normal channels. It is not ordinary for the Department to abandon its duty to protect law enforcement records containing sensitive personal information, instead offering them up to political operatives in the guise of a FOIA settlement. It is not routine for the statements of top Department officials to be indistinguishable from the made-for-TV attacks of those political operatives. It is not typical for purported congressional requests to materialize in the midst of pending FOIA litigation, seeking the same records, and for the Department to eagerly and immediately offer to produce the requested material. And it is not normal—nor should it be—for the President of the United States to brand a fellow former President "A Crooked Politician!!!" because the former President has filed a lawsuit so that an impartial federal court can protect rights that the Department of Justice, operating under President Trump's banner, is failing to defend.

The Department's unexplained deviations from regular practice matter for purposes of the Administrative Procedure Act ("APA"), the statute under which President Biden is challenging the Department's proposed disclosure of his private conversations to the Committee. That statute provides a mechanism for courts to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). That is, the APA requires agency action to be both reasonable and reasonably explained. The relevant laws have not changed since Department attorneys determined in late 2024 that the materials should be treated as law enforcement records implicating serious privacy interests, but nonetheless, the Department has reversed course. The Department has yet to offer any formal explanation for its decision. That may well be because the decision is nakedly political, lacking any basis in law.

2

The Department previously determined, and explained in no uncertain terms in filings in the FOIA Action, that the recordings and transcripts should be treated as law enforcement records containing an uncharged individual's private information—a category of material that the Department regularly refuses to provide to Congress or provides only after ensuring that sufficient redactions and conditions are in place. In the Department's own words, release of President Biden's private conversations "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." Declaration of Amy Jeffress ("Jeffress Decl.") ¶ 34 & Ex. 1 (*Heritage v. DOJ*, Defendant's Memorandum of Law ("Def.'s Mem.")) at 1. Such release would also inhibit law enforcement in the future, thereby threatening public safety. The Department's highest-ranking career official, who served across administrations for more than 30 years, explained in a declaration that "the Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties." Jeffress Decl. ¶ 35 & Ex. 2 (*Heritage v. DOJ*, Declaration of Bradley Weinsheimer ("Weinsheimer Decl.")) ¶ 24. As that official explained, the "[r]elease of law enforcement records that reveal non-public private conduct poses substantial threats to [a] core tenet of American justice." *Id.* ¶ 21.

President Biden has intervened in the FOIA Action and brought this separate lawsuit to protect his privacy interests and to advocate for the faithful application of the law, given that the Department has abandoned its duty to do so in this matter. All of the preliminary injunction factors weigh in his favor: (1) he is likely to succeed on the merits of his claims; (2) he will suffer irreparable harm in the absence of preliminary relief; and (3) the balance of equities and the public interest support a preliminary injunction. For the reasons explained below, the Court should set aside the Department's decision and enjoin its disclosure of the recordings and transcripts at issue.

## BACKGROUND

### I.    The Records at Issue and the Special Counsel's Investigation

Beginning in the spring of 2016, President Biden met periodically with his writing partner, Mark Zwonitzer, to discuss what would become President Biden's 2017 memoir, *Promise Me, Dad*. Weinsheimer Decl. ¶ 10. In these private conversations—which took place in President Biden's home in 2016 and 2017—President Biden recounted one of the most politically consequential and personally painful years of his life, beginning on Thanksgiving in 2014. *Id.* ¶¶ 10, 12-13. Then-Vice President Biden served the final year of his term in that office and considered a run for the Presidency in 2016. *Id.* ¶¶ 12-13. All the while, President Biden's eldest son, Beau, battled brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six. Pressing decisions that President Biden faced about his political future were inextricably intertwined with Beau. *Id.* Candidly reflecting on this time in his life, President Biden discussed with Zwonitzer a range of sensitive topics, including the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family; the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; and the many other voices and events that factored into that difficult, highly personal decision. *See id.* ¶¶ 13, 16.

Zwonitzer recorded these conversations for his personal use in working with President Biden on *Promise Me, Dad*. *Id.* ¶¶ 10, 13. Both men understood that they were speaking privately, and the recordings were never intended to be released to the public in verbatim form. *See id.* ¶ 13 ("The recorded conversations reflect source material; the book that resulted from that source material was only released to the public after subsequent drafting and editing.").

Years later, in 2020, President Biden ran for and was elected President. In 2023, Attorney General Merrick Garland appointed Special Counsel Robert K. Hur to investigate the possible unauthorized removal and retention of classified documents by President Biden. *Id.* ¶ 5. As the

Special Counsel's final report reflects, President Biden cooperated with the investigation—including by sitting for a voluntary interview while he was serving as President—and Special Counsel Hur ultimately concluded that criminal charges against President Biden were unwarranted and that "the evidence d[id] not establish Mr. Biden's guilt beyond a reasonable doubt." Jeffress Decl. ¶ 36 & Ex. 3 ("Hur Report") at 1, 11.

In the course of Special Counsel Hur's investigation, the Department obtained materials related to Zwonitzer's conversations with President Biden in 2016 and 2017. Weinsheimer Decl. ¶ 11. The Special Counsel's 345-page final report to Attorney General Garland, which the Department later published on its website, cited limited excerpts of President Biden's conversations with Zwonitzer, all of which focused on President Biden's notes and other records related to official business as Vice President. Hur Report at 65, 75-77, 106, 110-11, 236-37. The Department obtained these materials subject to an agreement between the White House Counsel's Office and the Special Counsel's Office, which provided that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office." Complaint ("Compl.") Ex. A ("Agreement") ¶ 1, ECF No. 1-1; *see* Jeffress Decl. ¶¶ 8, 31. The Agreement also required the Special Counsel's Office to provide President Biden "advance notice and a sufficient opportunity to challenge [any] disclosure" of the materials "outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public." Agreement ¶ 5; *see* Jeffress Decl. ¶ 9. The Agreement applies to the materials at issue here. Compl. Ex. B, ECF No. 1-2; *see* Jeffress Decl. ¶ 10.

II.    **Developments in the FOIA Action, the Department's About-Face, and the Purported Congressional Request**

On February 9, 2024, Mike Howell submitted the relevant FOIA request to the Department for certain "[r]ecords [r]elied [u]pon by Special Counsel Robert K. Hur." Am. Compl. Ex. 2 (the "FOIA Request"), *Heritage v. DOJ*, ECF No. 6-3. On March 6, 2024, the Heritage Plaintiffs filed the FOIA Action against the Department. *Heritage v. DOJ*, ECF No. 1. On October 16, 2024, the Department issued a final response to the FOIA request and released 117 redacted pages of transcripts of conversations between President Biden and Zwonitzer that occurred between October 10, 2016, and April 26, 2017. Weinsheimer Decl. ¶ 4 & Ex. B. The unredacted portions of the Department's final response correspond to the material quoted in the Hur Report. *Compare* Weinsheimer Decl. Ex. B, *with* Hur Report at 65, 75-77, 106, 110-11, 236-37. In November 2024, the parties filed cross-motions for summary judgment on the validity of the Department's withholdings pursuant to FOIA. *Heritage v. DOJ*, ECF Nos. 33-34. Those motions have been fully briefed since December 23, 2024. *See Heritage v. DOJ*, ECF No. 38.

The Department's motion correctly described the "privacy interests" at stake in these materials as "undoubtedly enormous"—the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone . . . despite no charges having ever been brought, let alone charges relating to that private content." Def.'s Mem. at 11. Further, given the Department's publication of Special Counsel Hur's report and the "voluminous information" about the Special Counsel investigation already in the public domain—including hours of congressional testimony by Special Counsel Hur and transcripts of President Biden's and Zwonitzer's interviews with Special Counsel Hur—the Department asserted that "release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions." *Id.* at 14-15. Thus, the Department concluded that disclosure of the audio

6

recordings and transcripts would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." *Id.* at 1.

On September 23, 2025, in response to the Department's May 2025 release of more than five hours of audio recordings of President Biden's interview with Special Counsel Hur,[1] the court in the FOIA Action directed the parties to "file . . . a joint status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records." *Heritage v. DOJ*, Min. Order (Sept. 23, 2025).  In the joint status report that followed, the parties explained that the Department had not made additional releases of records and was reviewing its withholdings.  *Heritage v. DOJ*, ECF No. 42.

On September 27, 2025, the court stayed the FOIA Action "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues."  *Heritage v. DOJ*, Min. Order (Sept. 27, 2025).  The FOIA Action remains stayed, and until President Biden's recent intervention, the only substantive activity in the case after September 27, 2025, has been the filing of joint status reports and minute orders extending the stay.  *Heritage v. DOJ*, ECF Nos. 43-50.

On February 25, 2026, pursuant to the Agreement, the Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce the audio recordings and transcripts at issue in this action to the Heritage Plaintiffs with only very limited redactions.  Jeffress Decl. ¶¶ 11, 13.  Counsel for President Biden subsequently engaged with the Department in an effort to resolve this matter without litigation.  *See id.* ¶¶ 13-29.

---

[1] *See* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66; *Interview Between Special Counsel Robert Hur et al. and Joseph R. Biden, Jr. {October 8, 2023 - October 9, 2023}*, FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y, https://www.justice.gov/oip/available-documents-oip.

On March 19, 2026, while these conversations were ongoing, the Department reported to counsel for President Biden that it intended to comply with a request from Congress for the very same materials the Department intended to produce to the Heritage Plaintiffs. *Id.* ¶ 20. Counsel for President Biden asked for a copy of the written request. *Id.* ¶ 21. On March 23, 2026, the Department shared the congressional request that it had purportedly described the previous week, stating that it was "received from House Judiciary today." *Id.* ¶ 22. The request was dated March 23, 2026, four days after the Department described it to President Biden's counsel and three days after counsel requested the written document. *Id.* ¶ 23. The request sought "[a]ll audio recordings of any interviews or conversations between Mark Zwonitzer and President Biden relating to Zwonitzer's ghostwriting work on President Biden's memoirs, *Promise Me, Dad* and *Promises to Keep*," in order to, purportedly, "advance [the Committee's] oversight of the politicization of the Biden-Garland Department of Justice." *Id.* ¶¶ 22, 33 & Ex. C at 1.

On May 5, 2026, the Department informed President Biden it had made a final decision to release the recordings and transcripts at issue—with redactions that are wholly inadequate to protect the privacy interests of President Biden and of third parties—on June 15, 2026, unless President Biden obtains a court order blocking release by that date. *Id.* ¶¶ 25-29. The Department declined to make the recordings and transcripts available to the Committee's members and staff in a closed reading room at the Department. *Id.* ¶¶ 28-29.

On May 12, 2026, President Biden moved to intervene in the FOIA Action, seeking to enjoin the Department from producing the recordings and transcripts to the Heritage Plaintiffs or to the House Judiciary Committee. *Heritage v. DOJ*, ECF No. 51. Recognizing President Biden's "right to protect his privacy interests," the court granted his intervention motion "as to the Department's production of the Zwonitzer materials to the [Heritage Plaintiffs]." *Heritage v. DOJ*,

ECF No. 63 ("Intervention Order") at 5.  The court reasoned that "[t]he sensitive nature of the Zwonitzer materials means that Biden's privacy interests are likely substantial" and that "the audio tapes and transcripts, if disseminated, 'would result in a substantial change in the status quo with respect to those [privacy] interests, such that the task of reestablishing the status quo' would be impossible." *Id.* at 8 (quoting *Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 7 (D.D.C. 2018)). The court also explained that disclosure of these materials would cause "concrete harm to [President Biden's] privacy similar to those injuries addressed by the common-law tort of intrusion upon seclusion" given that the Department's proposed "intrusion into [President Biden's] private affairs, including personal thoughts regarding the death of a family member, 'would be highly offensive to a reasonable person.'" *Id.* at 6 (quoting *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025)).  The court denied intervention as to President Biden's "cross-claims regarding the Department's production of such materials to the House Judiciary Committee," explaining that permitting those claims would expand the action beyond its original scope.  *Id.* at 12-13.  President Biden filed this action to pursue his claims against the Department in connection with the proposed disclosure to the Committee.

III.    **The Coordinated Effort to Disclose President Biden's Private Information for Political Ends**

The public record reflects striking alignment between the White House, top Department of Justice officials, Representative Jim Jordan, and the Heritage Plaintiffs in their targeting of President Biden, including in connection with theories that link Special Counsel Hur's investigation, President Biden's mental state, and claims about President Biden's use of an autopen.  The alignment between these disparate actors—two of which purportedly are opponents in the FOIA Action, and one of which (Representative Jim Jordan) has issued a supposedly independent records request—bears directly on the purposes of the proposed disclosure under the

9

Privacy Act and the Department's reasons for its new position under the APA.

Their relevant statements include the following:

- On June 4, 2025, the Trump White House issued a memorandum directing the review of certain presidential actions under the Biden Administration, including "who ran the United States while President Biden was in office." The memorandum directed investigation on topics related to "Biden's mental state" and "the circumstances surrounding Biden's purported execution of the numerous executive actions during his final years in office, examining policy documents signed with an autopen, who authorized its use, and the validity of the resulting Presidential policy decisions." It stated that "[t]he combined nature of Biden's documented cognitive decline and the repeated use of an autopen raises serious concerns about the legitimacy of his actions." Jeffress Decl. ¶ 38 & Ex. 5.

- In the same memorandum, the Trump White House expressly linked its claims about President Biden's mental state to Special Counsel Hur's investigation and non-prosecution decision, falsely stating: "Reports indicate that, for years, Biden suffered from serious cognitive decline. For example, although the Department of Justice found that Biden had violated the law by willfully retaining and disclosing classified materials, it ultimately concluded that Biden was unfit to stand trial given his incompetent mental state." *Id.*

- The same memorandum quotes President Trump as saying: "And you know what, they ought to find out who was using that autopen. Because whoever that person was, he or she was like the President of the United States . . . I think a President should sign it, not use an autopen." *Id.* (alteration in original).

- In a June 5, 2025, Fox Business interview, Representative Jim Jordan discussed the autopen investigation and stated: "Everyone knows [Biden] wasn't up for the job" as president. *Everyone Knew that Biden Wasn't 'Up for the Job' as President, Says Rep. Jim Jordan*, Fox Business, at 0:25 (June 5, 2025), https://www.foxbusiness.com/video/6373928443112.

- In a March 6, 2025, post on X, Plaintiff Mike Howell wrote: "There is a constitutional process to deal with an incapacitated POTUS and it doesn't contemplate giving someone else his autopen and authority. It's called the 25th Amendment and the conspiracy not to invoke it in order to keep whatever they were doing going is a big problem." Jeffress Decl. ¶ 39 & Ex. 6.

- In an August 21, 2025, post on X, *Heritage v. DOJ* Plaintiff Mike Howell wrote: "theres [*sic*] now a generation of dem WH staffers who were planning to rely on titles that showed a proximity to a president that now cant [*sic*] do that they should have to update their linkedins to things like Special Assistant to the Autopen." Jeffress Decl. ¶ 40 & Ex. 7.

- On September 26, 2025, the Heritage Plaintiffs asserted in the FOIA Action: "This case is still of great relevance to on-going national discourse regarding President Joseph R. Biden's use of the autopen and whether President Biden—or a 'politburo' of unelected officials *actually* ran the Country." *Heritage v. DOJ*, ECF No. 42 at 1.

10

- On October 27, 2025, the Oversight Project of the Heritage Foundation issued a report titled "The Autopen Presidency Part IV." Jeffress Decl. ¶ 41 & Ex. 8.

- In an October 28, 2025, post on X, then-Attorney General Pam Bondi wrote: "My team has already initiated a review of the Biden administration's reported use of autopen for pardons. @RepJamesComer's new information is extremely helpful, and his leadership on this issue is invaluable. We'll continue working with @GOPoversight to deliver accountability for the American people." Jeffress Decl. ¶ 42 & Ex. 9.

- In a December 15, 2025, post on X, *Heritage v. DOJ* Plaintiff Mike Howell explained that, in the summer of 2024, he and his team searched for ways to "accelerate" President Biden's "exit," and that one such way was "intense litigation to obtain the audio of President Biden's interview with Special Counsel Hur." Jeffress Decl. ¶ 43 & Ex. 10.

- In the same post, Plaintiff Mike Howell stated that "Joe Biden wasn't the President, an autopen was." He further stated: "President Trump has brought up the autopen perhaps more than any other topic. He has called it the scandal of the century." *Id.*

- In a May 10, 2026, post on X, Jeff Clark, counsel of record for the Heritage Plaintiffs in the FOIA Action, referred to this action as "our case against DOJ that started in [*sic*] Biden autopen administration." Jeffress Decl. ¶ 44 & Ex. 11.

- On May 16, 2026, the Heritage Plaintiffs asserted in their opposition to President Biden's motion to intervene in the FOIA Action: "President Biden clearly was in cognitive decline over his Term and in particular in 2024. . . . President Trump has deemed this issue 'one of the most dangerous and concerning scandals in American history.'" *Heritage v. DOJ*, ECF No. 59 at 4-5 (citation omitted).

- In a May 26, 2026, post on Truth Social, President Trump responded to an article about President Biden's filing of this lawsuit with the statement: "A Crooked Politician!!!" Jeffress Decl. ¶ 45 & Ex. 12.

## LEGAL STANDARD

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). "Where a federal agency is the defendant, the last two factors merge." *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 7 (D.D.C. 2025); *accord Nken v. Holder*, 556 U.S. 418, 435-36 (2009).

11

**ARGUMENT**

President Biden satisfies all of the preliminary injunction factors: (1) he is likely to succeed on the merits of his claims; (2) he will suffer irreparable harm in the absence of preliminary relief; and (3) the balance of the equities and the public interest weigh strongly in his favor. *See League of Women Voters*, 838 F.3d at 6.

**I.    President Biden Is Likely to Succeed on the Merits of His Claims Challenging the Department's Proposed Disclosure of His Private Information to the House Judiciary Committee**

President Biden is likely to prevail on his claims. The Department's decision to disclose the materials to the Committee—which it plans to do with insufficient redactions, and without placing them in a reading room or imposing other restrictions, Jeffress Decl. ¶¶ 25, 29—is a final agency action that is arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA. *First*, the Department's purported reliance on a "request" from the Committee is wholly pretextual, and there can be no legitimate legislative purpose in a request engineered by the Department to circumvent its statutory obligations and its own policy and practice. *Second*, the proposed disclosure is not reasonable or reasonably explained in light of the Department's prior determination that the materials should be treated as law enforcement records entitled to protection, as well as the Department's longstanding policies and practices regarding the disclosure of such materials to Congress. *Third*, the Privacy Act prohibits the proposed disclosure to the Committee under these circumstances, and the APA authorizes the Court to enjoin disclosure on that basis alone.

**A.    The Department's Decision Is a Final Agency Action Subject to Review**

The Department's decision to produce the materials to the Committee on June 15, 2026, absent a court order barring release, constitutes "final agency action . . . subject to judicial review" under the APA. 5 U.S.C. § 704. The decision satisfies the two requirements of final agency action:

12

It "'marks the consummation of the agency's decisionmaking process' and is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hill v. U.S. Dep't of the Interior*, 151 F.4th 420, 428 (D.C. Cir. 2025) (citation modified) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  The Department's decision—communicated by phone to President Biden's counsel on May 5, 2026, Jeffress Decl. ¶ 29, and memorialized in a joint status report filed in the FOIA Action on May 8, *see Heritage v. DOJ*, ECF No. 50 at 1—is conclusive, "not tentative, advisory, or interlocutory." *Creed v. Nat'l Transp. Safety Bd.*, 758 F. Supp. 2d 1, 7 (D.D.C. 2010).  And, as the Court in the FOIA Action has recognized, the Department's decision to release the information threatens President Biden's "legally protected interest in his privacy." Intervention Order at 7; *see also id.* at 6 (concluding that, for purposes of the motion to intervene, "production of the Zwonitzer materials will cause concrete harm to [President Biden's] privacy").

Indeed, the Department expressly represented to President Biden's counsel that its decision is final agency action.  Jeffress Decl. ¶ 29; *see Northrop Grumman Sys. Corp. v. NASA*, 346 F. Supp. 3d 109, 115, 118-21 (D.D.C. 2018) (reviewing agency decision to disclose confidential materials where agency "informed [third party] that its decision constituted final agency action with respect to the matter" (citation modified)); *Creed*, 758 F. Supp. 2d at 7 (explaining that agency's communication to third party of its intent to disclose materials publicly was a "conclusive determination[]" and thus "final order[]").

**B.      The Department's Reliance on a Purported Request from the Committee Is Pretextual and Therefore Lacks a Reasoned Basis**

Because the Department's reliance on the purported congressional request is pretextual, the Department's decision to disclose President Biden's private information to the Committee violates the APA.  The facts show that the Department obtained the "request" as part of an attempted end-run around its questionable legal position in the FOIA Action and its obligations

13

under the Privacy Act. *See infra* Argument Sections I.C, I.D. Agency action premised on pretext violates the APA categorically. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). The same pretextual scheme also renders the request itself invalid and unenforceable: A congressional "request" engineered by the Department to circumvent the Department's statutory obligations cannot serve a legitimate legislative purpose. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 870 (2020) (requiring "detailed and substantial . . . evidence of Congress's legislative purpose" for congressional requests for a President's private information). The Department's exclusive reliance on an invalid "request" lacks a reasoned basis, and the Department's decision therefore further violates the APA.

Regardless of an agency's authority to release materials in its possession, its discretionary decision to produce materials that implicate a third party's statutorily protected interests is final agency action subject to APA review. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979). As reviewable agency action, an agency's decision to release such materials is subject to the bedrock principles of administrative law.

Accordingly, the agency must "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); *see also Dep't of Com.*, 588 U.S. at 780 ("[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962), and citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943))). Put simply, agency action must "be reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). An agency cannot rest its decision on a "pretextual basis" that conceals its actual motivation for the decision. *Dep't of Com.*, 588 U.S. at 780, 785; *see also id.* at 785 (pretextual agency action lacks the "explanation" "call[ed] for" by

14

"[r]easoned decisionmaking under the [APA]"). Where "an explanation for agency action . . . is incongruent with what the record reveals about the agency's priorities and decisionmaking process," the action violates the APA. *Id.*

The Department's planned disclosure to the Committee violates the APA because it rests on a pretextual basis. To be sure, the Department can point to a written "request" from the Committee. Compl. Ex. C; Jeffress Decl. ¶ 33. That is, there is a signed letter on Committee letterhead, dated March 23, 2026, requesting certain audio recordings "to advance our oversight of the politicization of the Biden-Garland Department of Justice." Compl. Ex. C; *see* Jeffress Decl. ¶ 22. But the timing, sequence, and context of events do not support the Department's claim that it is producing the materials "pursuant to a request from the Chair of the House Judiciary Committee." *Heritage v. DOJ*, ECF No. 50 at 1; *see Dep't of Com.*, 588 U.S. at 784-85 (looking to "unusual circumstances" and timing of agency action). Rather, the evidence strongly suggests that the request was a product of—not the rationale for—the Department's intent to disseminate these materials. *Cf. Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 934-35 (D.C. Cir. 2008) (agency action violates the APA where "the only cognizable justification" is to create a "'back door' that allows the [agency] unlawfully to" release materials that it would not otherwise be permitted to release).

"[V]iewing the evidence as a whole" only bolsters the conclusion that the Department's rationale for its voluntary production to the Committee is pretextual. *Dep't of Com.*, 588 U.S. at 783. On March 19, 2026, a Department attorney informed President Biden's counsel that the Department intended to produce the materials in response to a request it had received from Congress. Jeffress Decl. ¶ 20. At that time, the Hur Report had been public for two years, and the FOIA Action had been pending for the same amount of time. Yet by the Department's own

15

account, the Committee issued the request only after the Department notified President Biden in March 2026 of the planned disclosure in the FOIA Action, which the Department knew was likely to invite legal challenge. In fact, the Department informed President Biden's counsel of the existence of a congressional request the evening before President Biden's counsel were scheduled to discuss that planned disclosure with Department attorneys. *Id.*

Once the Department informed President Biden's counsel of the purported request from the Committee, counsel asked the Department attorney to share a copy of the request. *Id.* ¶ 21. Three days later, on March 23, the Department attorney sent President Biden's counsel a document which he described as a request that the Department "received from House Judiciary today." *Id.* ¶ 22. The document is dated March 23, 2026—but the Department had announced its intention to comply with this purported request four days earlier, on March 19. *Id.* ¶ 23. This discrepancy "reveal[s] a significant mismatch between the decision the [Department] made and the rationale [it] provided" and does not come close to satisfying the "reasoned explanation requirement of administrative law." *Dep't of Com.*, 588 U.S. at 783, 785.

Relatedly, when Representative Jordan appeared on Fox Business in May, he seemed to lack a basic understanding of what he reportedly had requested from the Department. He claimed that because the Department "already released the transcripts," it had therefore "waived any privilege that they want to try to exercise" over the audio recording—apparently confusing the materials at issue here with the transcript and recording of President Biden's interview with Special Counsel Hur. *Trump Eyes 'Project Freedom' Revival as Iran Tensions Surge in Strait of Hormuz*, Fox Business, at 6:48-7:03 (May 12, 2026), https://www.foxbusiness.com/video/6395325807112; *see also id.* at 7:25-7:40 ("[W]e have the written transcript. Now we'd like to see, or now we'd like to have, the audio recording as well."). That Representative Jordan appears to lack basic

16

knowledge about the materials he supposedly sought further demonstrates that the Department's reliance on the purported request is pretextual.

It is not difficult to infer why the Department might solicit a request from Congress in the midst of its discussions with President Biden's counsel: It was determined to release the materials, but in the face of an increasingly likely legal challenge by President Biden over the disclosure to the Heritage Plaintiffs, it faced serious legal obstacles to doing so.  As the Department knew and had argued forcefully for two years, the materials are exempt from FOIA under Exemptions 6 and 7(C).  *See infra* Argument Section I.C.  Moreover, such materials are protected from disclosure by the Privacy Act.  *See infra* Argument Section I.D; *see also Heritage v. DOJ*, ECF No. 65-1 ("*Heritage* PI Mot.") at 13-18, 26-32.  Beyond that, the Department would have to defend its conspicuous and unprincipled reversal on the weighty law enforcement and privacy interests underlying the records.  *See Heritage* PI Mot. at 19-26.  A congressional request could provide the Department with the workaround it needed to avoid legal obstacles to producing the materials in the FOIA Action.  The problem is that the Department's decision to produce the records to the Committee, on this pretextual basis, merely substituted one unlawful act for another.

Considered in this context, "the sole stated reason" for the Department's planned disclosure to the Committee—responding to the Committee's March 23 request—"seems to have been contrived."  *Dep't of Com.*, 588 U.S. at 784; *see Heritage v. DOJ*, ECF No. 50 at 1 (stating that the Department "intend[ed] to disclose" the materials "to Congress, pursuant to a request from the Chair of the House Judiciary Committee").  Because the purported request was not an explanation but "more of a distraction" from the actual basis for the Department's decision—to circumvent the serious legal obstacles the Department faced in the FOIA Action—the Department's decision violates the APA.  *Dep't of Com.*, 588 U.S. at 785.

17

To the extent the Department contends that its voluntary production to the Committee is not pretextual because the Committee has a valid legislative purpose, the Department is wrong on two fronts.[2]  First, even if the Committee had a legitimate reason to seek recordings of President Biden's private conversations from a decade ago to investigate "the Biden-Garland Department of Justice"—and it does not—the issuance of a request does not cure the "contrived" and pretextual basis for the Department's decision.  *Id.* at 784-85.  Agency action that rests on pretext categorically violates the APA, even when the agency invokes a facially reasonable ground for the decision.  *See id.* at 776, 784-86.  If the evidence "does not match the explanation the [Department] gave for [its] decision," but instead "indicate[s] that [the Department] went to great lengths to elicit the request from [Congress]," then the Department's sole asserted basis for its decision—receipt of a congressional request—was not the actual reason for its decision, and the decision violates the APA.  *Id.* at 784.

Second, there is ample reason to conclude that the purported request lacks a legitimate legislative purpose.  *See Mazars*, 591 U.S. at 869.  While Congress possesses the power to investigate in "those areas in which it may potentially legislate or appropriate," *Barenblatt v. United States*, 360 U.S. 109, 111 (1959)—that is, where it has a "valid legislative purpose," *Quinn v. United States*, 349 U.S. 155, 161 (1955)—Congress does not have a "'general' power to inquire into private affairs and compel disclosures," *McGrain v. Daugherty*, 273 U.S. 135, 173 (1927); *see also Mazars*, 591 U.S. at 862 (recognizing that Congress's investigative power is "subject to several limitations" because it is "justified solely as an adjunct to the legislative process" (quoting

---

[2] Earlier today, the Committee moved to intervene in this action.  President Biden is not responding here to the arguments of a non-party, but he will address these arguments in due course if intervention is granted.

*Watkins v. United States*, 354 U.S. 178, 197 (1957))). "[T]here is no congressional power to expose for the sake of exposure" nor "a general power to expose where the predominant result can only be an invasion of the private rights of individuals." *Watkins*, 354 U.S. at 200.

Moreover, requests related to a President's information are held to a stricter standard than other congressional requests. *See Mazars*, 591 U.S. at 869.[3]  When courts weigh such requests, they must consider (1) "[w]hether the asserted legislative purpose warrants the significant step of involving the President and his papers"; (2) whether the subpoena is "no broader than reasonably necessary to support Congress's legislative objective"; (3) whether Congress has offered "detailed and substantial . . . evidence" to show the subpoena furthers a valid legislative purpose; and (4) whether the subpoena burdens the President as Chief Executive. *Id.* at 869-71.

The purported request here does not satisfy the applicable standards.  That request seeks "[a]ll audio recordings of any interviews or conversations between Mark Zwonitzer and President Biden relating to Zwonitzer's ghostwriting work on President Biden's memoirs, *Promise Me, Dad* and *Promises to Keep*," and its stated purpose is "to advance [the Committee's] oversight of the politicization of the Biden-Garland Department of Justice."  Compl. Ex. C at 1.  But the request sets forth no evidence—certainly not "detailed and substantial" evidence—substantiating how such "oversight" could be served by production of the audio recordings of President Biden's ten-year-old conversations, conversations that took place in his home and were recorded for personal use. *Mazars*, 591 U.S. at 870.  Nor does the request, on its face, identify any connection between President Biden's private conversations and "the politicization of the Biden-Garland Department

---

[3] The D.C. Circuit has applied *Mazars* to congressional requests implicating the information of a former President, without conclusively deciding which standard governs such requests.  *See Comm. on Ways & Means v. U.S. Dep't of the Treasury*, 45 F.4th 324, 335-36 (D.C. Cir. 2022); *Trump v. Mazars USA, LLP*, 39 F.4th 774, 787-88 (D.C. Cir. 2022).

of Justice." Compl. Ex. C at 1. In the absence of such information about the Committee's "aims" and "why the President's information will advance its consideration of the possible legislation," "it is 'impossible' to conclude" that its request "is designed to advance a valid legislative purpose." *Mazars*, 591 U.S. at 870-71 (quoting *Watkins*, 354 U.S. at 205-06, 214-15).

Further, it does not follow that the Committee's purported interest in the Biden-Garland Department of Justice "warrants the significant step of involving" President Biden's *private* conversations, which predate his Presidency by years.[4] *Id.* at 869. The failure of the purported request to assert a valid purpose, apart from an unelaborated interest in "the Biden-Garland Department of Justice," lays bare the actual interests at play: to harass a political opponent and circumvent legal obstacles to the Department's indefensible decision to release President Biden's private conversations to the Heritage Plaintiffs. Such a purpose is hardly "a subject on which legislation 'could be had,'" *id.* at 863 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975)), and is certainly not a valid legislative aim, *see Watkins*, 354 U.S. at 187 ("Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible.").

Because agencies may disclose protected materials "only upon *valid* . . . requests of Congress or its committees" and must "verify that fact before delivery," *Exxon Corp. v. FTC*, 589 F.2d 582, 588, 593 (D.C. Cir. 1978) (emphasis added), the absence of evidence and explanation, combined with the timing, context, and circumstances surrounding the request, supports the

---

[4] If the Committee's interest lies in scrutinizing Special Counsel Hur's investigation, the request for audio recordings and transcripts of President Biden's private conversations is far "broader than reasonably necessary to support [the Committee's] legislative objective." *Mazars*, 591 U.S. at 870. The Department has already released the portions of the transcripts that Special Counsel Hur cited in his report, and the nexus between the remaining materials sought in the request and any asserted interest in understanding the Special Counsel investigation is tenuous at best.

conclusion that the Department procured the request from Congress as an end-run around its dubious arguments in the FOIA Action.  For all of these reasons, the Department's reliance on the purported request is pretextual, and this invalid and unenforceable request cannot serve as the basis for the Department's discretionary decision to disseminate President Biden's private conversations.[5]  *Mazars*, 591 U.S. at 862-63.

## C.    The Proposed Disclosure Is Otherwise Arbitrary and Capricious and an Abuse of Discretion

The APA requires the Department to exercise its authority in a reasonable, non-arbitrary manner under the circumstances.  *See Troy Corp. v. Browner*, 120 F.3d 277, 284 (D.C. Cir. 1997) ("[The] sufficiency of an agency's stated reasons under the arbitrary and capricious review of the APA is fact-specific and record-specific."); *Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs.*, 844 F. Supp. 770, 783 (D.D.C. 1993) (arbitrary and capricious "standard should be applied with regard to the nature and context of the challenged action").[6]

When an agency fails to meet this standard, "[t]he reviewing court should not attempt itself to make up for such deficiencies" and "may not supply a reasoned basis for the agency's action

---

[5] The D.C. Circuit cases upholding congressional requests for a President's documents after *Mazars* are inapposite.  Unlike *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), which involved a request for official presidential records generated during President Trump's first term, *id.* at 17-20, the purported request here relates to President Biden's conversations as a private citizen in his own home.  And the congressional request considered in *Committee on Ways & Means* was premised on a statutory provision that vests authority in the chairman of the House Committee on Ways and Means to request the particular information sought in that case.  45 F.4th at 328, 331; 26 U.S.C. § 6103(f)(1).  There is no analogous statutory authority here.

[6] "[C]ourts rarely draw any meaningful distinctions between acts that are arbitrary, capricious, or an abuse of discretion."  *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review—Review of District Court Decisions & Agency Actions* 167 (2007)).  Accordingly, "[a]rbitrary, capricious, [or] an abuse of discretion review under § 706(2)(A) is now routinely applied by the courts as one standard under the heading of arbitrary and capricious review."  *Id.* (internal quotation marks omitted) (quoting Edwards & Elliott, *supra*, at 167).

that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947) ("*Chenery II*")).  It is therefore black-letter law that, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action."  *Dep't of Com.*, 588 U.S. at 780 (quoting *Burlington Truck Lines*, 371 U.S. at 167-69).  And when an agency reverses its prior position, "the familiar 'requirement that an agency provide reasoned explanation for its action' obliges the agency to 'show that there are good reasons for the new [decision]' and to provide 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior [decision].'"  *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26 Civ. 317, 2026 WL 569034, at *1 (D.D.C. Mar. 1, 2026) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

Considering the specific facts and record here,[7] the Department's decision to produce President Biden's conversations to the Committee—after recognizing the "undoubtedly enormous" privacy interests at stake, Def.'s Mem. at 11, and contrary to its prior established practices—fails to pass muster.  The Department's abandonment of its prior determination is neither reasonable nor reasonably explained, as required by the APA.

### 1. The Department's New Position Is Irreconcilable with Its Prior Determination that the Materials Are Sensitive Law Enforcement Records Entitled to Protection

The Department does not write on a blank slate in this action.  To the contrary, in the context of the FOIA Action, it previously set forth a detailed, reasoned position on the law enforcement and privacy interests at stake.  *See* Def.'s Mem.  The underlying facts and

---

[7] In addition to the arguments set forth in this memorandum regarding the applicability of Exemptions 6 and 7(C), President Biden adopts and incorporates by reference the Department's prior arguments and briefing in the FOIA Action. *See, e.g.*, Def.'s Mem.

circumstances have not changed in any respect that would support disclosure, yet the Department has reversed course.  The Department's new position—a striking about-face from its prior position on the status and proper treatment of the materials—violates the APA.

In analyzing the materials for purposes of the FOIA Action, Department attorneys concluded unambiguously that the materials were law enforcement records containing sensitive personal information.  Indeed, the Department argued forcefully and correctly—relying on sworn statements from a top career official—that multiple FOIA exemptions, including Exemption 7(C), applied.  *See Heritage v. DOJ*, ECF Nos. 33, 37.  Exemption 7(C) applies to "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).[8]

Bradley Weinsheimer, who served as the Department's highest-ranking career official, provided a declaration setting forth the basis for the Department's determination in the FOIA Action.  *See generally* Weinsheimer Decl.  As Weinsheimer explained, "[t]he audio recordings at issue here were not originally created by the government; rather, they were created by individuals acting in a private capacity, and they reflect private conversations."  *Id.* ¶ 22.  Indeed, "conversations with a writing assistant to aid with drafting a memoir are analogous to an audio

---

[8] The Department also determined that the material was exempt from disclosure under Exemptions 5 and 6.  Def.'s Mem. at 6, 19, 22-23.  Exemption 5 exempts information and materials that are privileged in civil discovery, including material subject to attorney work product protection.  *See* 5 U.S.C. § 552(b)(5); *FTC v. Grolier Inc.*, 462 U.S. 19, 28 (1983).  Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Because Exemption 7(C) is "broader" than Exemption 6, there is "no need to consider Exemption 6 separately [with respect to law enforcement records] because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)."  *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

version of a personal diary." *Id.* Further, "the conversations at issue are unusually sensitive," as "[t]hey were created for the purpose of helping create a memoir that focused on a highly emotional period in President Biden's life." *Id.* "The portions of the audio recordings remaining at issue took place in the context of broader conversations between President Biden and his writing assistant that involved highly personal topics, including the illness and death of President Biden's son." *Id.* ¶ 23. "How Mr. Biden's voice sounded throughout those conversations thus implicates substantial privacy rights." *Id.* Moreover, the materials at issue also "implicate substantial privacy interests of . . . other individuals mentioned or included in the unredacted transcripts." *Id.* ¶ 22.

The Department's unexplained abandonment of this position violates the APA. *See Conserve Sw. Utah*, 2026 WL 569034, at *1, 18. Since the Department reached its prior determination in late 2024, the underlying facts and circumstances have not changed in any way that would favor disclosure. Nevertheless, without any explanation of its blatant "disregard[]" of the privacy interests that "underlay . . . [its] prior [decision]," *id.* at *1 (quoting *Fox Television*, 556 U.S. at 515-16), the Department now seeks to produce President Biden's private conversations to the Committee, without any restrictions and with insufficient redactions. But President Biden has not waived his privacy interests in the audio recordings or transcripts, and the Department does not have unfettered discretion to release the materials at issue. The D.C. Circuit "has made clear that," in the FOIA context, individuals involved in law enforcement proceedings "have cognizable privacy interests that may be protected by Exemption 7(C)," *Canning v. U.S. Dep't of Just.*, 919 F. Supp. 451, 455 (D.D.C. 1994) (citing *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991)), and that "[t]he privacy interest at stake belongs to the individual, not the government agency," *Whitmore v. U.S. Dep't of Just.*, 132 F. Supp. 3d 69, 78 (D.D.C. 2015). Accordingly, "Exemption 7(C) . . . requires courts 'to protect, in the proper degree, the personal privacy of

24

citizens against the uncontrolled release of information compiled through the power of the State.'" *Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*, 394 F. Supp. 3d 67, 76 (D.D.C. 2019) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).    And here, the Department's discretion is further limited by the Agreement governing the production of the materials to the Special Counsel's Office.  *See* Agreement ¶ 1 (providing that the materials would "be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation"); Jeffress Decl. ¶ 8; *see also* Compl. Ex. B.  For all these reasons, the Department's decision to disclose materials that it previously determined should be treated as sensitive law enforcement records violates the APA.

### 2. The Department's New Position Conflicts with Longstanding Department Policy and Practice

The Department's voluntary production also runs counter to the Department's own guidance regarding productions to Congress, which are animated by the same law enforcement and privacy interests that form the basis for the Department's determination in the FOIA Action. It is the Department's official stated policy that "[t]he rule of law depends upon the evenhanded administration of justice.  The legal judgments of the Department of Justice must be impartial and insulated from political influence.  It is imperative that the Department's investigatory and prosecutorial powers be exercised free from partisan consideration."  U.S. Dep't of Just., Just. Manual § 1-8.100 (2019).  The Department has established guidance for communications with Congress that "promote the rule of law and . . . ensure that the Department's actions are free from the appearance of political influence."  *Id.*  One of these guidelines is that "the Department will use its best efforts to respond as appropriate to inquiries from Congress consistent with policies, laws, regulations, and professional ethical obligations that may require confidentiality."  *Id.* § 1-8.210 (2019).

25

The Department's voluntary production to the Committee contravenes Department policy in at least two critical ways: (1) it conflicts with Department policy for the disclosure of material from independent counsel investigations; and (2) it inexplicably departs from the Department's longstanding policies and practices regarding the disclosure of private information contained in law enforcement files.

With respect to material from independent counsel investigations, the Department has explicitly recognized the particular importance of protecting confidential information in closed criminal enforcement files when making productions to Congress.  In a 1986 memorandum opinion addressing congressional requests for information regarding decisions made under the then-operative Independent Counsel Act, the Department's Office of Legal Counsel concluded that records compiled as part of a since-closed independent investigation "should not automatically be disclosed to Congress":

> Obviously, much of the information in a closed criminal enforcement file, such as unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods would continue to need protection (which may or may not be adequately afforded by a confidentiality agreement with Congress).  In addition, the Department and the Executive Branch have a long-term institutional interest in maintaining the integrity of the prosecutorial decision-making process.

Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 Op. O.L.C. 68, 77 (1986).  These principles apply here: The relevant investigation is an independent investigation by a Special Counsel, and the "criminal enforcement file" has been "closed" since early 2024.  *See id.*

Separately, the Department has robust and longstanding policies governing the production of sensitive material to Congress, including when Congress has sought law enforcement records containing personal or otherwise confidential information.  As the Office of Legal Counsel wrote in 1983, it "has been a consistent theme throughout our constitutional existence" that the executive

26

branch has "decline[d] to furnish to the Congress" certain categories of "information which [the Department] has acquired and which is necessary to it in the administration of statutes," including "information . . . relating to law enforcement, security, or personnel investigations." History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress ("Olson Opinion"), 6 Op. O.L.C. 782, 782-83 (1983) (quoting 40 Op. Att'y Gen. 45, 48 (1941)). As reflected in a letter Deputy Attorney General Harold R. Tyler, Jr., wrote to the Chair of the House Subcommittee on Government Information and Individual Rights in 1976, three principles have traditionally guided the Department's decision-making with respect to the disclosure of "interview statements and investigative reports" to Congress:

> First, the Executive Branch must make a strong effort to protect innocent individuals. Disclosure of investigative files and reports, which often contain hearsay and inaccurate information, could do irreparable damage to the reputation of innocent individuals.

> Second, if the Department changes its policy and discloses investigative information, we could do serious damage to the Department's ability to prosecute prospective defendants and to the FBI's ability to detect and investigate violations of federal criminal laws.

> Third, the detection, and investigation of violations of federal criminal laws and the prosecution of individuals alleged to have committed such violations are Executive functions. . . . [The] duty . . . to take care [that] the laws be faithfully executed . . . encompasses the responsibility to maintain the Separation of Powers so basic to our government.

*Id.* at 802.

The Department had, until recently, continued to abide by these well-established policies. In 2024, for example, when Representative Jordan threatened contempt proceedings to enforce a House Judiciary Committee subpoena to the Department for audio recordings of President Biden's interview with Special Counsel Hur, the Department wrote that refusing to disclose the audio recordings was consistent with its "longstanding approach of safeguarding sensitive law

27

enforcement information" to avoid "the perception of improper influence on the law enforcement process." Letter from Carlos Felipe Uriarte, Asst. Att'y Gen., to Jim Jordan, Chairman, H. Comm. on the Judiciary, and James Comer, Chairman, H. Comm. on Oversight & Accountability ("Uriarte Letter"), at 6 (Apr. 25, 2024), available at https://www.justice.gov/ola/media/1385541/dl. That concern "is deeply rooted in the Department's principles and has been articulated by administrations of both parties." *Id.* As the Department put it, "[p]rotecting sensitive law enforcement files from the reality or perception of political treatment has been the Department's approach for decades," and is designed to ensure that "highly politicized issues in public committee hearings . . . have no role in criminal investigations." *Id.* at 6, 8.

These policies are also reflected in directives to Department employees. Under the Justice Manual, "no Department employee may communicate with Senators, Representatives, congressional committees, or congressional staff without advance coordination, consultation, and approval by [the Office of Legislative Affairs]." Just. Manual § 1-8.200 (2019). And "in both open and closed cases, [Department employees] must *never* provide information [to Congress] on . . . restricted information; or . . . matters that would reveal . . . the reasoning behind the exercise of prosecutorial discretion, or the identity of individuals who may have been investigated, but not indicted." *Id.* § 1-8.210 (emphasis added); *see also id.* § 9-27.760 (2024) ("[T]here is ordinarily 'no legitimate governmental interest served' by the government's public allegation of wrongdoing by an uncharged party, and this is true 'regardless of what criminal charges may be contemplated by the [prosecution] . . . for the future.'" (alterations adopted) (quoting *In re Smith*, 656 F.2d 1101, 1106-07 (5th Cir. 1981))).

28

The Department's longstanding practices reflect these obligations and principles: Even when the Department determines that a committee acting within its jurisdiction may obtain material from the Department on matters encompassed by a legitimate legislative purpose, the Department has a consistent practice of limiting disclosure to Congress through the use of interview summaries, redactions, reading rooms, and other restrictions on congressional access. The practice of providing materials to Congress in closed reading rooms dates back at least to 1979. *See* Olson Opinion, 6 Op. O.L.C. at 803 (citing Letter from Dep. Asst. Att'y Gen. Heckman to Rep. Baucus (Aug. 20, 1979)). And it has continued through the present across administrations. *See* Uriarte Letter at 7. For example, after the conclusion of Special Counsel Robert S. Mueller III's investigation into Russian election interference, "the Department produced only summaries of certain witness interviews [for Congress], many in redacted form, and many only for review *in camera.*" *Id.* At times, the Department has gone further, limiting Congress's access entirely where the disclosure of any kind would present a "significant chilling effect[]" for future law enforcement cooperation. *Id.* For example, after the 2008 investigation by Special Counsel Patrick Fitzgerald into the disclosure of the identity of Central Intelligence Agency officer Valerie Plame Wilson, the Department declined to produce to Congress even summaries of the President's and the Vice President's interviews with the Special Counsel's office. *Id.*

These policies and practices are not just a prudential decision by prior Justice Departments, to be taken up or discarded at whim. Rather, they reflect and facilitate compliance with applicable law, including the Department's obligations under the Privacy Act and the principle that congressional requests that lack a legitimate legislative purpose are invalid and unenforceable. *See* 5 U.S.C. § 552a; *Mazars*, 591 U.S. at 862-63; *see also infra* Argument Section I.D (explaining why the proposed disclosure to the Committee would violate the Privacy Act).

The Department's approach here is a remarkable departure from the longstanding policies and practices the Department has followed over the decades and across administrations. Rather than adhering to its settled practice of carefully limiting congressional access to sensitive law enforcement materials through redactions, reading-room review, summaries, and other restrictions, the Department now proposes to provide hours of President Biden's private conversations to the Committee with insufficient redactions and without meaningful conditions on access or use. In so doing, the Department has adopted a course of action it has long avoided because such disclosures threaten both law enforcement interests and the appearance of evenhanded justice. This position is unreasoned and unreasonable, and it violates the APA.

### 3. The Department Has Not Reasonably Explained Its New Position and Departure from Longstanding Policies and Practices

The APA requires the Department to provide a reasonable explanation of why it has abandoned its prior assessment of the materials and departed from its settled practices. *See State Farm*, 463 U.S. at 57. Instead, the Department has offered shifting and legally flawed rationales that neither confront its earlier position nor reasonably explain its abrupt reversal—confirming that its new course is arbitrary, capricious, and contrary to law. To be clear, President Biden does not contend that FOIA's exemptions apply directly to the Department's productions to Congress. Rather, under the specific facts and circumstances present here, the Department has already analyzed and reached a determination as to the *underlying* privacy and law enforcement interests at stake—and it is that reasoned determination that the Department has now abandoned without explanation.

"It is a 'simple but fundamental rule of administrative law' that 'a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency.'" *AAR Airlift Grp., Inc. v. U.S. Transp. Command*, 161 F. Supp. 3d 37, 43 (D.D.C. 2015) (first alteration in

original) (quoting *Chenery II*, 332 U.S. at 196).  Here, "[t]he Court cannot . . . affirm [the Department's] disclosure determination based on a rationale that was not in fact considered or relied upon by the agency." *Id.* at 45.  Nor can the Court "be expected to chisel that which must be precise from what the agency has left vague and indecisive." *AAR Airlift Grp.*, 161 F. Supp. 3d at 45 (quoting *Chenery II*, 332 U.S. at 197).  Because the Department did not satisfy the APA's requirement to "engage in 'reasoned decisionmaking,'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted), its decision to disclose the transcripts and audio recordings of President Biden's private conversations to the Committee must be "set aside," 5 U.S.C. § 706(2).

The Department has not provided any formal explanation of the basis for its sudden decision, two years into the FOIA Action, to disclose the materials pursuant to both the FOIA request and a purported request from the Committee.  On February 25, 2026, when Associate Deputy Attorney General Paul Perkins notified President Biden, through counsel, of the Department's decision to release the materials to the Heritage Plaintiffs in the FOIA Action, he briefly stated but did not explain the Department's decision.  *See* Jeffress Decl. ¶ 11.  At that time, Perkins did not mention a congressional request or any possibility that the Department would receive one.  *Id.*  That issue did not arise until the evening of March 19, 2026, the day before the Department and President Biden's counsel were scheduled to meet in person at the Department of Justice to discuss the materials and proposed redactions, when Perkins represented that the Department intended to produce the materials in response to a request from Congress.  *Id.* ¶ 20. Perkins did not offer the requisite "good reasons" for reversing the Department's prior, well-reasoned position regarding the law enforcement and privacy interests at stake, *Fox Television*, 556 U.S. at 515; *see generally* Def.'s Mem., or for "disregarding facts and circumstances that

31

underlay or were engendered by the prior [decision]," *Fox Television*, 556 U.S. at 516.  The Department thereby failed to satisfy the "fundamental requirement of administrative law . . . that an agency set forth its reasons for decision," and this "failure . . . constitutes arbitrary and capricious agency action."  *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted).

In subsequent communications, Department employees likewise have failed to provide any reasoned justification for the Department's new position.  To the contrary, these communications only confirm that the Department lacks a reasonable basis for its actions.  For example, Acting Chief Privacy and Civil Liberties Officer Peter Winn wrote to President Biden's counsel that "with a . . . Congressional inquiry in hand," the Department reassessed "whether the public's interest goes beyond the Hur Report itself to any of the evidence referenced in the Report."  Jeffress Decl. ¶ 37 & Ex. 4 at 3.  Winn suggested that, under *Brennan Center for Justice v. U.S. Department of Justice*, 697 F.3d 184 (2d Cir. 2012), the entirety of the transcripts and audio recordings at issue have "become[] disclosable" simply because Special Counsel Hur considered them during his investigation and cited limited portions of them in his Report.  Jeffress Decl. ¶ 37 & Ex. 4 at 3. That suggestion is entirely flawed.  For one thing, the doctrine Winn invoked involves privilege waiver by the government, but President Biden and third parties have substantial privacy interests in the materials that the government cannot waive unilaterally.  *See supra* at 17-18.  For another, the Department's regulations expressly foreclose Winn's effort to conflate the Hur Report with the investigative materials underlying it.  Those regulations provide that, while a Special Counsel report may be disclosed to the public in the discretion of the Attorney General, "[a]ll *other* releases of information by any Department of Justice employee, including the Special Counsel and staff, concerning matters handled by Special Counsels," can occur only in compliance with "generally

32

applicable Departmental guidelines" and "relevant law." 28 C.F.R. § 600.9(c) (emphasis added). As explained above, those guidelines and legal obligations prohibit disclosure here. *See supra* Argument Section I.C.2; *see also infra* Argument Section I.D.

Like Perkins's initial notification, Winn's communications—which are divorced from the personal, private, and sensitive contents of the particular materials at issue—failed to grapple with the "facts and circumstances that underlay" the Department's previous determination that the materials at issue are exempt from disclosure. *Fox Television*, 556 U.S. at 515-16. In addition, Winn failed to "grapple with" the Department's decades-long principles, policies, and procedures with respect to the disclosure to Congress of information relied upon in a law enforcement investigation, *see supra* Argument Section I.C.2, and failed to acknowledge that the transcripts of President Biden and Zwonitzer's conversations that were cited in the Hur Report have already been released to the public, *see* Weinsheimer Decl. Ex. B; *see also Heritage* PI Mot. at 21-24 (addressing additional flaws in Winn's reasoning).

Put simply, the Department has failed entirely to explain its contemplated disclosure to the Committee. Its decision is therefore arbitrary, capricious, and an abuse of discretion. *See, e.g.*, *Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) ("Agency action that 'stands on a faulty legal premise and [lacks] adequate rationale' is arbitrary and capricious." (alteration in original) (quoting *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985))).

**D.     Disclosure to the Committee Would Violate the Privacy Act**

President Biden is also likely to succeed on his APA claim that the Department's proposed disclosure to the Committee is barred by the Privacy Act and thus is contrary to law. *See* Compl. ¶¶ 102-110 (Count III). The non-disclosure provision of the Privacy Act bars agencies from disclosing certain government records about individuals, unless the individual has consented or one of the enumerated exceptions applies. *See* 5 U.S.C. § 552a(b). This provision, working in

tandem with other parts of the statute, "promote[s] observance of valued principles of fairness and privacy." *Londrigan v. FBI*, 670 F.2d 1164, 1169 n.28 (D.C. Cir. 1981) (quoting S. Rep. No. 93-1183, at 2 (1974)).

As an initial matter, President Biden may challenge the Department's planned Privacy Act violation in the form of an APA claim seeking declaratory and injunctive relief. To be sure, the Privacy Act does not directly provide for injunctive relief in the context of an unlawful-disclosure claim; rather, it authorizes claims for monetary damages once the disclosure has occurred. *See* 5 U.S.C. § 552a(g)(1)(D), (g)(4). As multiple courts have now recognized, however, plaintiffs may sue under the APA to enjoin proposed disclosures that are barred by the Privacy Act, on the theory that the agency action is contrary to law. *See AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2026 WL 879518, at *19-20 (D.D.C. Mar. 31, 2026) (holding that "the APA could step into the breach and supply plaintiffs with a cause of action for injunctive and declaratory relief" and that the "Privacy Act does not preclude plaintiffs' APA claim that the [agency action is] contrary to law"); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 113 (D.D.C. 2026) ("Plaintiffs may pursue injunctive relief under the APA for alleged violations of the Privacy Act."). These recent decisions acknowledge—and are consistent with—the fact that the Privacy Act does not provide its own mechanism for such relief.

The remaining question, then, is whether the proposed disclosure to the Committee is prohibited by the Privacy Act and thus would be contrary to law under the APA. For the reasons explained below, President Biden is likely to prevail on the merits of this claim.

"An agency violates the [Privacy] Act when it 'discloses' information in the form of a 'record' from a 'system of records' and the disclosure is not pursuant to a valid exception under the Act." *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (quoting 5 U.S.C. § 552a(b)).

The enumerated exceptions include certain disclosures to Congress, *id.* § 552a(b)(9), and disclosures for a "routine use" as defined in the statute, *id.* § 552a(b)(3).

Under the circumstances present here, the exception for certain disclosures to Congress does not apply. That exception covers an agency's disclosures "to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee." *Id.* § 552a(b)(9). As explained above, however, the purported request does not involve a "matter within [the] jurisdiction" of the Committee because it is a product of the *Department's* efforts to disseminate President Biden's private information, not the Committee's genuine inquiry into a matter within its jurisdiction. *See supra* Argument Section I.B; *cf. Tijerina v. Walters*, 821 F.2d 789, 798 (D.C. Cir. 1987) (refusing to apply the "routine use" exception, another exception to the Privacy Act's disclosure bar, where the agency had prompted the request). And even if the Court were to view aspects of the purported request as encompassing matters within the Committee's jurisdiction, that is not true of all the material it seeks, particularly as to private details from 2016-2017 that could not possibly bear on the Committee's stated purpose to investigate the "Biden-Garland Department of Justice." *See* 5 U.S.C. § 552a(b)(9) (using "to the extent" language). In the absence of case law analyzing the § 552a(b)(9) exception in analogous circumstances, the Court should apply a straightforward reading of the Privacy Act's text: A committee does not have jurisdiction over the matter where the Department's reliance is pretextual or the purported request lacks a valid legislative purpose. *See Mazars*, 591 U.S. at 862-63.

This reading accords with the Department's own analysis of the § 552a(b)(9) exception and with courts' interpretive approach to the Privacy Act generally. The Department itself, in an Office of Legal Counsel opinion, has previously construed § 552a(b)(9) narrowly, to exclude

35

requests from a congressional committee's ranking minority member.    Application of
Privacy Act Congressional-Disclosure Exception to Disclosures to Ranking Minority Members,
25 Op. O.L.C. 289, 289 (2001).  Likewise, courts in the D.C. Circuit interpret the Privacy Act "in
a manner that will give effect to Congress' intent to protect the individual privacy of the subjects
of protected records."  *Pilon v. U.S. Dep't of Just.*, 73 F.3d 1111, 1119 (D.C. Cir. 1996).  To
facilitate the Act's protection of personal privacy, courts generally construe the Act's exceptions
narrowly.  *See, e.g.*, *Tijerina*, 821 F.2d at 798 ("routine use" exception); *Bartel v. FAA*, 725 F.2d
1403, 1412 (D.C. Cir. 1984) (FOIA exception).  This precedent counsels in favor of construing the
Section 552a(b)(9) exception to exclude agency-engineered "requests" like the one at issue here.

Nor would any of the other exceptions to the disclosure bar set forth in § 552a(b)(1)-(13)
authorize the Department's proposed disclosure to the Committee.  For example, under the
"routine use" exception set forth in § 552a(b)(3), the disclosure "must be both (i) 'for a purpose
which is compatible with the purpose for which it was collected' and (ii) within the scope of a
routine use notice published by the agency," *Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238,
240 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552a(a)(7), (e)(4)(D)); *see Brunotte v. Johnson*, 892 F.
Supp. 2d 199, 207 (D.D.C. 2012) ("The agency must demonstrate both compatibility and
publication in order to invoke the routine use exception.").  Here, regardless of the specific routine-
use notice at issue,[9] the Department cannot satisfy the compatibility requirement because the
purposes of the disclosure are at odds with, and indeed would gravely undermine, the purpose for

---

[9] Agencies that wish to rely on a "routine use" for a specific "system of records" must provide
notice to the public in the form of a System of Records Notice published in the Federal Register.
5 U.S.C. § 552a(e)(4)(D).  Because routine uses are specific to particular "system[s] of records,"
President Biden may have additional arguments that a "routine use" does not apply, depending on
the Department's position on which repositories are at issue.

which the records were collected.

Even at this preliminary stage, ample evidence supports the conclusion that the purpose for which the records were collected is incompatible with the purposes of the disclosure. Regarding the purpose of collection, the parties and the Court do not have to guess. This purpose is set forth in the Agreement governing the production of the materials to the Special Counsel's Office, which provides that "[t]he information produced will be accessed, reviewed, and used . . . only for purposes of advancing the investigation." Agreement ¶ 1. By contrast, the evidence shows that the Department's new position is motivated by a desire to further *non-investigative* goals of the Department and the Trump Administration. These goals overlap substantially with the stated objectives of the Committee.

As noted, both the Trump White House and the Committee—as well as the plaintiffs in the FOIA Action, who are now poised to reach a mutually agreeable resolution with the Department regarding President Biden's private information—have expressly tied their political attacks on President Biden to materials from Special Counsel Hur's investigation. *See, e.g.*, Jeffress Decl. ¶ 38 & Ex. 5 (June 2025 White House fact sheet describing a White House memorandum referencing the Special Counsel's report, "Biden's mental state," and an investigation into the use of autopen); *Everyone Knew that Biden Wasn't 'Up for the Job' as President, Says Rep. Jim Jordan*, Fox Business (June 5, 2025), https://www.foxbusiness.com/video/6373928443112 (interview by Representative Jim Jordan stating, in connection with the autopen allegations, that "[e]veryone knew that [Biden] wasn't 'up for the job' as president"); Jeffress Decl. ¶ 43 & Ex. 10 (December 2025 X post by Plaintiff Mike Howell, stating that pursuing "intense litigation to obtain the audio of President Biden's interview with Special Counsel Hur" was part of an effort to "accelerate" President Biden's "exit" in mid-2024). In any case, President Biden need not prove

the specific motive at issue.  To establish that the "routine use" exception is unavailable, it is enough to show that the purpose of disclosure is different from the purpose for which the records were collected.  5 U.S.C. § 552a(a)(7), (e)(4)(D); *Ames*, 861 F.3d at 240.  Here, President Biden can easily demonstrate that the Department is pursuing a purpose *other* than "advancing the investigation" of Special Counsel Hur, which concluded in 2024.  Agreement ¶ 1.

President Biden also is likely to succeed in establishing the other elements of an unlawful disclosure under the Privacy Act.  *See* 5 U.S.C. § 552a(b).  As noted, the Privacy Act provides that, unless a statutory exception applies, "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  *Id.*; *see Chichakli*, 882 F.3d at 233 (citing 5 U.S.C. § 552a(b)).  Thus, in deciding President Biden's claim on the merits, the Court will need to consider whether: (1) the materials are "record[s]" that "pertain[] to" and are "about" President Biden; (2) the materials are "contained in a system of records"; and (3) the Department's proposed action involves a "disclos[ure]" to "any person" without President Biden's "written consent."  5 U.S.C. § 552a(a)(4), (b).  President Biden is likely to prevail on each of these points.

First, the materials meet the definition of "record[s]" under the Privacy Act, and those records pertain to and are about President Biden.  The Privacy Act defines the term "record" to mean "any item, collection, or grouping of information about an individual that is maintained by an agency . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."  5 U.S.C. § 552a(a)(4).  "[T]o be a 'record,' an item must contain 'information that actually describes the person in some way.'"  *McCready v. Nicholson*, 465 F.3d 1, 9 (D.C. Cir. 2006) (quoting *Tobey v.*

38

*NLRB*, 40 F.3d 469, 472 (D.C. Cir. 1994)).  The audio recordings and transcripts of President Biden's private conversations certainly pertain to and are about President Biden, as he discusses in those conversations intimate details about himself and his life.  The transcripts contain his name, and the Department previously recognized that the audio recordings—which capture President Biden's distinct and widely recognized voice—contain an identifying particular of President Biden.  *See* Weinsheimer Decl. ¶ 23 ("How Mr. Biden's voice sounded throughout those conversations thus implicates substantial privacy rights.").

Second, President Biden likely will be able to establish that the records are contained in a "system of records."  Under the Privacy Act, a "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."  5 U.S.C. § 552a(a)(5).  In general, a "system of records exists only if the information contained within the body of material is both *retrievable* by personal identifier and actually *retrieved* by personal identifier."  *Paige v. DEA*, 665 F.3d 1355, 1359 (D.C. Cir. 2012) (quoting *Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010)).  Here, President Biden has alleged that the recordings and transcripts are "record[s]" contained in one or more "system[s] of records."  *See* Compl. ¶¶ 103-04.  His complaint identifies relevant systems of records; alleges on information and belief that Department officials retrieved the materials from a system or systems of records using one or more personal identifiers, such as President Biden's name; and alleges on information and belief that Department officials generally used personal identifiers to retrieve information about individuals from the relevant systems of records during the period in question.  *See id.* ¶¶ 81-86.  Because the materials at issue were sought in a FOIA action, and because the Weinsheimer Declaration and other filings in this case describe the Department's review and withholding of the

39

materials in response to a FOIA request, President Biden is especially likely to prevail in

establishing that the materials were contained in, retrievable from, and retrieved from the system

of records for "FOIA processing records" (DOJ-004: Freedom of Information Act, Privacy Act,

and Mandatory Declassification Review). *Id.* ¶ 81.[10]

In any case, it is highly probable that the materials at issue were retrieved from at least one

Department system of records. *See Maydak*, 630 F.3d at 172-73 ("[W]here an agency compiles

information about individuals for investigatory purposes, 'Privacy Act concerns are at their zenith,

and if there is evidence of even a few retrievals of information keyed to [personal identifiers], it

may well be the case that the agency is maintaining a system of records.'" (quoting *Henke v. U.S.

Dep't of Com.*, 83 F.3d 1453, 1461 (D.C. Cir. 1996))). Here, while certain details are within the

Department's exclusive control, there is sufficient evidence for the Court to find in President

Biden's favor on the "likelihood of success" factor.[11]  Notably, "[t]he source of any particular bit

of information is a question of fact" that will and should be resolved at a future stage of the

litigation. *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010).

Third, it is undisputed that the Department's proposed action involves a "disclos[ure]" to

"any person" without President Biden's "written consent."  The Department's own statements

establish that it plans to disclose the materials to the Committee. *See Heritage v. DOJ*, ECF No. 50

---

[10] President Biden alleged that the Department may also have maintained the materials in the following systems of records, among others: DOJ-003: Correspondence Management Systems for the Department of Justice; DOJ-006: Personnel Investigation and Security Clearance Records for the Department of Justice; FBI-002: FBI Central Records System; and CRM-001: Central Criminal Division Index File and Associated Records.  Compl. ¶ 82.

[11] Although discovery is typically unavailable in APA cases, *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011), courts and parties may look beyond the agency-compiled record where there is evidence of bad faith or when the record is so sparse on a particular issue as to frustrate the court's review, *see Truong v. U.S. Citizenship & Immigr. Servs.*, No. 21 Civ. 316, 2022 WL 17356865, at *5-6 (D.D.C. Dec. 1, 2022).  President Biden reserves the right to seek discovery here.

at 1. Moreover, the Department is well aware that President Biden has not consented to the disclosure, and it has not obtained his written consent. *See* Jeffress Decl. ¶¶ 11-30 (describing negotiations between President Biden's counsel and the Department).

Because the proposed disclosure to the Committee would violate the Privacy Act, *see* 5 U.S.C. § 552a(b), the Department's actions are contrary to law under the APA.

## II.    President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction

The harms that President Biden asserts strongly support the issuance of a preliminary injunction. To establish irreparable harm, a movant must assert an actual, great, and imminent injury that is beyond remediation. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006). President Biden has done so here.

First, the conversations that the Department plans to disclose to the Committee are deeply sensitive and personal in nature, and their disclosure would cause the kind of real and apparent injury that courts have characterized as "severe," "substantial," and "impossible" to redress. Intervention Order at 8 (first quoting *Jud. Watch v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 349-50 (D.C. Cir. 2017); and then quoting *Waterkeeper All., Inc.*, 330 F.R.D. at 7). The disclosure would encompass hours of recordings and over 100 transcript pages covering President Biden's intimate reflections on his decision-making both as a public servant and as a husband, father, and grandfather, including his descriptions of conversations with multiple third parties on these subjects. These conversations, which took place in President Biden's home, were never intended to be disclosed in verbatim form. In fact, the Department previously recognized that the materials are "analogous to entries in a personal diary." *Id.* at 6 (quoting Def.'s Mem. at 1). It would of course "be highly offensive to a reasonable person" to have his personal diary disclosed to someone else. *Id.* (quoting *All. for Retired Ams.*, 770 F. Supp. 3d at 102). And the intrusion is even greater where, as here, the recipient has engaged in repeated public attacks focused on the

41

diary-writer's mental competency.  *See supra* Background Section III.  Thus, both the "type of information"—a private citizen's sensitive and personal reflections made in the privacy of his own home—and the "breadth of disclosure and use of the information disclosed"—unrestricted disclosure to an inherently political body with a history of using President Biden's private information for political ends—weigh strongly in favor of finding an actual and great harm to President Biden's privacy interests.  *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 60-61 (D.D.C. 2025) (quoting *AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2025 WL 1783899, at *11 (D.D.C. June 27, 2025)).

Second, there is no dispute that harm is imminent.  As the court in the FOIA Action wrote in the Intervention Order, President "Biden's injury is imminent given that the Department will produce the materials on June 15, 2026."  Intervention Order at 6.

Third, the harm caused by disclosure will be irreparable.  No judicial remedy could un-ring the bell or fairly compensate President Biden for the perpetual intrusion on his and his family's privacy.  For this very reason, courts in this district routinely find that "disclosure necessitates a preliminary injunction when there is an imminent risk that information privately disclosed . . . will either be impermissibly used or publicly disclosed."  *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 61 (quoting *AFL-CIO*, 2025 WL 1783899, at *12); *see, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (concluding that "disclosure of proprietary information" to "competitors in the market" would constitute irreparable harm); *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 76-77 (D.D.C. 2009) (concluding that public disclosure of confidential information, including "personal information" about a party's employees, would cause irreparable harm).  As in those cases, "public dissemination of [President Biden's] sensitive, private information is an irreparable harm."  *All. for Retired Ams.*, 770 F. Supp. 3d at 108.

42

### III. The Balance of Equities and the Public Interest Weigh Strongly in Favor of Preliminary Injunctive Relief

Finally, the balance of equities and the public interest also weigh in favor of a preliminary injunction. *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 68 (explaining that the balance of equities and public interest factors merge where the government is the opposing party (citing *Nken*, 556 U.S. at 435)). President Biden risks severe and irreparable harm to his privacy interests if the materials are disclosed. By contrast, the Department faces no injury and the public interest is served if the Department is enjoined from disclosing the materials consistent with its obligations under the law. Nor is there any private or public interest the Committee could assert that would outweigh the severity of the injury to President Biden's privacy if the materials were released.

With respect to the Department, it is well established in this Circuit that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks omitted); *accord Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 68. In the context of the APA in particular, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). As explained above, disclosure of President Biden's sensitive, private conversations to the Committee would violate federal law, and the public interest does not support lawless governmental disclosures of private citizens' private conversations.

With respect to the Committee, as explained above, the Committee lacks any legitimate legislative interest in President Biden's intimate conversations in the privacy of his own home in 2016 and 2017, and it therefore will suffer no injury if preliminary relief is granted. *See supra* Argument Section I.B; *Mazars*, 591 U.S. at 863 (quoting *McGrain*, 273 U.S. at 173-74). Even if

43

the Committee had a valid legislative interest in obtaining President Biden's decade-old private conversations, however, there is no time-sensitive need for the Committee to obtain President Biden's decade-old conversations, at a time when he neither holds nor is seeking public office.

In short, any hypothetical public or private interest in the release of President Biden's private conversations is far exceeded by the irreparable harm that President Biden will face.

**IV.    The Bond Requirement Should Be Waived or Set to a Nominal Amount**

Finally, the Court should waive Rule 65(c)'s bond requirement or set bond at a nominal amount.    Under Rule 65(c), "injunction bonds are generally required," *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025), but district courts have "'broad discretion . . . to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all," *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (first quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999); and then citing *Council on Am.-Islamic Rels.*, 667 F. Supp. 2d at 80).    The Department will not suffer meaningful damages or costs if it is temporarily ordered not to disclose the materials to the Committee pending a final determination on the merits.    *See* Fed. R. Civ. P. 65(c).    Accordingly, President Biden respectfully requests that the Court waive the bond requirement or set bond at a nominal amount.    *Cf. N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (waiving bond requirement); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 64-65 (D.D.C. 2025) (setting nominal bond of $1 and collecting cases imposing the same where "the risk of harm to the government is non-existent or remote" (quoting *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 702 (D. Md. 2025))).

**CONCLUSION**

For the foregoing reasons, President Biden respectfully requests that the Court waive a security bond and grant the motion for preliminary injunction.

Dated: June 1, 2026                    Respectfully submitted,

                                        /s/ Amy Jeffress
                                        Amy Jeffress (D.C. Bar No. 449258)
                                        Kaitlin Konkel (D.C. Bar No. 1021109)
                                        Taisa M. Goodnature (D.C. Bar No. 90044537)*
                                        H. Atticus Ballesteros (D.C. Bar No. 90043198)*
                                        Jared M. Hirschfield (N.Y. Bar No. 6296933)*
                                        HECKER FINK LLP
                                        1050 K Street, NW, 10th Floor
                                        Washington, D.C. 20001
                                        Tel: (212) 763-0883
                                        ajeffress@heckerfink.com

                                        *Counsel for Plaintiff Joseph R. Biden, Jr.*

                                        *Admitted *pro hac vice*