**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSEPH R. BIDEN, JR.,

               *Plaintiff,*

   v.

U.S. DEPARTMENT OF JUSTICE,

               *Defendant,*

COMMITTEE ON THE JUDICIARY
OF THE U.S. HOUSE OF
REPRESENTATIVES

          *Intervenor-Defendant.*

Case No. 1:26-cv-01818-TSC

**OPPOSITION OF INTERVENOR-DEFENDANT COMMITTEE ON THE JUDICIARY
OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

MATTHEW B. BERRY
  *General Counsel*
TODD B. TATELMAN
  *Deputy General Counsel*
SARAH E. CLOUSE
  *Associate General Counsel*
ANDY T. WANG
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
Matthew.Berry@mail.house.gov

*Counsel for Intervenor-Defendant Committee on the
Judiciary of the U.S. House of Representatives*

June 8, 2026

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.      The Committee's Constitutional Authority To Investigate and To Request
Information To Advance Its Investigations ........................................................... 3

II.     The Committee's Investigation into the Department of Justice........................... 5

III.    The Committee's Requests for the Recordings ................................................... 7

IV.    Procedural History ............................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.      Plaintiff Cannot Demonstrate a Substantial Likelihood of Success on the Merits ........... 12

      A.     The Committee Has a Valid Legislative Purpose ................................... 12

            1.     The Committee's Legitimate Legislative Purpose..................................... 13

            2.     The Committee's Request is Not "Pretextual" ........................................ 16

      B.     The Administrative Procedure Act Does Not Apply to Executive Branch
Disclosures to Congress ......................................................................... 18

      C.     *Mazars* Does Not Apply ....................................................................... 23

            1.     The Rationale Underlying *Mazars* Is Not Present Here .......................... 23

            2.     Plaintiff, While a President, Is Not *the* President ................................... 26

      D.     The Privacy Act Does Not Preclude Production to the Committee...................... 29

      E.     FOIA Exemptions Are Not Relevant Here ........................................... 31

II.     The Remaining Preliminary Injunction Factors Favor the Committee........................... 33

CONCLUSION................................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**

*Angelo v. District of Columbia,*
648 F. Supp. 3d 116 (D.D.C. 2022) ................................................................................35

*Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.,*
573 F.3d 815 (D.C. Cir. 2009) ......................................................................................11

*\*Barenblatt v. United States,*
360 U.S. 109 (1959)......................................................................................4, 12, 17

*Bean LLC v. John Doe Bank,*
291 F. Supp. 3d 34 (D.D.C. 2018) ............................................................................12, 17

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ..................................................................................35, 36

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979).....................................................................................................19

*Clinton v. Jones,*
520 U.S. 681 (1997).....................................................................................................26

*\*Comm. on the Judiciary of the U.S. House of Representatives v. McGahn,*
968 F.3d 755 (D.C. Cir. 2020) ..................................................................................23, 33

*\*Comm. on the Judiciary, U.S. House of Representatives v. Miers,*
558 F. Supp. 2d 53 (D.D.C. 2008) .............................................................................21, 33

*Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury,*
45 F.4th 324 (D.C. Cir. 2022) .............................................................................25, 27, 28

*Devine v. United States,*
202 F.3d 547 (2d Cir. 2000) .............................................................................29, 30, 31

*\*Eastland v. U.S. Servicemen's Fund,*
421 U.S. 491 (1975)..........................................................................4, 12, 15, 17, 34

*Elec. Priv. Info. Ctr. v. Transp. Sec. Admin.,*
928 F. Supp. 2d 156 (D.D.C. 2013) ...............................................................................33

*Exxon Corp. v. FTC,*
    589 F.2d 582 (D.C. Cir. 1978) ...................................................................................................19, 34

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ...........................................................................................................35

*Guerrero v. Clinton,*
    157 F.3d 1190 (9th Cir. 1998) ...........................................................................................................20

*Heritage Found. v. DOJ*, Memorandum Opinion,
    No. 24-cv-00645 (D.D.C. May 12, 2026), ECF No. 63.......................................................10, 32

*Jigsaw Prods., Inc. v. SEC,*
    No. 24-cv-2358, 2026 WL 797411 (D.D.C. Mar. 23, 2026)......................................................36

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.,*
    5 F.3d 1508 (D.C. Cir. 1993) ...........................................................................................................34

*\*McGrain v. Daugherty,*
    273 U.S. 135 (1927)..........................................................................................4, 12, 13, 17, 18

*McPhaul v. United States,*
    364 U.S. 372 (1960) ...........................................................................................................................18

*McSurely v. McClellan,*
    521 F.2d 1024 (D.C. Cir. 1975) ...................................................................................................15, 34

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ...........................................................................................................................20

*Muldrow v. City of St. Louis,*
    601 U.S. 346 (2024)............................................................................................................................30

*Murphy v. Dep't of Army,*
    613 F.2d 1151 (D.C. Cir. 1979)..........................................................................................................33

*Nat. Res. Def. Council, Inc. v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988) ...........................................................................................................20

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014)............................................................................................................................22

*Northrop Grumman Sys. Corp. v. NASA,*
   346 F. Supp. 3d 109 (D.D.C. 2018) ...................................................................................19

*Quinn v. United States,*
   349 U.S. 155 (1955).........................................................................................................33

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012).........................................................................................................20

*Rubin v. United States,*
   449 U.S. 424 (1981).........................................................................................................29

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011)..........................................................................................11

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   990 F. Supp. 2d 9 (D.D.C. 2013) .....................................................................................35

*Townsend v. United States,*
   95 F.2d 352 (D.C. Cir. 1938) ...........................................................................................12

*\*Trump v. Mazars USA, LLP,*
   591 U.S. 848 (2020)...............................................................2, 22, 23, 24, 25, 26, 27

*Trump v. Mazars USA, LLP,*
   39 F.4th 774 (D.C. Cir. 2022)...........................................................................................28

*\*United States v. Am. Tel. & Tel. Co.,*
   567 F.2d 121 (D.C. Cir. 1977) .............................................................................1, 2, 21

*United States v. Nixon,*
   418 U.S. 683 (1974)..........................................................................................................26

*United States v. Rumely,*
   345 U.S. 41 (1953)..............................................................................................................4

*United States v. Trump,*
   740 F. Supp. 3d 1245 (S.D. Fla. 2024), *appeal dismissed,*
   No. 24-12311, 2024 WL 6081345 (11th Cir. Nov. 26, 2024) ...................................6

*Venetian Casino Resort, L.L.C. v. EEOC,*
   530 F.3d 925 (D.C. Cir. 2008)..........................................................................................19

*Watkins v. United States,*
354 U.S. 178 (1957)................................................................................4, 6, 17

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008)....................................................................................11, 35

*Wisconsin Gas Co. v. FERC,*
758 F.2d 669 (D.C. Cir. 1985) ........................................................................35

**Constitution**

U.S. Const. art. I, § 1, cl. 1...............................................................................4

**Statutes**

5 U.S.C. § 551(1)(A)........................................................................................19

5 U.S.C. § 552(d) ...................................................................................3, 19, 32

5 U.S.C. § 552a .............................................................................................29

5 U.S.C. § 552a(b)(9) ..........................................................................2, 19, 20, 29

26 U.S.C. § 6103(f)(1) ......................................................................................25

**Legislative Authorities**

H. Rep. No. 118-628 (2024), https://perma.cc/5F53-7BS6 ............................................9

Rules of the House of Representatives,
119th Cong. (2025), https://perma.cc/3UX4-2YG5

House Rule X.1...........................................................................................4

House Rule X.1(l)(7) ...............................................................................5, 29

House Rule X.2(b)(1)(B) ..............................................................................5

House Rule XI.1(b)(1) .................................................................................4

**Other Authorities**

*1 Congress Investigates: A Documented History 1792-1974*
(Arthur M. Schlesinger, Jr. & Roger Burns eds., 1983).............................................3

*2 James Wilson, Collected Works of James Wilson*
(Kermit L. Hall & Mark David Hall eds., 2007),
https://perma.cc/NL97-PSPE ................................................................................................3

Motion To Intervene By Joseph R. Biden, Jr.,
*Heritage Found. v. DOJ*, No. 24-cv-00645 (D.D.C. May 12, 2026), ECF No. 51 ..................10

Memorandum of Law In Support Of Motion To Intervene By Joseph R. Biden Jr.,
*Heritage Found. v. DOJ*, No. 24-cv-00645 (D.D.C. May 12, 2026), ECF No. 51-1 ...............10

Proposed Defendant-Intervenor's Answer To Amended Complaint & Cross-Claims,
*Heritage Found. v. DOJ*, No. 24-cv-00645 (D.D.C.), ECF No. 51-3 ......................................10

Robert K. Hur, *Report on the Investigation Into Unauthorized Removal,*
*Retention, and Disclosure of Classified Documents Discovered at*
*Locations Including the Penn Biden Center and the Delaware*
*Private Residence of President Joseph R. Biden, Jr.*, (Feb. 2024),
https://perma.cc/X5MV-RU8J .................................................................................5, 6, 7, 8, 14

Superseding Indictment, *United States v. Trump*,
No. 23-cr-80101 (S.D. Fla. July 15, 2024), ECF No. 85 ..........................................................6

**INTRODUCTION**

Plaintiff's case is based upon at least five erroneous premises.

**First and foremost**, the efforts by the Committee on the Judiciary of the U.S. House of Representatives (Committee) to obtain the recordings of Plaintiff's conversations with his ghostwriter did not begin in March 2026.  Rather, the Committee subpoenaed these recordings *more than two years ago*.  Thus, while Plaintiff claims that the Committee's request for these recordings is part of a "pretextual scheme" related to ongoing FOIA litigation, the fact remains that the Committee first requested these recordings *before the FOIA litigation even commenced*. The Committee seeks to obtain these recordings as part of its broader investigation of the Department of Justice's (Department) use of special counsels during the Biden Administration, whether those special counsel investigations delivered impartial justice, and if not, whether legislative reforms to the Department of Justice and its use of special counsels are necessary. Notwithstanding Plaintiff's puzzling and repeated references to the Committee making a "purported request" for these recordings, the Committee's interest in these materials is real and longstanding.

**Second**, the Department's cooperation with the Committee's oversight request is not reviewable under the Administrative Procedure Act (APA).  Plaintiff notably does not cite a single case where a court has held that an Executive Branch agency's response to a Congressional request for materials is subject to judicial review under the APA; this court should not be the first.  The D.C. Circuit has stressed the importance of the two political branches engaging in an accommodations process to attempt to resolve Congressional requests for information without judicial intervention.  *See, e.g.*, *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977).  It has stated that there should be a "a spirit of dynamic

1

compromise" where "each branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *Id.*  Here, by contrast, Plaintiff seeks to place the Judiciary squarely in the middle of the accommodations process.  For example, when engaging in "dynamic compromise," an agency would have to explain a change in its negotiating position to the satisfaction of a court.  This would both mark a dramatic expansion of the Judiciary's role in the accommodations process and inhibit the successful operation of that process.

**Third**, the framework set forth by the Supreme Court in *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020), does not apply to this case.  The *Mazars* framework is fundamentally premised on the existence of an "interbranch conflict" which arises when Congress attempts to compel the production of the President's information.  591 U.S. at 868.  In this case, however, the Executive Branch and Legislative Branch are in alignment; the Department seeks to voluntarily provide materials to Congress, a decision that is not governed by the *Mazars* framework.  Moreover, Plaintiff is a former President of the United States, but he is not "the President," the relevant term used throughout the Supreme Court's opinion.  *See infra* pp. 26-29.  And the recordings at issue here were made before Plaintiff served as President.

**Fourth**, the Department's production of the recordings to the Committee is exempt from the Privacy Act.  Specifically, the statute states that it does not prohibit disclosures to "either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee."  5 U.S.C. § 552a(b)(9).  Here, oversight of Department special counsel investigations is plainly a subject within the jurisdiction of the Committee.  Plaintiff's attempt to

explain why this straightforward provision does not apply here depends on reading requirements into the statute that appear nowhere in its text.

**Fifth**, this is not a Freedom of Information Act (FOIA) case.  Although Plaintiff devotes considerable space to discussing FOIA exemptions and the Department's analysis of whether those exemptions apply to the recordings at issue here, the statute makes clear that FOIA exemptions do not provide the Department with "authority to withhold information from Congress."  5 U.S.C. § 552(d).

For these reasons as explained in more detail below, Plaintiff cannot establish any likelihood of success on the merits.  Accordingly, his motion for preliminary injunction should be denied.

## BACKGROUND

I.    **The Committee's Constitutional Authority To Investigate and To Request Information To Advance Its Investigations**

Congress's authority to conduct oversight and investigations—and to issue requests for information—has a long and storied lineage.  From the time of the Framers, it has been expected that Congress would conduct investigations like the British House of Commons, functioning as "the grand inquest of the state … diligently inquir[ing] into grievances, arising from both men and things."  2 James Wilson, *Collected Works of James Wilson* 74 (Kermit L. Hall & Mark David Hall eds., 2007), https://perma.cc/NL97-PSPE.  Congress was designed to "play its part in preserving the balance of the Constitution through its possession of three vital powers: the power to authorize war; the power of the purse; and *the power of investigation*."  1 *Congress Investigates: A Documented History 1792-1974* i (Arthur M. Schlesinger, Jr. & Roger Burns eds., 1983) (emphasis added).

Article I of the Constitution vests in Congress "[a]ll legislative Powers." U.S. Const. art. I, § 1, cl. 1. Those include the authority to investigate matters relating to subjects within its broad legislative purview; conduct oversight of Executive Branch agencies; examine whether those agencies are faithfully, effectively, and efficiently executing the laws; and determine whether changes to federal law are necessary and proper. For nearly a century, the Supreme Court has consistently recognized that among the "legislative Powers" vested in Congress is a "power of inquiry" regarding any subject on which "legislation could be had." *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927); *Watkins v. United States*, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process."). Indeed, "[t]he scope of [Congress's] power of inquiry … is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). The investigative power is necessarily broad because a "legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975).

The House of Representatives' power to investigate and conduct oversight is delegated by the House Rules to its standing Committees.[1] *See* House Rule XI.1(b)(1) ("Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X."); *see also United States v. Rumely*, 345 U.S. 41, 44 (1953) (upholding delegated committee powers). As relevant to this case, the Committee

---

[1] The House Rules establish various standing committees, including the Committee on the Judiciary, and delegates to each committee "jurisdiction and related functions." *See generally* House Rule X.1, Rules of the House of Representatives, 119th Cong. (2025) (House Rules), https://perma.cc/QD7D-WRAX.

has been delegated jurisdiction over "[c]riminal law enforcement and criminalization," *see* House Rule X.1(l)(7), which necessarily encompasses oversight authority over the Department, *see* House Rule X.2(b)(1)(B) (stating that Committees shall "review and study on a continuing basis … the organization and operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within their jurisdiction").  Thus, the Committee has plenary authority—stemming from the House's constitutional power to conduct legislative oversight—to carry out the investigation at issue here.

## II.    The Committee's Investigation into the Department of Justice

During the Biden Administration, Attorney General Merrick Garland tasked one special counsel with investigating then-President Biden and another special counsel with investigating then-former President Trump.  Both investigations involved allegations related to the retention and handling of classified information.

In the first case, Special Counsel Robert K. Hur determined that on multiple occasions in early 2017, Plaintiff, then a private citizen having concluded his service as Vice President, disclosed classified information to Mark Zwonitzer, a ghostwriter who worked with Plaintiff, during conversations in preparation for Plaintiff's memoir.[2]  These conversations were recorded, and as part of his investigation, Hur acquired these recordings.  Decl. of Todd Tatelman (Decl.), Ex. B at 1-2.  Hur relied in part on them for his bottom-line conclusions that: (1) there was evidence that Plaintiff willfully retained and disclosed classified materials after his vice presidency; but (2) the evidence did not establish his guilt beyond a reasonable doubt.  *See id.* at

---

[2]  Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.*, 103-06 (Feb. 2024) (Hur Report), https://perma.cc/X5MV-RU8J.

3-4. Specifically, these recordings indicate that "during his dozens of hours of interviews with Zwonitzer, [Plaintiff] read from notebook entries" that contained classified information to Zwonitzer, and that, in one recording, Plaintiff specifically told Zwonitzer that he had "just found all the classified stuff downstairs." Hur Report at 106, 108-115. Notwithstanding this evidence, Hur ultimately decided that criminal charges against Plaintiff were unwarranted. *Id.* at 1. In the second case, Special Counsel Jack Smith, unlike Hur, elected to prosecute. Among other things, President Trump was charged with 32 counts of unlawfully retaining classified information after his first term in office,[3] which were ultimately dismissed by the U.S. District Court for the Southern District of Florida.[4]

For more than two years, the Committee has been using its investigatory powers to conduct oversight of the Department's use of special counsels during the Biden Administration, and, more specifically, the two aforementioned special counsel investigations. Decl., Ex. B at 1-2. It has held hearings, taken depositions, conducted transcribed interviews to obtain relevant testimony, and received numerous documents through subpoenas and requests to the Department and others. *Id.* The Committee has used its "broad" investigatory power to "survey[] … defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Watkins*, 354 U.S. at 187. Specifically, the Committee initiated this investigation because "while Special Counsel Hur declined to bring charges against President Biden, at the same time, the Department, through [Special Counsel Jack Smith's] office, [was] prosecuting [President Trump] for allegedly mishandling classified information." Decl., Ex. B at 4. To the

---

[3] Superseding Indictment, *United States v. Trump*, No. 23-cr-80101 (S.D. Fla. July 15, 2024), ECF No. 85.

[4] *United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024), *appeal dismissed*, No. 24-12311, 2024 WL 6081345 (11th Cir. Nov. 26, 2024).

extent that the Committee were to conclude that special counsel investigations during the Biden Administration did not lead to fair outcomes, the Committee may consider legislative reforms to address this problem including, among other proposals, "changing certain procedures governing the Department's special counsel investigations to better ensure that the Department pursues impartial justice." *Id.* at 5 (internal quotation marks and citation omitted). Additionally, because Hur's investigation of President Biden concerned his alleged disclosure of classified information to another person, examining his investigation could also "help inform [potential] legislative reforms related to the management of classified information, 'includ[ing], among other proposals, establishing clear statutory guidelines governing the handling, storage, and disclosure of classified materials, as well as modifying criminal penalties for the unauthorized dissemination and disclosure of classified materials.'" *Id.* at 5 (citation omitted).

### III.    The Committee's Requests for the Recordings

The recordings of Biden and Zwonitzer are relevant to the Committee's investigation. As the Committee has explained, "Special Counsel Hur detailed how the Biden-Zwonitzer tapes were essential in [his] investigation." *Id.* at 3. Hur stated that part of the reason he declined to recommend charging Plaintiff was because Plaintiff's "memory was significantly limited … during his recorded interviews with the ghostwriter in 2017," and thus it "would be difficult to convince a jury that they should convict him … of a serious felony that requires a mental state of willfulness." Hur Report at 5-6. Hur claimed that "Mr. Biden's recorded conversations with Zwonitzer from 2017 [were] often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries." *Id*. at 207. Hur also relied on other aspects of the recordings in deciding not to prosecute Plaintiff for unlawfully disclosing classified information to Zwonitzer. For example, Hur contended that Plaintiff discussed highly emotional topics with Zwonitzer just before he read a classified passage to him, and that "the

lack of any pause before Mr. Biden launched into reading the classified entry" could lead a juror to conclude that he had not considered whether the information was classified (and thus had not disclosed it willfully).  *Id.* at 246.

Given Hur's stated reasons for not bringing charges against Plaintiff and the fact that the Committee is investigating whether the Department pursued impartial justice through its use of special counsels, the recordings are both relevant and important because they will help the Committee "to properly assess whether Special Counsel Hur appropriately pursued justice by declining to recommend charges against President Biden."  Decl., Ex. B at 4 (internal quotation marks and citation omitted).  In turn, that will assist the Committee in determining "whether legislative reforms to the Department … and its use of special counsels are necessary," such as "changing certain procedures governing the Department's special counsel investigations to better ensure that the Department pursues impartial justice."  *Id.* at 1 (internal quotation marks and citation omitted).  Likewise, the recordings may inform possible legislative reforms related to the management of classified information as well as modifying criminal penalties for the unauthorized dissemination and disclosure of classified materials.  As the Committee has articulated, it:

> seeks to understand the context behind President Biden's disclosure of classified materials to [Zwonitzer]—especially given the fact that he later stored and handled the classified information for his own use. The Committee [also] seeks to comprehend the manner of the storage and handling of such materials, the way the President disclosed the classified materials to Mr. Zwonitzer for his own gain, and whether reforms are needed to curb or prevent such future behavior by government officials entrusted with classified information.

*Id.* at 5 (first alteration in original) (citation omitted).

Given the relevance of the recordings to the Committee's investigation, it began its effort to acquire them from either Zwonitzer or the Department *over two years ago* shortly after it launched its investigation.  *See id.* at 2-3.

As to Zwonitzer, on February 14, 2024, shortly after the release of Hur's final report, the Committee sent a letter to him requesting, among other things, the recordings of his conversations with Plaintiff. *Id.* at 2 & n.9. Because Zwonitzer declined to voluntarily produce the recordings, the Committee subpoenaed them on March 22, 2024. *Id.* at 2 & n.10. Even with the subpoena, however, Zwonitzer refused to comply. *Id.* at 2-3. As a result, the Committee reported a resolution recommending that Zwonitzer be held in contempt of Congress. *See* H. Rep. No. 118-628 (2024), https://perma.cc/5F53-7BS6. As to the Department, on February 12, 2024, the Committee wrote to Attorney General Merrick Garland requesting documents referenced in Hur's report, including "[a]ll documents and communications, including audio and video recordings, related to the Special Counsel's interview[s] of President Biden and Mark Zwonitzer." Decl., Ex. B at 3 & n.13. This request encompassed the recordings at issue in this case because they were discussed during these interviews. *See id.* at 3-4. However, Attorney General Garland refused to cooperate with the Committee's request, so the Committee issued a subpoena on February 27, 2024. *Id*. at 3 & nn.6, 14. To date, the Committee has not received any of these recordings from either the Department or Zwonitzer.

In March of this year, when the Committee was made aware of an opportunity to finally obtain these recordings from the Department more than two years after first seeking them, it wrote another letter to the Department requesting that they be produced. *See* Decl., Ex. A. Subsequent to Plaintiff being informed that the Department intended to disclose the recordings to the Committee and the Heritage Foundation—which had separately sued the Department for the recordings in a Freedom of Information Act (FOIA) lawsuit back in 2024—he sought to intervene in the FOIA case as a defendant and to assert crossclaims against the Department. *See* Motion To Intervene By Joseph R. Biden, Jr., *Heritage Found. v. DOJ*, No. 24-cv-00645

9

(D.D.C. May 12, 2026), ECF No. 51.  In his intervention papers, Plaintiff broadly attacked the Committee's investigation, calling it "pretextual," "lack[ing in] legitimate legislative purpose," and done "for the sake of exposure, among other improper purposes," and argued that its request for the recordings was "invalid and unenforceable."  Memorandum of Law In Support Of Motion To Intervene By Joseph R. Biden Jr. at 3, *Heritage Found.*, No. 24-cv-00645 (D.D.C.), ECF No. 51-1; Proposed Defendant-Intervenor's Answer To Amended Complaint & Cross-Claims at 29-31, *Heritage Found.*, No. 24-cv-00645 (D.D.C.), ECF No. 51-3.

After the Committee learned of Plaintiff's intervention motion, it sent a letter to the Department on May 22, 2026, to "correct[] the record" and rebut Plaintiff's baseless accusations. *See* Decl., Ex. B at 6.  The Committee's May 22 letter to the Department recounted the more-than-two-year long history of the Committee trying to acquire the recordings, discussed their relevance to the Committee's investigation, and again asked the Department to turn over the recordings.  *See id.*

## IV.    Procedural History

In the Heritage Foundation's FOIA case, the district court granted Biden's motion to intervene as a defendant but denied his attempt to raise crossclaims against the Department related to the disclosure of the recordings to the Committee, holding that an intervenor can only raise matters already before the court and that his crossclaims raised different legal issues than Heritage's FOIA suit.  *See* Memorandum Opinion at 12-13, *Heritage Found.*, No. 24-cv-00645 (D.D.C.), ECF No. 63.  Shortly thereafter, on May 26, 2026, Plaintiff filed this case against the Department, bringing three claims under the Administrative Procedure Act.  *See* ECF No. 1 at 17-20.  Throughout his Complaint, Plaintiff attacks the Committee's investigation and request for the recordings.  He asks the Court to declare that the Committee's request for the recordings

10

"is pretextual, lacks a legitimate legislative purpose, is outside the scope of the Committee's investigative powers under Article I of the Constitution, and is invalid and unenforceable," as well as to enjoin the Department from disclosing the recordings to the Committee. *Id.* at 21.

As a result, to "defend itself against these spurious attacks [and to] advocate for the critical and fundamental congressional interests at stake," the Committee moved to intervene. ECF No. 18 at 2. Shortly after the Committee filed its motion, Plaintiff filed his Motion for Preliminary Injunction, seeking to enjoin the Department "from disclosing or causing to be disclosed the written transcript and audio recordings at issue in this matter, or any portion thereof, to the U.S. House Committee on the Judiciary." ECF No. 23 at 1. The Court granted the Committee's intervention motion on June 2 and ordered the Committee to file its Opposition to Plaintiff's Motion for Preliminary Injunction on the same schedule as the Department, that is, by June 8. *See* Minute Order (June 2, 2026). The Committee now timely files its Opposition.

## ARGUMENT

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To demonstrate entitlement to a preliminary injunction, a litigant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Plaintiff has not met his high burden here. Among other things, Plaintiff's failure to show a likelihood of success on the merits is sufficient to defeat his motion for a preliminary injunction. *See Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009).

11

**I.      Plaintiff Cannot Demonstrate a Substantial Likelihood of Success on the Merits**

Plaintiff cannot show a likelihood of success on the merits because both the Committee's underlying investigation and the specific request at issue here are valid exercises of its constitutional authority to gather information in furtherance of its legislative and oversight functions.  Plaintiff's Complaint and Motion for Preliminary Injunction misunderstand and misrepresent the Committee's clear legislative purpose in seeking the recordings here and invite the Court to intervene in and disrupt the accommodations process that resulted in an agreement between the Committee and the Executive Branch whereby the recordings are to be produced.

**A.      The Committee Has a Valid Legislative Purpose**

Congress's broad authority to obtain information to conduct oversight and investigations is well-established.  *See, e.g.*, *Eastland*, 421 U.S. at 504 n.15 ("[T]he scope of [Congress's] power of inquiry … is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." (citation omitted)); *McGrain*, 273 U.S. at 161, 174 (recognizing that Congress's "power to se[c]ure needed information … has long been treated as an attribute of the power to legislate" and "is an essential and appropriate auxiliary to the legislative function"); *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 43 (D.D.C. 2018) (similar).

Both the Supreme Court and D.C. Circuit have repeatedly confirmed that the legislative power of inquiry is broad and "has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate[.]"  *Barenblatt*, 360 U.S. at 111; *see also Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938) ("A legislative inquiry anticipates all possible cases which may arise thereunder and the evidence admissible must be responsive to the scope of the

12

inquiry, which generally is very broad."). For example, in *McGrain*, the Supreme Court held that even where the original resolution authorizing the Senate's investigation into the Teapot Dome Affair made no mention of a legislative purpose, 273 U.S. at 177, "[p]lainly the subject was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit." *Id.* Moreover, the Court concluded that it was "bound to presume that the action of the legislative body was with a legitimate object, if it is capable of being so construed, and we have no right to assume that the contrary was intended." *Id.* at 178 (quotation marks and citation omitted).

Notwithstanding this extensive jurisprudence, Plaintiff argues that the Department should be enjoined from complying with the Committee's request because the request lacks a "legitimate legislative purpose." ECF No. 23-1 at 12 (Mem.). Plaintiff also attacks the request as "invalid and unenforceable" because it is part of a "pretextual scheme" concocted "by the Department to circumvent [its] statutory obligations" under FOIA. *Id.* at 14. Each of these assertions lack merit.

### 1.  The Committee's Legitimate Legislative Purpose

The Committee's legitimate legislative purpose here is straightforward. As detailed above, *see supra* pp. 5-10, for over two years the Committee has been engaged in a substantial investigation of the use of special counsels during the previous administration in an effort to determine if any legislative reforms to the Department of Justice and its use of special counsels are necessary. Decl., Ex. B at 1. Such reforms may include changes to "certain procedures governing the Department's special counsel investigations to better ensure that the Department pursues impartial justice." *Id.* The Committee initiated this investigation because while Special Counsel Hur declined to bring charges against Plaintiff for his alleged mishandling of classified

13

information, at the same time, the Department, through Special Counsel Smith's office, was actively prosecuting President Trump for allegedly mishandling classified information.  Decl., Ex. B at 4.  To the extent that the Committee determines that the Department's use of special counsels is not leading to fair and impartial outcomes, legislative reforms may be warranted.

Furthermore, as set forth above, *see supra* pp. 7-8, Hur has explained that the recordings of Plaintiff's conversations with Zwonitzer were an important factor in his decision not to bring charges against Plaintiff.  Therefore, a review of these recordings is relevant to determining whether Hur's investigation resulted in fair and impartial justice.

Plaintiff suggests that the portions of the transcripts cited by Hur are sufficient for the Committee's purpose.  *See* Mem. at 20 n.4.  That argument is belied by the reasoning set forth in Hur's report.  For example, in reaching his conclusion that "[i]t would be difficult to convince a jury that they should convict [Plaintiff] … of a serious felony that requires a mental state of willfulness," Hur Report at 5-6, Hur relied in part on his observation that "Mr. Biden's recorded conversations with Zwonitzer from 2017 [were] often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries," *id.* at 207. Similarly, Hur noted that when Plaintiff "told Zwonitzer he had 'just found all the classified stuff downstairs,' Mr. Biden's tone was remarkably casual." *Id*. at 206-07.  Hur observed that this "seeming nonchalance" could lead potential jurors to conclude that Plaintiff's discovery of classified materials "was something he quickly could have forgotten," meaning that he lacked the required mental state.  *Id.* at 207.  But a cold transcript does not reveal, among other things, the pace of Plaintiff's speech or his tone.  Moreover, a review of the entire recordings, not just those portions cited in Hur's report, is relevant to determining whether Plaintiff's conversations were, in fact, painfully slow, and whether he was, in fact, struggling to remember events in a manner,

or stating things in a certain tone that would have led a jury to question whether he possessed the required a mental state of willfulness.

Likewise, the fact that these recordings "predate [Plaintiff's] presidency by years," Mem. at 20, does nothing to cast doubt on the Committee's legislative purpose. Because the recordings are an important piece of evidence upon which Hur relied in deciding not to charge Plaintiff, a review of those recordings is relevant to the Committee determining whether Hur's investigation produced fair and impartial justice and objectively evaluated the evidence. Decl., Ex. B at 3-4. The date when the recordings were made is irrelevant.

More fundamentally, Plaintiff's argument that, in his opinion, the Committee's request is "far broader than reasonably necessary" to the investigation, Mem. at 20 n.4, misses the point. It is not appropriate for outside entities, the subjects of investigations, or witnesses to set the parameters of a Congressional investigation or determine what evidence and information may be necessary or sufficient for a Committee to review. "There is no requirement that every piece of information gathered in [a Congressional] investigation be justified before the judiciary." *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975). In fact, the Supreme Court has recognized that Congressional investigations may lead "up some 'blind alleys' and into nonproductive enterprises. [But] [t]o be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509.

Given that the Committee's investigation here plainly involves a serious inquiry into the actions of the Department of Justice during the prior administration in service of both fact-

15

finding and consideration of potential remedial legislation, there can be no serious question about its legitimacy.[5]

### 2.    The Committee's Request is Not "Pretextual"

Nor is the Committee's interest in these materials the product of some "pretextual scheme" recently "engineered" by the Department, as Plaintiff repeatedly alleges. Mem. at 12, 13-14, 16-17, 36. Rather, the record demonstrates that the Committee's interest in obtaining these recordings began over two years ago. On February 14, 2024, shortly after the release of Hur's final report, the Committee sent a letter to Zwonitzer requesting, among other things, the Biden-Zwonitzer recordings at issue here. Decl., Ex. B at 2. Zwonitzer refused the Committee's request for voluntary cooperation, and on March 22, 2024, the Committee issued a subpoena compelling production of the tapes. *Id.* After initial back-and-forth over Zwonitzer's objections to the subpoena, he again refused to comply with the subpoena, ultimately leading the Committee to recommend he be held in contempt of Congress. *Id.* at 2-3. Incidentally, the subpoena that the Committee previously issued to acquire the recordings at issue here was a real subpoena, not a "purported" subpoena, just as the Committee's current request for these recordings is a real request, not a "purported request" as Plaintiff repeatedly asserts, Mem. at 16-21, 31, 35.

---

[5] In addition to possible legislation regarding use of special counsels, the Committee seeks information to help assess whether any changes to the laws on the "handling, storage, and disclosure of classified materials," and "criminal penalties for the unauthorized dissemination and disclosure of classified materials" are needed. Decl., Ex. B at 5. The recordings at issue here apparently contain direct discussions of the Plaintiff's retention and handling of classified materials after he left office. *Id*. at 3 (noting that Hur directly asked Plaintiff about a recorded statement by Plaintiff that he "just found all the classified stuff downstairs"). As such, "[t]he Committee seeks to comprehend the manner of the storage and handling of such materials, the way [Plaintiff] disclosed the classified materials to Mr. Zwonitzer for his own gain, and whether reforms are needed to curb or prevent such future behavior by government officials entrusted with classified information." *Id*. at 5.

16

Moreover, the Committee contemporaneously attempted to gain access to the tapes through the Department, writing a letter to Attorney General Merrick Garland on February 12, 2024, requesting documents referenced in Hur's report "including audio and video recordings, related to the Special Counsel's interview[s] of President Biden and Mark Zwonitzer."  Decl., Ex. B. at 3.  Attorney General Garland refused to cooperate with this voluntary request, and the Committee ultimately issued a subpoena to the Attorney General on February 27, 2024.  *See id.* In short, the allegation that the Committee's interest in these recordings has been "engineered by the Department," Mem. at 12, ignores the relevant facts.

But even if the Court is inclined to believe Plaintiff's framing of the events leading to this litigation, which it should not, that ultimately does not matter.  This is because the Supreme Court has instructed that "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132.  Phrased another way, it is not for this Court to adjudicate the motivations of the Committee or second-guess its reasonable determinations regarding the need for this information.  *Eastland*, 421 U.S. at 509 ("The wisdom of congressional approach or methodology is not open to judicial veto."); *Watkins*, 354 U.S. at 200 ("But a solution to our problem is not to be found in testing the motives of committee members for this purpose.  Such is not our function."); *McGrain*, 273 U.S. at 178; *see also, e.g.*, *Bean LLC*, 291 F. Supp. 3d at 44 (holding that courts "lack[] the authority to restrict the scope of the Committee's investigation" and stating that they "*may not* [] engage in a line-by-line review of ... Committee[] requests" (emphasis added)).

The ability of this Court to examine the Committee's inquiry is limited to whether it is authorized under House Rules (which it is, *see supra* pp. 4-5), and whether Plaintiff can

17

demonstrate that the Committee's request is "plainly incompetent or irrelevant to any lawful purpose," *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (citation omitted), which he cannot.  It is sufficient for the Committee to show that the subject matter of the legislative inquiry is "one on which legislation *could* be had and would be materially aided by the information which the investigation was calculated to elicit."  *McGrain*, 273 U.S. at 177 (emphasis added).  The Committee's investigation and request here easily meet that standard. Despite Plaintiff's objections, he has offered no legitimate argument that the oversight request to the Department could not elicit information that will aid and inform the Committee in its oversight of the Department's use of special counsels in sensitive high-profile investigations and whether those special counsels are obtaining impartial justice, which are topics upon which legislation could be had.

B.   **The Administrative Procedure Act Does Not Apply to Executive Branch Disclosures to Congress**

Plaintiff improperly and fatally frames this entire dispute as challenging decisions by the Department that are governed by the judicial review provisions of the APA.  Rather, the applicable and appropriate framework is the constitutionally-based accommodations process for negotiating interbranch disputes.

Plaintiff's causes of action and legal argument are based on the flawed premise that the Department's decision to produce records in response to the Committee's oversight request constitutes "final agency action" that is subject to judicial review under the APA.  Mem. at 12 ("The Department's decision to disclose the materials to the Committee … is a final agency action that is arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the APA.").  However, the APA does not govern either the interaction or the flow of information between the Executive and Legislative Branches.  Therefore, since *all* three counts in Plaintiff's

18

Complaint are APA claims, *see* ECF No. 1 at 17-20, he does not have a substantial likelihood of success on the merits for this reason alone.

As an initial matter, the APA does not apply to actions by Congress. 5 U.S.C. § 551(1)(A) (explicitly excluding Congress from the APA's definition of "agency"). To the extent Plaintiff is attempting to find a backdoor to judicial review of the legitimacy of both the Committee's investigation and this specific request, it must necessarily fail because the Committee's actions are unreviewable under the APA.

Although the APA applies to certain actions by the Department, Plaintiff has identified no case where a court has applied the APA to an agency's decision to disclose records in response to a Congressional oversight request, and Intervenor-Defendant is aware of none.[6] Additionally, agency disclosures to Congress are expressly exempt from the specific statutes that principally govern the Executive Branch's ability and responsibility to release information. FOIA specifically states that the statute provides no "authority to withhold information from Congress." 5 U.S.C. § 552(d). Similarly, the Privacy Act exempts disclosures "to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee

---

[6] None of the APA cases cited by Plaintiff involving the release of information held by an agency entailed disclosure to Congress. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 287-89 (1979) (reverse-FOIA action involving agency disclosure to the public); *Northrop Grumman Sys. Corp. v. NASA*, 346 F. Supp. 3d 109, 113 (D.D.C. 2018) (reverse-FOIA action involving agency disclosure to public); *Creed v. Nat'l Transp. Safety Bd.*, 758 F. Supp. 2d 1, 2-3 (D.D.C. 2010) (challenging agency's posting of medical information on a public website); *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 927-29 (D.C. Cir. 2008) (challenging EEOC policy of disclosure of investigatory materials to potential plaintiffs). The sole case cited by Plaintiff involving agency disclosure to Congress involved the Federal Trade Commission Act and nowhere mentioned the APA. *See Exxon Corp. v. FTC*, 589 F.2d 582, 588 (D.C. Cir. 1978) ("For this court on a continuing basis to mandate an enforced delay on the legitimate investigations of Congress whenever these inquiries touched on trade secrets could seriously impede the vital investigatory powers of Congress and would be of highly questionable constitutionality.")

19

thereof, any joint committee of Congress or subcommittee of any such joint committee."

5 U.S.C. § 552a(b)(9).  It would therefore be anomalous for an exceedingly general statute like

the APA to restrict an agency's disclosure of information in response to a Congressional

oversight request.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("It is a

commonplace of statutory construction that the specific governs the general[.]"); *RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (noting that this principle

"is particularly true where … 'Congress has enacted a comprehensive scheme and has

deliberately targeted specific problems with specific solutions.'" (citation omitted)).

Furthermore, courts have declined to review under the APA agency decisions in cases

where there was an express statutory obligation to report information to Congress.  *See, e.g.*, *Nat.*

*Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988) ("Executive responses to

congressional reporting requirements of the kind presented here represent, we believe, an entirely

different sort of agency action."); *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998)

(finding that failure to issue a required report "is not agency action of the sort that is typically

subject to judicial review").  In *Hodel*, the D.C. Circuit expressly rejected application of the APA

to an agency's compliance with statutory reporting requirements, noting that it "invited [the

court] to sail into uncharted waters and hold, at least potentially, that the veritable cornucopia of

federal reporting requirements, involving basic interrelationships between the Article I and

Article II branches, are appropriate grist for the judicial mill."  865 F.2d at 317.  This Court

should decline Plaintiff's similar invitation to sail into uncharted waters here.

Historically, disputes over Congressional access to records from the Executive have been

hashed out politically through the negotiation and accommodations process, which reflects the

carefully considered relationship between the coordinate branches envisioned by the Framers in

20

our system of constitutional separation of powers. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 67 (D.D.C. 2008) ("The political branches have instead traditionally resolved their differences by the process of negotiation and accommodation."). As the D.C. Circuit has previously noted:

> The framers, rather than attempting to define and allocate all governmental power in minute detail, relied, we believe, on the expectation that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system. Under this view, the coordinate branches do not exist in an exclusively adversary relationship to one another when a conflict in authority arises. Rather, each branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches …. This aspect of our constitutional scheme avoids the mischief of polarization of disputes.

*Am. Tel. & Tel. Co.*, 567 F.2d at 127 (footnotes omitted). Consequently, the Judiciary is to exercise extreme caution in wading into such interbranch disputes. *See Miers*, 558 F. Supp. 2d at 56-57 ("Although standing ready to fulfill the essential judicial role to 'say what the law is' on specific assertions of executive privilege that may be presented, the Court strongly encourages the political branches to resume their discourse and negotiations in an effort to resolve their differences constructively, while recognizing each branch's essential role.").

Here, there is no dispute between the political branches to be resolved. The Committee and the Department have reached an accommodation, reflecting an ongoing process of discussion and recognition of routine shifts in the political landscape. It is the Committee's understanding that the Department will be providing it with *redacted* recordings and transcripts. In short, the political accommodations process has worked as it should. This Court should not permit a third-party actor at the eleventh hour to disrupt the outcome of the political branches' discussions.

21

Allowing Plaintiff's APA claims to move forward would lead to absurd and troubling results. If every agency deliberation regarding how best to respond to a Congressional request were subject to potential intervention by a third party whose records might be implicated by a document production to Congress and possible scrutiny by the Judiciary, the political accommodations process would quickly be seriously disrupted, if not entirely derailed. Indeed, the accommodations process inherently requires the Executive Branch and Congress to demonstrate flexibility in their positions to reach compromises, and this process has generally worked throughout our nation's history. *See Mazars*, 591 U.S. at 862.[7] But subjecting every change in the Executive Branch's position during its discussions with Congress to APA review would substantially impede the operation of that process. A necessarily informal process involving give-and-take between the parties and sometimes trading concessions on different issues to reach accommodations would be transformed into something else entirely. As a result, opening the courthouse doors to any party wishing to use the APA to stop records from being produced to Congress would fundamentally alter not only what information requests Congress might make, but also the Executive's decision-making process regarding how and when to comply with such requests from Congress. The end result would be exceedingly detrimental for the accommodations process that courts have instructed the political branches to undertake to avoid the need for the Judiciary's involvement.

---

[7] As the Supreme Court recognized in *Mazars*, "Congress and the Executive have nonetheless managed for over two centuries to resolve [informational access] disputes among themselves without the benefit of guidance from us." 591 U.S. at 862. The Court also noted that this type of "longstanding practice is a 'consideration of great weight'" in cases regarding "'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches … themselves have reached.'" *Id.* (alterations in original) (quoting *NLRB* v. *Noel Canning*, 573 U.S. 513, 524-26 (2014)).

Accordingly, this Court should reject Plaintiff's argument that the Department's cooperation with the Committee's oversight request is subject to APA review and avoid an outcome that "would upset settled expectations and dramatically alter bargaining positions in the accommodation process over informational disputes in the future." *Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 771 (D.C. Cir. 2020).

### C.      *Mazars* Does Not Apply

If APA review is available here, which it is not, Plaintiff asks this Court to analyze the Committee's request for the recordings under the framework set forth in *Mazars,* 591 U.S. 848, arguing that Congressional requests for "a President's information are held to a stricter standard than other congressional requests." Mem. at 19.  Plaintiff is wrong that *Mazars* applies here for two related reasons.  First, the *Mazars* framework was developed by the Supreme Court to balance the interests of the two political branches of government: Congress and the Executive. But here, the two branches agree that the recordings should be released, so the *Mazars* framework does not apply.  *Mazars* governs Congressional efforts to compel the disclosure of information, whether by subpoena or by statute, not the Executive Branch's (or anyone else's for that matter) voluntary disclosure of information to Congress.  Second, *Mazars* concerned Congressional subpoenas for records of the sitting President (and some of the records sought were created during the term of the sitting President); and the opinion's language confirms that the *Mazars* framework only applies to Congressional efforts to compel the disclosure of information of the sitting President.

### 1.      The Rationale Underlying *Mazars* Is Not Present Here

In *Mazars*, "three committees of the U.S. House of Representatives issued four subpoenas [to third party businesses] seeking information about the finances of President Donald

23

J. Trump … ."  591 U.S. at 853.  Crucially, the subpoenas were issued while President Trump was serving his first term as President, and some of the records sought were created during his term.  *Id.* at 853-57.  Thus, *Mazars* was framed as a case pitting Congress against *the* President.  As the Court explicitly noted, the principle that "Congress and the President—the two political branches established by the Constitution—have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity" was the "distinctive aspect necessarily inform[ing] our analysis of the question before us."  *Id.* at 854.  Thus, the Court delved into the history of such requests and how the branches often worked out their conflicts "in the 'hurly-burly … give-and-take of the political process between the legislative and the executive.'"  *Id.* at 859.  The Court also discussed how the two branches "maintained this tradition of negotiation and compromise—without the involvement of this Court—until the present dispute" and how the litigation "represents a significant departure from historical practice."  *Id.* at 861.  Indeed, the Court explained that the case "raise[s] important issues concerning relations between the branches" and that it was only "turn[ing] to the question presented" because the accommodations process between the political branches, which had "managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us," had failed.  *Id.* at 862.  It is with this background and context, cognizant of the clear separation-of-powers concerns underlying the case, that the Supreme Court adopted a multi-factor balancing test for when "congressional subpoenas [are] directed at *the* President."  *Id.* at 869 (emphasis added).

In this case, the circumstances that produced the *Mazars* opinion and framework are absent.  The coordinate branches are not at an impasse because the "hurly-burly" "political process between the legislative and the executive" has succeeded in reaching a solution that avoids litigation.  *Id.* at 859.  Thus, this case presents a factual circumstance as disparate as can

24

be from the one presented in *Mazars*. Indeed, in a telling passage when the Court rejected the House's argument that the subpoenas should be analyzed under the normal framework (which, as explained above, requires courts to defer to legislative rationales), the Court explained that "[w]ithout limits on its subpoena powers, Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared." *Id.* at 867 (citations omitted). But Plaintiff offers no explanation for how the Committee's investigative power here, whether by letter or subpoena, would exert control over the Executive Branch. In fact, the very nature of this case, where Plaintiff—a former President—*is suing the Executive Branch*, demonstrates the absurdity of applying *Mazars* to this case. Simply put, *Mazars* was premised on a conflict between the political branches; that clash is not present here.

Relatedly, *Mazars* involved an effort by Congress to compel the production of information, and the Court's opinion repeatedly frames the issue as involving Congressional subpoenas. But this case does not involve an attempt by the Committee to mandate the disclosure of information; rather, it involves the Executive Branch's voluntary decision to disclose information to Congress, a decision to which the *Mazars* framework does not apply.[8]

---

[8] While a House Committee did not attempt to compel the production of the President's tax returns through a subpoena in *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, it did attempt to compel the production through an applicable statutory mechanism, which states that "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives … the Secretary [of the Treasury] *shall furnish* such committee with any return or return information specified in such request." 45 F.4th 324, 328 (D.C. Cir. 2022) (first alteration in original) (emphasis added) (quoting 26 U.S.C. § 6103(f)(1)) (internal quotation marks omitted); *see also id.* at 329 (noting that the Office of Legal Counsel had concluded that "Treasury *had no choice* but to comply with [the request] per the mandatory language of § 6103(f)(1)" (emphasis added)). That case therefore did not involve judicial review of the Executive Branch's voluntary decision to disclose information to Congress.

25

### 2.    Plaintiff, While a President, Is Not *the* President

A corollary to the argument above is that *Mazars* was written in the context of a Congressional attempt to compel the production of records of the sitting President.  As *Mazars* explained, the issue there involved "congressional subpoenas for *the* President's information," or "congressional subpoenas directed at *the* President."  *Id.* at 866 (emphases added).[9]  Thus, it is not, as Plaintiff argues, that requests for "*a* President's information are held to a stricter standard than other congressional requests," Mem. at 19 (emphasis added), but rather efforts to compel the production of *the* President's information, under *Mazars*, are held to a higher standard.  Two passages from *Mazars* demonstrate how the opinion's framework applies only to the sitting President's information.

First, the Court explains how the "interbranch conflict here does not vanish simply because the subpoenas seek personal papers or because the President sued in his personal capacity.  The President is the only person who alone composes a branch of government." *Mazars*, 591 U.S. at 868.  Here, President Biden is a *former* President, and the distinction between official and personal capacity as applied to him is nonexistent, rendering the application of *Mazars* nonsensical.  Further, far from embodying a "branch of government," Plaintiff is but a private citizen.  *See id.*  Second, the Supreme Court explained that "[g]iven the close connection between the *Office of the President and its occupant*, congressional demands for the President's papers can implicate the relationship between the branches."  *Id.* at 868 (emphasis added).  Here though, there is no connection between Plaintiff, the Office of the President, and the Office's

---

[9]  The Court's analysis in *Mazars* consistently refers to "the President."  And in those rare occasions when it uses the term "a President," it is clearly referring to a sitting President.  *See, e.g.*, *id.* at 853 (using "a President" to describe the holdings in *United States v. Nixon*, 418 U.S. 683 (1974), and *Clinton v. Jones*, 520 U.S. 681 (1997)).

current occupant, President Trump, which further indicates that *Mazars* was intended to apply to Congressional efforts to compel the production of information of the sitting President. As a result, these passages in *Mazars* would not make sense if the decision applied to former Presidents.

On the flipside, there is no language in *Mazars* suggesting the Supreme Court intended to apply *Mazars* beyond the sitting President, and the *Mazars* framework itself makes this clear. For example, the second prong of the framework states: "to narrow the scope of possible conflict between the branches, courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective. The specificity of the subpoena's request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'" *Id.* at 870 (citation omitted). But requests for a former President's personal information do not intrude into the operation of the Office of the President. Similarly, the fourth prong of the framework states that "courts should be careful to assess the burdens imposed on the President by a subpoena" and goes on to mention "burdens on the President's time and attention" and how any burdens should be carefully scrutinized given Congress's "ongoing relationship with the President." *Id.* at 871. In context, this passage is clearly discussing the sitting President's time and attention, not a former President's, and Congress has an "ongoing relationship" only with the current President, not a former President such as Plaintiff.

Plaintiff cites in a footnote two cases where the D.C. Circuit applied *Mazars* to a former President. *See* Mem. at 19 n.3. But Plaintiff is also forced to concede that in these cases, the D.C. Circuit did not "conclusively decid[e] [that the *Mazars*] standard governs such requests." *Id.* That is because in those cases, the Congressional "request … passe[d] muster under all suggested" tests. *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of*

27

*Treasury*, 45 F.4th 324, 334 (D.C. Cir. 2022).  In any case, there were key facts in those cases that are not present here, obviating the need to apply *Mazars*.  For example, those cases addressed the validity of Congressional efforts to compel the production of information; this case addresses whether the Executive Branch may voluntarily disclose information to Congress.  *See supra* at pp. 23-25.

Additionally, in *Trump v. Mazars USA, LLP*, 39 F.4th 774, 787 (D.C. Cir. 2022), the D.C. Circuit noted that even though President Trump was no longer in office, "the subpoena in this case, when issued, *sought a sitting President's information*.  President Trump then brought this challenge *while still in office*; … .  At least in these specific circumstances, we do not understand that the *Mazars* test instantly ceased to apply."  (emphases added).  The same is true for *Comm. on Ways & Means, U.S. House of Representatives*, where a House committee "requested the federal income tax returns of then-President Donald J. Trump."  45 F.4th at 328.

The circumstances presented here are entirely different.  The request challenged by Plaintiff here does not seek the records of the sitting President.  Moreover, as Plaintiff himself concedes, the records at issue involve his "private conversations, *which predate his Presidency by years*."  Mem. at 20 (emphasis added).  In fact, Plaintiff repeatedly characterizes what is at issue as his "conversations as a private citizen."  *Id.* at 21 n.5; *see also id.* at 4 ("In these private conversations—which took place in President Biden's home in 2016 and 2017… .").  Thus, not only was Plaintiff not the President at the time the recordings were made, he was unburdened with *any* position of public office.  This fact, in conjunction with the fact that Plaintiff filed this case as a private citizen and not during his term as President, erases any justification for this Court to apply the *Mazars* framework.

28

At bottom, if this Court were to adopt Plaintiff's interpretation of *Mazars*, it would greatly extend its reach and bestow heightened protection from Congressional requests (and subpoenas) for the entirety of any President's life (not just Plaintiff), regardless if the records sought relate to the President's pre-Presidential or post-Presidential life. Nothing in *Mazars* suggests that was the Supreme Court's intent, and this Court's adoption of such a view would have ramifications for all future Congresses.

**D.      The Privacy Act Does Not Preclude Production to the Committee**

The Department's production of the recordings to the Committee is exempt from the Privacy Act, 5 U.S.C. § 552a, and Plaintiff's claims to the contrary are unavailing. The Privacy Act explicitly states that it does not prohibit disclosures to "either House of Congress, or, *to the extent of matter within its jurisdiction, any committee* or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee." 5 U.S.C. § 552a(b)(9) (emphasis added). This exception "unambiguously permits federal agencies to disclose personal information about an individual without the individual's consent to a Congressional subcommittee that has jurisdiction over the matter to which the information pertains." *Devine v. United States*, 202 F.3d 547, 551 (2d Cir. 2000). The only question for this Court under the relevant statutory provision is whether the Committee's request is within its jurisdiction. As discussed at length above, oversight of Department special counsel investigations and whether they are leading to fair and impartial justice are plainly subjects within the jurisdiction of the Committee. *See supra* pp. 3-7; House Rule X.1(l)(7) (delegating to the Committee jurisdiction over "[c]riminal law enforcement and criminalization"). That should be the end of the matter. *See Rubin v. United States*, 449 U.S. 424, 430 (1981) ("When we find the terms of a statute

29

unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances.'" (quotation marks and citation omitted)).

Plaintiff purports to encourage this Court to apply "a straightforward reading of the Privacy Act's text." Mem. at 35. However, rather than *actually* apply the plain and unambiguous text of the statute, Plaintiff asks this Court to read requirements for further analysis of the motivation, sincerity, and utility of the Committee's request that have no basis in the plain text of the statute. *Id.* ("[T]he purported request does not involve a 'matter within the jurisdiction' of the Committee because it is a product of the *Department's* efforts to disseminate President Biden's private information, not the Committee's genuine inquiry into a matter within its jurisdiction. … A committee does not have jurisdiction over the matter where the Department's reliance is pretextual or the purported request lacks a valid legislative purpose.").[10] Plaintiff's request, however, "add[s] words—and significant words, as it were—to the statute Congress enacted." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Imposing such requirements would mean that the "law as applied demands something more … than the law as written." *Id.*

Plaintiff cites to no precedent that supports imputing these additional requirements, and in fact expressly notes the "absence of case law analyzing the § 552a(b)(9) exception in analogous circumstances." Mem. at 35. While Intervenor-Defendant is not aware of any precedent from this Circuit, the Second Circuit, in *Devine v. United States*, has expressly held that while "Congress articulated specific conditions in other exceptions to the disclosure

---

[10]  In any event, as previously explained, the Committee's request for the recordings has a legitimate legislative purpose, and its efforts to acquire the recordings at issue date back to February 2024, long predating any alleged interest by the Department in disclosing them. *See supra* pp. 5-10.  This is very much a real request, not a "purported" one.

restrictions of the Privacy Act … [n]o such conditions exist in § 552a(b)(9) and we shall not read in additional conditions." 202 F.3d at 551-52. This Court should follow *Devine* and similarly apply the plain and unambiguous meaning of the Privacy Act. Doing so leads inexorably to the conclusion that the statute does not prohibit the Department from disclosing the recordings sought by the Committee here.

### E.    FOIA Exemptions Are Not Relevant Here

Plaintiff devotes considerable space to discussing FOIA exemptions and why the recordings at issue here must be withheld because of them. *See* Mem. at 22-25. As Plaintiff tells it, an injunction is warranted because "[g]overnment lawyers [previously] reviewed the case, determined that the FOIA exemptions applied," and now, in response to the Committee's request, the Department is abandoning "long-settled principles [in order to withhold the recordings] from disclosure under FOIA." *Id.* at 1.

More specifically, Plaintiff's APA argument is premised on the Department's previous application of FOIA exemptions. Plaintiff argues that "[t]he Department does not write on a blank slate in this action. To the contrary, in the context of the FOIA Action, it previously set forth a detailed, reasoned position on the law enforcement and privacy interests at stake." *Id.* at 22. Specifically, Plaintiff observes that the Department previously argued that "multiple FOIA exemptions, including Exemption 7(C), applied" to the recordings. *Id.* at 23. Thus, Plaintiff alleges that the Department's "striking about-face from its prior position on the status and proper treatment of the materials … violates the APA." *Id.*; *see also id.* at 24 ("The Department's unexplained abandonment of this position violates the APA."). But Plaintiff is confused. FOIA exemptions do not apply here because this is not a FOIA case, and, in any event, FOIA makes

31

clear that its enumerated exemptions do not provide the Department with the "authority to withhold information from Congress."  5 U.S.C. § 552(d).

This case is new and distinct from the Heritage Foundation's FOIA suit, and the Committee sought these recordings under its constitutionally based investigatory powers, not under FOIA.  As a result, FOIA and its exemptions simply do not apply (nor is the Department's prior determination of whether those exemptions apply relevant here).  Indeed, this is the reason that Judge Friedrich, who is assigned to the Heritage Foundation's FOIA case, rejected Plaintiff's assertions of crossclaims and determined that this case is not related to the FOIA case.  *See* Memorandum Opinion at 12-13, *Heritage Found.*, No. 24-cv-00645 (D.D.C.), ECF No. 63; *see also* ECF No. 8.  Moreover, Plaintiff, at times in his Motion, appears to recognize this.  For example, he contends:

> It is not difficult to infer why the Department might solicit a request from Congress[:] … [i]t was determined to release the materials, but in the face of an increasingly likely legal challenge by President Biden over the disclosure to the Heritage Plaintiffs, it faced serious legal obstacles to doing so.  As the Department knew and had argued forcefully for two years, the materials are exempt from FOIA under Exemptions 6 and 7(C) … .  A congressional request could provide the Department with the workaround it needed to avoid legal obstacles to producing the materials in the FOIA Action.

Mem. at 17.  But implicit in Plaintiff's theory is the concession that FOIA and its exemptions do not apply to agency responses to Congressional requests.  After all, if the Committee's inquiry is "an end-run around [the Department's] dubious arguments in the FOIA Action," *id.* at 21, then it must, by definition, bypass FOIA and its exemptions.

Regardless, the FOIA exemptions do not provide the Department with any "authority to withhold information from Congress."  5 U.S.C. § 552(d).  Plaintiff, however, conveniently fails to mention this critical statutory language.  Indeed, as the D.C. Circuit has explained, Section 552(d) serves the "obvious purpose of the Congress to carve out for itself a special right of

32

access to privileged information not shared by others." *Murphy v. Dep't of Army*, 613 F.2d 1151, 1155-56 (D.C. Cir. 1979); *see also Elec. Priv. Info. Ctr. v. Transp. Sec. Admin.*, 928 F. Supp. 2d 156, 164 (D.D.C. 2013) ("This provision arguably implies that Congress intended to permit agencies to freely share information with Congress … .").

In sum, FOIA, its exemptions, and the Department's analysis of its exemptions are not at issue in this case and cannot serve as a basis for Plaintiff's claims.

## II.    The Remaining Preliminary Injunction Factors Favor the Committee

Even if Plaintiff were able to establish a likelihood of success on the merits, which he cannot, the remaining factors to be considered by the Court also weigh in favor of the Committee.

The Committee's interest in prompt compliance with its informational request is of the highest order. *See McGahn*, 968 F.3d at 764 (acknowledging "the essentiality of information to the effective functioning of Congress" and noting that without access to information "'Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively'" (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955))). Any undue delay—especially in circumstances like these where the Committee has sought the records at issue for over two years and had finally secured a path to obtain them—would inflict the legally cognizable harms of loss of information to which it is entitled and institutional diminution of the Committee's prerogative to conduct oversight of the Executive Branch. *See Miers*, 558 F. Supp. 2d at 71. Furthermore, allowing a third-party to prevent the Department's prompt cooperation with this oversight request would also be an improper usurpation of the power to investigate and conduct oversight, functions integral to the duties assigned to Congress by the Constitution. No outside entity, including the subject of the records being sought or this Court, is permitted to

33

micromanage the Committee's investigation or second-guess what should be considered relevant or urgent. *See Eastland*, 421 U.S. at 509 ("The wisdom of congressional approach or methodology is not open to judicial veto.").

Here, the Committee is investigating matters squarely within its jurisdiction, and the information contained in the records at issue is relevant to informing that investigation. The Committee's interest in obtaining information relevant to its investigation would be harmed by any injunctive relief in this case. The fact that the Committee's overarching investigation is within its legislative power should be the end of the inquiry. *Cf. McSurely*, 521 F.2d at 1041 ("We do not believe a Congressional committee's investigatory jurisdiction can turn on this kind of detailed assessment of the relevancy of particular items garnered by employees or Members of Congress pursuant to a facially valid inquiry."). Accordingly, the balance of the equities favors denial of the motion for a preliminary injunction.

For the same reasons, the public interest supports denial of the requested relief. There is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress," and "the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress." *Exxon Corp.*, 589 F.2d at 594. Plaintiff's contrary argument rests on the same flawed arguments refuted above and ignores the important public interest in the timely and efficient conduct of the Committee's investigation. Even in the less-pressing context of administrative investigations, the D.C. Circuit has "recognized a strong public interest in having [such] investigations proceed expeditiously and without impediment." *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (quotation marks omitted). Likewise, the public interest in expeditious and unimpeded Congressional investigations is compelling.

34

Finally, the D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The injury "must be both certain and great; it must be actual and not theoretical" *and* "the injury must be beyond remediation." *Id.* (internal quotation marks and citation omitted). The burden of demonstrating irreparable injury rests entirely on Plaintiff's shoulders. *See Winter*, 555 U.S. at 22. Plaintiff has provided no direct evidence, such as a sworn declaration, establishing the severity and certainty of his alleged injury to any privacy interest, relying instead on a declaration by counsel. *See* ECF No. 23-2. However, "because 'the court must decide whether the harm will *in fact* occur,' a party seeking injunctive relief must 'substantiate the claim [of] irreparable injury.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (alteration in original) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The absence of such direct evidence weighs against the issuance of a preliminary injunction. *See Angelo v. District of Columbia*, 648 F. Supp. 3d 116, 132 (D.D.C. 2022) (noting that "a conclusory allegation contained in an unverified complaint is insufficient to support a motion for a preliminary (or permanent) injunction" (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015))).

Further, while the Committee is interested in the materials themselves for the reasons discussed above, *supra* pp. 5-10, 16-18, much of the underlying substance of the recorded discussions has already been made public through various avenues. For example, Hur quoted, discussed, and ultimately relied upon these materials substantially in his report and in making his ultimate recommendations. *See supra* pp. 7-8, 14-15. Additionally, Plaintiff concedes that transcripts of portions of the recordings have already been made public by the Department. Mem. at 20 n.4 ("The Department has already released portions of the transcripts that Special

Counsel Hur cited in his report[.]").  These facts undercut any assertion that Plaintiff is at risk of any harm "certain and great" enough to support the extraordinary remedy of a preliminary injunction, *see Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, especially with respect to the portions of the recordings that were already discussed in the Hur Report.  *Jigsaw Prods., Inc. v. SEC*, No. 24-cv-2358, 2026 WL 797411, at *1 (D.D.C. Mar. 23, 2026) (Chutkan, J.) ("Because the SEC has already released a transcript of that interview and because Musk is a highly visible public figure whose image, demeanor, and voice are already well known, the SEC has not identified a substantial privacy interest that would be actually impeded by releasing the recording.").  Accordingly, Plaintiff has not met his high burden of establishing irreparable harm were the recordings to be disclosed to the Committee.

## CONCLUSION

For the foregoing reasons, Plaintiff's request for a preliminary injunction should be denied.

Respectfully submitted,

*/s/ Matthew B. Berry*
MATTHEW B. BERRY
   *General Counsel*
TODD B. TATELMAN
   *Deputy General Counsel*
SARAH E. CLOUSE
   *Associate General Counsel*
ANDY T. WANG
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
Matthew.Berry@mail.house.gov

*Counsel for Intervenor-Defendant Committee on the*
*Judiciary of the U.S. House of Representatives*

June 8, 2026

**CERTIFICATE OF SERVICE**

I certify that on June 8, 2026, I caused the foregoing document to be filed via this Court's

CM/ECF system, which I understand caused service on all registered parties.

/s/ *Matthew B. Berry*
Matthew B. Berry