**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOSEPH R. BIDEN, JR.,<br><br>   *Plaintiff*,<br><br>  v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>   *Defendant,*<br><br>COMMITTEE ON THE JUDICIARY OF<br>THE U.S. HOUSE OF<br>REPRESENTATIVES*,*<br><br>   *Intervenor-Defendant.* | Case No. 1:26-cv-1818-TSC |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND............................................................................................... 4

      A.      The Zwonitzer Materials.................................................................................. 4

      B.      The Investigation of President Biden by Special Counsel Hur............................. 5

      C.      The Committee's Oversight Regarding the Hur Report ........................................ 6

      D.      The Committee's Request for the Zwonitzer Materials......................................... 7

      E.      The Department's Decision to Provide the Zwonitzer Materials to the
Committee........................................................................................................ 8

LEGAL BACKGROUND ................................................................................................... 9

      A.      Congressional Oversight and the Accommodation Process ................................. 9

      B.      Statutory Background ...................................................................................... 10

ARGUMENT...................................................................................................................... 11

I.      Plaintiff is not likely to succeed on the merits. .................................................... 11

      A.      Plaintiff lacks a cause of action under the APA. ................................................ 11

            1.   APA review is unavailable because Plaintiff does not challenge agency
action......................................................................................................... 12

            2.   APA review is unavailable because release of Executive Branch
information to Congress is committed to agency discretion by law. .............. 17

            3.   Plaintiff cannot assert a contrary-to-law cause of action under the APA
(Count III) for alleged violations of the Privacy Act. .................................. 20

      B.      Even assuming APA review were available, Plaintiff is not likely to
succeed on the merits of his claims................................................................... 25

            1.   Plaintiff is unlikely to succeed on his claim that release to the Committee
is contrary to the Privacy Act....................................................................... 25

            2.   Plaintiff is unlikely to succeed on his claims that release to the Committee
is arbitrary and capricious or an abuse of discretion...................................... 29

II.      Plaintiff cannot establish irreparable harm. ......................................................... 34

III.      The equitable factors strongly disfavor preliminary injunctive relief. ..................... 36

IV.      Plaintiffs should post security in connection with any emergency relief. ................. 37

CONCLUSION .......................................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) .................................................................................. 23

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025) ....................................................................................... 24

*Am. Trucking Ass'n., Inc. v. United States*,
755 F.2d 1292 (7th Cir. 1985) ...................................................................................... 14

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018) ...................................................................................... 11

*Berardi v. U.S. Dep't of the Air Force*,
No. 05-2269 (JR), 2006 WL 8448631 (D.D.C. Sep. 29, 2006) .................................... 23

*Bierly v. Dep't of Def.*,
No. 23-2386 (RCL), 2024 WL 4227154 (D.D.C. Sep. 18, 2024) ................................. 23

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ...................................................................................................... 21

*Bowen v. Mass.*,
487 U.S. 879 (1988) ...................................................................................................... 20

*Cassell v. Taylor*,
243 F.2d 259 (D.C. Cir. 1957) ...................................................................................... 35

*Cell Assocs., Inc. v. NIH*,
579 F.2d 1155 (9th Cir. 1978) .......................................................................... 22, 23, 24

*Chang v. Dep't of Navy*,
314 F. Supp. 2d 35 (D.D.C. 2004) ................................................................................ 19

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ...................................................................................... 34

*Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*,
111 F.3d 1485 (10th Cir. 1997) .................................................................................... 14

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) .......................................................................................... 15, 16, 19

*Clevinger v. Advoc. Holdings, Inc.*,
  134 F.4th 1230 (D.C. Cir. 2025) ................................................................. 35

*Coll. Sports Council v. Gov't Accountability Off.*,
  421 F. Supp. 2d 59 (D.D.C. 2006) .............................................................. 13

*Comm. on Oversight & Gov't Reform v. Lynch*,
  156 F. Supp. 3d 101 (D.D.C. 2016) ............................................................ 35

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
  973 F.3d 121 (D.C. Cir. 2020) ...................................................................... 1

*Creed v. NTSB*,
  758 F. Supp. 2d 1 (D.D.C. 2010) ................................................................ 16

*Ctr. for Biological Diversity v. Brennan*,
  571 F. Supp. 2d 1105 (N.D. Cal. 2007) ...................................................... 14

*Dep't of Agric. Dev. Hous. Serv. v. Kirtz*,
  601 U.S. 42 (2024) ....................................................................................... 24

*Devine v. United States*,
  202 F.3d 547 (2d Cir. 2000) .................................................................. 3, 27

*Dew v. United States*,
  192 F.3d 366 (2d Cir. 1999) ....................................................................... 21

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) .................................................................. 22

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) ...................................................................... 20

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) ...................................................................... 37

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975) ....................................................................................... 9

*eBay, Inc. v. Mercexchange, LLC*,
  547 U.S. 388 (2006) ..................................................................................... 35

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
  396 F.3d 1265 (D.C. Cir. 2005) .................................................................. 20

*Encino Motorcars, LLC v. Navarro*,
  584 U.S. 79 (2018) ....................................................................................... 28

iv

*Env't Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981) ........................................................................................ 29

*Exxon Corp. v. FTC*,
  589 F.2d 582 (D.C. Cir. 1978) ........................................................................................ 16

*FAA v. Cooper*,
  566 U.S. 284 (2012) ........................................................................................ 10, 21, 22, 34

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................................................ 33

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) .......................................................................................... 23

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ........................................................................................ 20

*Guerrero v. Clinton*,
  157 F.3d 1190 (9th Cir. 1998) .................................................................................... 13, 18

*Haleem v. Dep't of Def.*,
  No. 23-1471 (JEB), 2024 WL 230289 (D.D.C. Jan. 22, 2024) ...................................... 23

*Harrison v. Fed. Bureau of Prisons*,
  248 F. Supp. 3d 172 (D.D.C. 2017) ................................................................................ 23

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................................................................ 17

*Hinck v. United States*,
  550 U.S. 501 (2007) ........................................................................................................ 23

*In re Exec. Off. of President*,
  215 F.3d 20 (D.C. Cir. 2000) .......................................................................................... 23

*Jones v. HUD*,
  2012 WL 1940845 (E.D.N.Y. May 29, 2012) ................................................................ 21

*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023) ................................................................................ 36

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  818 F. Supp. 3d 34 (D.D.C. 2026) .................................................................................. 23

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................................. 17

*Make The Road New York v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ................................................................................. 11

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) ............................................................................................. 9, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................... 33

*Mulhern v. Gates*,
  525 F. Supp. 2d 174 (D.D.C. 2007) ......................................................................... 34

*Murphy v. Dep't of Army*,
  613 F.2d 1151 (D.C. Cir. 1979) ............................................................... 3, 16, 19, 34

*Nat. Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ........................................................................ *passim*

*Nat. Res. Def. Council v. Lujan*,
  768 F. Supp. 870 (D.D.C. 1991) ......................................................................... 13, 18

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ................................................................................................... 2

*Northrop Grumman Sys. Corp. v. NASA*,
  346 F. Supp. 3d 109 (D.D.C. 2018) ......................................................................... 16

*Parks v. IRS*,
  618 F.2d 677 (10th Cir. 1980) ................................................................................. 23

*Pilon v. U.S. Dep't of Just.*,
  73 F. 3d 1111 (D.C. Cir. 1996) ................................................................................ 28

*Poss v. Kern*,
  No. 23-cv-2199 (DLF), 2024 WL 4286088 (D.D.C. Sep. 25, 2024) ........................ 23

*Rimmer v. Holder*,
  700 F.3d 246 (6th Cir. 2012) ................................................................................... 21

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
  498 F.2d 725 (D.C. Cir. 1974) ................................................................................... 1

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013) ............................................................................. 34

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ........................................................................... 22

*Tijerina v. Walters*,
  821 F.2d 789 (D.C. Cir. 1987) ............................................................................. 27

*Tripp v. DOD*,
  193 F. Supp. 2d 229 (D.D.C. 2002) ..................................................................... 23

*Trump v. Mazars USA, LLP*,
  591 U.S. 848 (2020) ...................................................................................... *passim*

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ................................................................................ 11

*United States v. Am. Tel. & Tel. Co.*,
  551 F.2d 384 (D.C. Cir. 1976) ......................................................................... 2, 15

*United States v. American Telephone & Telegraph*,
  567 F.2d 121 (D.C. Cir. 1977) ....................................................................... 10, 14

*United Techs. Corp. v. U.S. Dep't of Def.*,
  601 F.3d 557 (D.C. Cir. 2010) ............................................................................. 12

*Walker v. Cheney,*
  230 F. Supp. 2d 51 (D.D.C. 2002) ....................................................................... 36

*Watkins v. United States*,
  354 U.S. 178 (1957) .............................................................................................. 9

*Westcott v. McHugh*,
  39 F. Supp. 3d 21 (D.D.C. 2014) ......................................................................... 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................. 11

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 34

## **Statutes**

5 U.S.C. § 551 ........................................................................................................ 12

5 U.S.C. § 552 ........................................................................................................ 19

5 U.S.C. § 552a ................................................................................................ *passim*

5 U.S.C. § 553 ................................................................................................................ 24

5 U.S.C. § 701 ................................................................................................................ 17

5 U.S.C. § 702 ................................................................................................................ 20

5 U.S.C. § 704 .......................................................................................................... 12, 20

5 U.S.C. § 706 ................................................................................................................ 24

Pub. L. No. 99–591, 100 Stat. 3341 (1986) ................................................................. 13

**Rules**

Federal Rule of Civil Procedure 65(c) ......................................................................... 37

**Regulations**

28 C.F.R. § 600.8 ............................................................................................................ 5

**Other Authorities**

1 Writings of Thomas Jefferson (P. Ford ed. 1892) .................................................. 9, 10

Application of Privacy Act Congressional-Disclosure Exception to Disclosures to Ranking
    Minority Members, 25 Op. O.L.C. 289 (2001) ......................................................... 28

Appointment of Robert K. Hur as Special Counsel, Att'y Gen. Order No. 5588-2023 (Jan. 12,
    2023), https://www.justice.gov/archives/media/1268121/dl ...................................... 5

Hearing on the Report of Special Counsel Robert K. Hur, House Judiciary Committee,
    March 12, 2024, 118th Cong., https://www.congress.gov/118/chrg/CHRG-
    118hhrg55150/CHRG-118hhrg55150.pdf ("Hearing") .......................................... 6, 7

House Rule X.1., Rules of the House of Representatives, 119th Cong. (2026) ("House Rules"),
    https://rules.house.gov/sites/evosubsites/rules.house.gov/files/documents/houserules
    119thupdated.pdf ................................................................................................ 25, 26

Report on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified
    Documents Discovered at Locations Including the Penn Biden Center and the Delaware
    Private Residence of President Joseph R. Biden, Jr.  (Feb. 5, 2024) ("Hur Report"),
    https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-
    february-2024.pdf ........................................................................................ 5, 6, 31, 35

**INTRODUCTION**

This motion presents an extraordinary request by Plaintiff, former-President Joseph Biden, to subject to judicial review the Executive Branch's voluntary provision of information to Congress.  For centuries, the political branches have exchanged information cooperatively, including through the constitutionally-mandated accommodation process.  *See generally Trump v. Mazars USA, LLP*, 591 U.S. 848, 859-62 (2020).  In exceedingly rare circumstances where the Branches are at impasse, Congress has sought judicial intervention, *see, e.g.*, *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (*en banc*), which has given rise to freighted litigation over whether such inter-branch disputes are justiciable, *see, e.g.*, *Committee on Judiciary of United States House of Representatives v. McGahn*, 973 F.3d 121, 123 (D.C. Cir. 2020).  No such dispute exists here.  The political branches are in accord that Congress should be provided the information it has requested, which can be redacted in a manner that satisfies Congress's need without harming Executive Branch interests in confidentiality and privacy.  Plaintiff nonetheless asks this Court to superintend that inter-branch dialogue.  But Plaintiff cites no authority—and Defendant is not aware of any—in which an Article III court interceded to prevent Congress from obtaining appropriately redacted information that both political branches *agreed* would aid Congress in carrying out its constitutional functions consistent with the interests of the Executive Branch.

No such law exists for good reason, as there is no legal basis for private parties to challenge inter-branch information sharing.  Plaintiff lacks a cause of action under the Administrative Procedure Act (APA), the only claims asserted, for several independent reasons.

To start, longstanding D.C. Circuit precedent holds that the provision of information to Congress is not the type of "agency action" susceptible to APA review because any disputes about such exchanges of information are best left to resolution by the political branches.  *See Nat'l Res.*

*Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988). And that logic carries particular force in the accommodation process, where the Supreme Court has instructed that courts possess "a duty of care to ensure that [they] do not needlessly disturb 'the compromises and working arrangements that [the political] branches . . . themselves have reached.'" *Mazars*, 591 U.S. at 862 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524–26 (2014)). The relief sought would similarly countermand the D.C. Circuit's teaching in the accommodation context "that a better balance would result in the constitutional sense, however imperfect it might be, if it were struck by political struggle and compromise than by a judicial ruling." *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 391 (D.C. Cir. 1976).

In addition, APA review is unavailable because the disclosure is committed to agency discretion by law. There is no legal standard against which this Court could assess the Executive Branch's voluntary provision of information to Congress through the accommodation process. Regardless of whether Congress has the power to subpoena this information from an unwilling recipient, Congress always has the authority to request information from a willing Executive Branch, and there is no workable standard to govern the reasonableness of the manner in which the Executive Branch cooperates in any particular case, which is inherently based on political negotiations between the Branches. While Plaintiff invokes the Privacy Act as a statutory constraint on the Executive Branch's discretion, the Privacy Act's reticulated remedy scheme precludes Plaintiff's attempt to use the APA to obtain injunctive relief that the Privacy Act itself declines to authorize.

Plaintiff fares no better if this Court assesses his likelihood of success on the merits of his claims. Plaintiff's claim that release of redacted records to Congress is contrary to the Privacy Act founders on the plain text of the statute, which exempts disclosures "to either House of Congress,

2

or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof." 5 U.S.C. § 552a(b)(9). It is indisputable that the Department of Justice's criminal investigation of former President Biden, and the materials considered by Special Counsel Robert Hur in declining to prosecute, fall squarely within the jurisdiction of the Committee on the Judiciary of the U.S. House of Representatives (the Committee). And courts have forcefully rejected Plaintiff's efforts to engraft an atextual motive requirement onto the unambiguous statute. *See Devine v. United States*, 202 F.3d 547, 553 (2d Cir. 2000).

Plaintiff's arbitrary-and-capricious and abuse-of-discretion claims are similarly unavailing. Even assuming this Court could somehow assess the reasonableness of information sharing between the political branches, the Department acted well within its discretion in deciding that Plaintiff's privacy interests in the materials at issue have been greatly reduced and are no longer sufficient to outweigh the significant congressional interest in investigating whether prior special counsels impartially administered justice and the significant executive interest in accommodating the Legislative Branch. That is particularly so in light of the extensive redactions that preserve the Executive Branch's own interests in protecting personal privacy.

Independently, this Court should deny preliminary relief because Plaintiff establishes neither irreparable harm nor that the balance of the equities and public interest favor relief. For one, Plaintiff cannot establish irreparable harm because disclosure to Congress does not amount to disclosure to the public, as the D.C. Circuit has long recognized. *See Murphy v. Dep't of Army*, 613 F.2d 1151, 1155–56 (D.C. Cir. 1979). Moreover, Plaintiff by definition has an adequate remedy at law for any violation of the Privacy Act, because the Act itself contains a remedial scheme, and Plaintiff can invoke whatever remedies (if any) that Congress has determined should be available in these circumstances. Finally, the balance of the equities and public interest strongly

3

disfavor relief that would disrupt a compromise reached by the political branches implicating a matter of national importance—the impartial and fair administration of justice in high profile investigations.

For these reasons, detailed further below, the Court should deny Plaintiff's motion for a preliminary injunction.

## FACTUAL BACKGROUND

### A. The Zwonitzer Materials

In 2016 and 2017, President Biden met with a writing assistant (or "ghostwriter"), Mr. Mark Zwonitzer, at the Naval Observatory and in McLean, Virginia, in connection with President Biden's preparation of his memoir, *Promise Me, Dad*, which was published in 2017. Declaration of Peter A. Winn ("Winn Decl.") ¶ 6.[1] In connection with this book-writing project, Mr. Zwonitzer had conversations with then former-Vice President Biden, which Mr. Zwonitzer recorded. *Id.*

The Zwonitzer materials include 117 pages of transcripts of the Biden-Zwonitzer conversations in 2016 and 2017, and approximately 2 ½ hours of audio recordings of the same conversations. *Id.* ¶ 7. President Biden's counsel and members of President Biden's staff reviewed the redacted recordings and transcripts at the Department of Justice in March and April 2026. *Id.* ¶ 14.

In consultation with President Biden's counsel, the transcripts and recordings have been redacted. *Id.* ¶¶ 7, 14. Information concerning President Biden's family and any family health issues has been fully redacted. *Id.* ¶ 7. Information concerning individuals who are not public figures has been redacted, as has national security information. *Id.* ¶ 7.

---

[1] Peter Winn is the Director of the Office of Privacy and Civil Liberties at the United States Department of Justice and the Acting Chief Privacy and Civil Liberties Officer of the Department. Winn Decl. ¶ 1.

**B.  The Investigation of President Biden by Special Counsel Hur**

On January 12, 2023, Attorney General Merrick B. Garland appointed Robert K. Hur as Special Counsel to investigate and prosecute any federal crimes arising from the "possible unauthorized removal and retention of classified documents or other records discovered at locations associated with President Biden.  Appointment of Robert K. Hur as Special Counsel, Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023), *available at*: https://www.justice.gov/archives/media/1268121/dl.   The Special Counsel's Office was authorized to investigate the possible unauthorized removal and retention of classified documents at various locations associated with President Biden.  *Id.*

At the conclusion of the investigation, Mr. Hur issued his findings and submitted a report to Attorney General Garland pursuant to Department regulations.  *See* 28 C.F.R. § 600.8(c).[2]  The Hur Report "conclude[d] that no criminal charges are warranted," Hur Report, at 1, and provided an extensive discussion of the investigation and the decisions reached, *see generally* Hur Report. The Department later produced a copy of the Hur Report to Congress without any additional redactions or modifications and published it on the Department's public-facing website.  Winn Decl. ¶ 9.

The Zwonitzer Materials "had significant evidentiary value."  Hur Report, at 334.  The Hur Report extensively quoted, referenced and relied upon the Zwonitzer Materials. *See*, *e.g.*, Hur Report, at 3 ("In a recorded conversation with his ghostwriter in February 2017, about a month after he left office, Mr. Biden said, while referencing his 2009 Thanksgiving memo, that he had 'just found all the classified stuff downstairs.'"); *id.* at 64 ("Referring to his 'Foreign Policy'

---

[2] *Report on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.*  (Feb. 5, 2024) ("Hur Report"), available at https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf.

notebook, Mr. Biden added, '[t]hey didn't even know I have this.'"). Relying in part on the Zwonitzer Materials, the Hur Report explained the Special Counsel's assessment of President Biden's memory and likely jury appeal. *See*, *e.g.*, *id.* at 207 ("Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."). Mr. Hur declined prosecution, concluding that "Mr. Biden would likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory." *Id.* at 6.

### C. The Committee's Oversight Regarding the Hur Report

On March 12, 2024, Special Counsel Hur publicly testified before the Committee on the Judiciary of the U.S. House of Representatives (the Committee) concerning his investigation and declination decision.[3]   At the hearing, the audio and transcripts related to Mr. Zwonitzer's conversations with President Biden were central topics of testimony and inquiries by members of Congress. *See*, *e.g.*, Hearing at 2, 7, 15, 16, 23, 24, 30, 32, 39, 43, 54, 60, 61, 72, 87, 92, 93.

As Mr. Hur testified: "We identified evidence that the President willfully retained classified materials after the end of his Vice Presidency when he was a private citizen. This evidence included an audio-recorded conversation during which Mr. Biden told his ghostwriter that he had, 'just found all the classified stuff downstairs.'" *Id.* at 7. "We also identified other recorded conversations during which Mr. Biden read classified information aloud to his ghostwriter." *Id.*

---

[3] Hearing on the Report of Special Counsel Robert K. Hur, House Judiciary Committee at 93, March 12, 2024, 118th Cong., *available at*: https://www.congress.gov/118/chrg/CHRG-118hhrg55150/CHRG-118hhrg55150.pdf ("Hearing").

The Zwonitzer Materials played a central role in Mr. Hur's assessment of President Biden's memory and declination decision. *See, e.g., id.* at 8 ("We interviewed the President and asked him about his recorded statement 'I just found all the classified stuff downstairs.' He told us that he didn't remember saying that to his ghostwriter.").

### D.  The Committee's Request for the Zwonitzer Materials

During the 118th Congress, the Committee "conducted oversight of Special Counsel Robert K. Hur's investigation of President Joe Biden's willful mishandling of classified information." *See* Letter from Chairman Jordan to Attorney General Bondi, March 23, 2026 ("March 23 Letter"), ECF No. 18-1 at 1.  "Based on its investigation, the Committee is 'consider[ing] whether legislative reforms to the Department of Justice and its use of special counsels are necessary,'" such as "changing certain procedures governing the Department's special counsel investigations to better ensure that the Department pursues impartial justice." Letter from Chairman Jordan to Acting Attorney General Blanche, May 22, 2026 ("May 22 Letter"), ECF No. 18-1 at 1.  "As part of that effort," the Committee "requested that Mark Zwonitzer, the ghostwriter for President Biden's memoirs, produce the audio recordings of his conversations with President Biden relating to his ghostwriting work on President Biden's memoirs." March 23 Letter at 1.  Mr. Zwonitzer declined to comply with that request.  *Id.*

Accordingly, on March 22, 2024, the Committee "issued a subpoena compelling production of the Biden-Zwonitzer tapes." May 22 Letter at 2.  According to the Committee, when Mr. Zwonitzer continued to refuse to produce responsive materials, the Committee "reported a resolution recommending that he be held in contempt of Congress for withholding the Biden-Zwonitzer tapes." *Id.* at 3.  The Committee also sought the materials directly from the Department of Justice.  *Id.*

7

On March 23, 2026, the Committee requested that the Department of Justice provide "[a]ll audio recordings of any interviews or conversations between Mark Zwonitzer and President Biden relating to Zwonitzer's ghostwriting work on President Biden's memoirs, *Promise Me, Dad* and *Promises to Keep*" as part of its "oversight of the politicization of the Biden-Garland Department of Justice." March 23 Letter at 1.

**E.  The Department's Decision to Provide the Zwonitzer Materials to the Committee**

On May 5, 2026, the Department determined to release the Zwonitzer Materials.  Winn Decl. ¶ 14.  This decision was publicly memorialized on May 8, 2026, in a Joint Status Report filed in *Heritage Foundation v. Dep't of Just.* ("*Heritage*"), 1:24-cv-645-DLF, ECF No. 50 (D.D.C. May 8, 2026) ("Defendant intends to disclose the written transcript and audio recordings at issue in this matter, with redactions, to Congress, pursuant to a request from the Chair of the House Judiciary Committee.").

The Department, in consultation with President Biden's attorneys, had prepared a set of the Zwonitzer Materials containing substantial redactions.  Winn Decl. ¶ 7, 14.  Information concerning President Biden's family and family health issues was fully redacted, as was information concerning third parties who are not public figures, national security information, and related information covered by the presidential communications privilege.  *Id.* ¶ 7.  Although the Department may provide unredacted records to Congress, the Department determined that these redactions would preserve the Department's institutional interest in maintaining the trust of individuals involved in the disclosure and of other stakeholders.  *Id.* ¶ 13.

Accordingly, the Department notified President Biden's counsel of its decision to release the materials on May 5, 2026, by phone call.  *Id.* ¶ 15.  The Department further stated that, if President Biden wished to prevent disclosure, he must file a motion to intervene by May 12, 2026.

*Id.* The Department did not state that its decision constituted final agency action for the purposes of the Administrative Procedure Act. *Id.*

## LEGAL BACKGROUND

### A. Congressional Oversight and the Accommodation Process

The Supreme Court has long recognized that Congress's "power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (citation omitted). "[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). This power to investigate "encompasses inquiries into," among other things, "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Mazars*, 591 U.S. at 862 (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)).

Congress has exercised this oversight authority since the early days of the republic, seeking information from the Executive Branch through a tradition of negotiation and compromise that has come to be known as the accommodation process. *See id.* at 859-61. "That practice began with George Washington and the early Congress. In 1792, a House committee requested Executive Branch documents pertaining to General St. Clair's campaign against the Indians in the Northwest Territory." *Id.* at 859. "Since this was the first such request from Congress, President Washington called a Cabinet meeting, wishing to take care that his response 'be rightly conducted' because it could 'become a precedent.'" *Id.* (quoting 1 Writings of Thomas Jefferson 189 (P. Ford ed. 1892)). That meeting "ended with the Cabinet of 'one mind': The House had authority to 'institute inquiries' and 'call for papers' but the President could 'exercise a discretion' over disclosures,

9

'communicat[ing] such papers as the public good would permit' and 'refus[ing]' the rest." *Id.* (quoting 1 Writings of Thomas Jefferson 189-90). That practice has been followed by every subsequent Administration, as the Supreme Court detailed in *Mazars*. *Id.* at 860-61.

Indeed, the D.C. Circuit explained in *United States v. American Telephone & Telegraph Co.* that the Constitution itself "contemplates" this accommodation process:

> The framers, rather than attempting to define and allocate all governmental power in minute detail, relied . . . on the expectation that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system. Under this view, the coordinate branches do not exist in an exclusively adversary relationship to one another when a conflict in authority arises. Rather, each branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation.

567 F.2d 121, 127 (D.C. Cir. 1977) (footnote omitted). "Negotiation between the two branches" over informational requests "should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme." *Id.* at 130.

### B. Statutory Background

"The Privacy Act of 1974, codified in part at 5 U.S.C. §552a, contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *FAA v. Cooper*, 566 U.S. 284, 287 (2012). The Privacy Act allows for recovery of "actual damages," *id.* at 291, and, in limited circumstances, injunctive relief. The Privacy Act is a limited waiver of sovereign immunity, and the Supreme Court has held "we refuse to enforce a waiver that is not unambiguously expressed in the statute, [and] we also construe any ambiguities in the scope of a waiver in favor of the sovereign." *Cooper*, 566 U.S. at 291. The Privacy Act exempts from its coverage disclosures "to either House of Congress, or, to the extent of matter

within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee." 5 U.S.C. § 552a(b)(9).

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely success on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "a balance of the equities in its favor"; and (4) "accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.*

## ARGUMENT

### I.   Plaintiff is not likely to succeed on the merits.

#### A.  Plaintiff lacks a cause of action under the APA.

Plaintiff must identify a cause of action to proceed in this Court. *See, e.g.*, *Make The Road New York v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020) ("While establishing jurisdiction gets" a plaintiff "through the courthouse door, . . . . [t]hey also need a cause of action to prosecute."). Here, Plaintiff invokes the APA for the cause of action underpinning all three of his counts. *See* Compl. ¶¶ 88-110, ECF No. 1. But no cause of action is available under the APA to challenge the release of information to Congress for three distinct reasons: (1) an agency's release of information to Congress is not agency action within the meaning of the APA; (2) an agency's release of information to Congress is committed to agency discretion by law; and (3) Congress

11

provided an adequate alternative review scheme for a violation of the Privacy Act, which is the premise of Plaintiff's contrary-to-law claim (Count III).

**1. APA review is unavailable because Plaintiff does not challenge agency action.**

The APA permits judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And agency action is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The provision of information to Congress does not satisfy any part of that definition, and Plaintiff tellingly cites no authority in which a court reviewed under the APA the Executive Branch's accommodation of a congressional request for information.

To be sure, the D.C. Circuit has reviewed under the APA the release of information to the public in response to a Freedom of Information Act (FOIA) request to constitute agency action for purposes of APA review. *See, e.g.*, *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (holding the Defense Contract Management Agency's decision to release to a FOIA requester information evaluating private companies' quality control processes was arbitrary and capricious). But longstanding D.C. Circuit precedent forecloses the extension of that body of law to the unique context in which *Congress*, rather than a private individual, requests information from the Executive Branch.

In *Natural Resources Defense Council, Inc. v. Hodel*, the D.C. Circuit considered a petition to require the Secretary of the Interior to provide more detailed explanations for why the Secretary declined to accept a proposal made by a congressional negotiating group for the development of oil and gas deposits in California's outer continental shelf. 865 F.2d 288, 316-319 (D.C. Cir. 1988). Congress had specifically directed the Secretary to "indicate in detail" through a report to Congress "why any specific portion of the proposals . . . was not accepted." *Id.* at 316 (quoting

12

The Continuing Appropriations Act, Fiscal Year 1987, Pub. L. No. 99–591, § 111, 100 Stat. 3341, 261–62 (1986)).   The court denied the petition, holding "that petitioners' claim . . . is not susceptible of judicial review."  *Id.* at 317.

The presumption of reviewability of agency action under the APA was inapplicable, the D.C. Circuit explained, because "the nature of the 'agency action' at issue is quite distinct from the prototypical exercise of agency power" subject to review:  while "[i]n the run-of-the-mill case, the agency whose action is challenged has exercised authority delegated (at least arguably) to it by Congress," "[e]xecutive responses to congressional reporting requirements . . . represent . . . an entirely different sort of agency action" because an agency is simply "reporting back . . . in accordance with the Article I branch's instructions."  *Id.* at 318.  Absent a statutory "provision for judicial review," the exchange of information from the executive branch to congress is a matter "that by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor," as "the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives."  *Id.* at 318-19.

Courts in this district and around the country have adopted *Hodel*'s reasoning to foreclose judicial review of an agency's compliance with congressional directives for information held by that agency.  *See Coll. Sports Council v. Gov't Accountability Off.*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006) ("Where a report is 'not explicitly or implicitly intended as anything more than a vehicle to inform Congress,' it is for Congress alone to 'determine if the Report satisfies the statutory requirements it enacted.'") (citation omitted); *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 882 (D.D.C. 1991) ("[T]he Report was not explicitly or implicitly intended as anything more than a vehicle to inform Congress . . . . It is for Congress, not the courts, to determine if the Report satisfies the statutory requirements it enacted."); *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th

13

Cir. 1998) (holding "the report is not agency action of the sort that is typically subject to judicial review" under the APA because, "[h]aving requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants"); *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1118 (N.D. Cal. 2007) ("[T]here is a difference between statutes dictating certain information be made available to the general public and statutes requiring only reporting to Congress. The latter 'reporting-to-Congress' obligations are not judicially reviewable . . . . because an agency obligation to report to Congress is not a typical agency action subject to the presumption of judicial review.") (citations omitted).[4]

That authority controls here.  Indeed, the animating principle behind *Hodel* carries even greater force in the context of non-statutory congressional requests for information from the executive branch:   judicial review would undermine—not assist—the exchange of information "between the two political branches in our system of separated powers," which is "quintessentially within the province of the political branches to resolve as part of their ongoing relationships."  865 F.2d at 319.  That is because when Congress requests information from the Executive Branch, the political branches are subject to "an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation."  *United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977).

Precisely such an accommodation has been reached here:  the Department of Justice agreed to provide, with redactions to protect Executive Branch interests in privacy and confidentiality, information that Congress requested to carry out its legislative functions.  There is no basis under

---

[4] *Cf. Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1495 (10th Cir. 1997) ("Construing the agency action challenged as the Secretary of Defense's certification to Congress that testing was complete is similarly unhelpful" in establishing final agency action under the APA); *Am. Trucking Ass'n., Inc. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985) (agency reports do not constitute "agency action" under APA because they do not change law or policy).

the APA for the judiciary to superintend that accommodation because it is not the type of agency action to which the APA's presumption of judicial review attaches.  *Hodel*, 865 F.2d at 318.  To the contrary, the D.C. Circuit has recognized in this very context "that a better balance would result in the constitutional sense, however imperfect it might be, if it were struck by political struggle and compromise than by a judicial ruling." *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 391 (D.C. Cir. 1976).  The Supreme Court has likewise instructed that courts have "a duty of care to ensure that [they] not needlessly disturb the compromises and working arrangements that [the political] branches . . . themselves have reached." *Mazars*, 591 U.S. at 862.  This Court should heed that instruction.

None of Plaintiff's authorities (*see* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Mot.") at 13-14, ECF No. 23-1) is to the contrary because each concerns the provision of information to the general public in response to a FOIA request, rather than to a co-equal branch of government as part of the accommodation process.  To start, the Supreme Court in *Chrysler Corporation v. Brown* explained that, although FOIA generally "does not limit an agency's discretion to disclose information" or create "any right to enjoin agency disclosure," an aggrieved party may bring an action under the APA to enjoin an agency from violating the Trade Secrets Act by releasing confidential business information to the general public through FOIA.  441 U.S. 281, 294, 317-18 (1979).  This holding is inapposite twice over:  Plaintiff here does not (and cannot) invoke the Trade Secrets Act as a statutory restriction on the Executive's discretion to disclose the information at issue, and the release that Plaintiff seeks to prevent is to Congress, not the public through FOIA.

Those distinctions are dispositive, as the D.C. Circuit has consistently recognized that "disclosure of information to Congress" is not "disclosure to the whole world" in the manner of a release under FOIA, because such an interpretation would be "inconsistent with the obvious

15

purpose of the Congress to carve out for itself a special right of access to privileged information not shared by others." *Murphy v. Dep't of Army*, 613 F.2d 1151, 1155–56 (D.C. Cir. 1979); *id.* at 1156 (concluding that "Congress has reserved to itself in section 552(c) the right to receive information not available to the general public"). For that reason, the D.C. Circuit has expressly authorized the Executive Branch to release trade secrets to Congress and its subcommittees even when release to the general public would not be permitted. *See Exxon Corp. v. FTC*, 589 F.2d 582, 588 (D.C. Cir. 1978) ("For this court on a continuing basis to mandate an enforced delay on the legitimate investigations of Congress whenever these inquiries touched on trade secrets could seriously impede the vital investigatory powers of Congress and would be of highly questionable constitutionality.").[5]

Insofar as Plaintiff intends to argue that the Department has conceded the applicability of APA review (*see* Mot. 13), that is wrong. The Department through a phone call between Plaintiff's counsel, Acting Chief Privacy and Civil Liberties Officer Peter A. Winn, and Associate Deputy Attorney General Paul R. Perkins confirmed "that the Department had made the final decision to produce the materials to the Heritage Plaintiffs and to the Committee on the Judiciary of the U.S. House of Representatives on June 15, 2026, absent a court order barring release." Winn Decl. ¶ 15. The Department did *not* represent, however, "that the Department's decision constituted final agency action for the purposes of the Administrative Procedure Act." *Id.*

\* \* \*

---

[5] Plaintiff's remaining authorities likewise applied *Chrysler Corporation*, 441 U.S. 281, in the context of a FOIA release to the public, not a release to Congress. *In Northrop Grumman Systems Corporation v. NASA*, the Court precluded NASA from releasing to a FOIA requestor proprietary information in a contract with NASA. *See* 346 F. Supp. 3d 109, 116 (D.D.C. 2018). And *Creed v. NTSB* held that the NTSB engaged in judicially reviewable agency action when it posted on a public website summaries of an individual's medical information obtained while investigating a multi-vehicle accident. 758 F. Supp. 2d 1, 2 (D.D.C. 2010).

In short, the D.C. Circuit has consistently held that the Executive Branch's provision of information to Congress is unique: it is not analogous to the release of information to the public, and it is therefore not agency action of the type susceptible to judicial review under the APA. This Court should adhere to that longstanding precedent and decline Plaintiff's invitation "to sail into uncharted waters" by holding "that the veritable cornucopia of" processes by which the Executive Branch provides information to Congress, "involving basic interrelationships between the Article I and Article II branches, are appropriate grist for the judicial mill." *Hodel*, 865 F.2d at 317. Plaintiff is therefore unlikely to succeed on the merits of his claims, all of which are brought under the APA's cause of action.

### 2. APA review is unavailable because release of Executive Branch information to Congress is committed to agency discretion by law.

Even if the Executive Branch's release of records to Congress as an accommodation to a congressional request for information were agency action for purposes of the APA (and it is not), Plaintiff would still be unable to assert a cause of action under the APA because that release is committed to agency discretion by law. Under 5 U.S.C. § 701(a)(2), "agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law,'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993). To determine whether an action is committed to agency discretion by law, courts assess whether "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Here, no statute whatsoever prescribes a standard by which a court could assess the propriety or adequacy of the Executive Branch's accommodation to a congressional request for information. The history of the accommodation process that the Supreme Court recently set out in *Mazars* illustrates the point. There is no standard by which any court could have assessed (and,

17

indeed, none did) the reasonableness of disclosing:  the Executive Branch documents pertaining to General St. Clair's campaign against the Indians in the Northwest Territory that President Washington provided in response to a request from an early Congress in 1792; the particular documents and special message that President Jefferson sent Congress in response to a request for "any information in his possession touching on the conspiracy" to "invade Spanish territory in North America with a private army"; the materials (and the conditions for their access) that President Reagan made available to a House subcommittee regarding "the Department of the Interior's decision whether to designate Canada a reciprocal country for purposes of the Mineral Lands Leasing Act"; or President Clinton's conditional release of notes concerning the Whitewater controversy to a Senate committee.  *See Mazars*, 591 U.S. at 859-61.[6]

Indeed, the D.C. Circuit and courts around the country have held that the content and sufficiency of the Executive Branch's provision of information to Congress is committed by law to the agency's exercise of discretion even where Congress *required by statute* that the agency provide a "detailed" report, *Hodel*, 865 F.2d at 319, or address certain topics, *Lujan*, 768 F. Supp. at 882.  In *Hodel*, the court explained that it could not "formulat[e] judicially manageable standards by which to gauge the fidelity of the Secretary's response to the strictures of" a statute mandating a "detailed" report because "[w]hether a report to Congress is sufficiently 'detailed' . . . is an inquiry which strikes us as inherently elusive, especially in light of the statute's apparent purpose to inform and further the ongoing interbranch negotiation process."  865 F.2d at 319; *see also Lujan*, 768 F. Supp. at 882 ("[T]he Court has no means of ascertaining, for example, what level of detail Congress demanded of the Secretary."); *Guerrero*, 157 F.3d at 1196 ("We agree . . . that

---

[6] To be sure, there are legal standards that apply in justiciable controversies where Congress seeks to compel unwilling private recipients to disclose information.  *See Mazars*, 591 U.S. at 869-71.  But the legal standards applied in such cases have no bearing on the propriety of a voluntary accommodation that both political branches have accepted.

under the circumstances of this kind of reporting provision, 'we despair at formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response' to the statutory strictures") (citation omitted).  Because even statutes that require the Executive Branch to furnish information to Congress in detail and to cover specific topics in those reports are insufficient to create the judicially enforceable standard necessary for APA review, it follows *a fortiori* that APA review is unavailable here, where no statute whatsoever provides any standard by which a Court could assess the release of information to Congress as part of the inter-branch accommodation process.

Plaintiff may argue that FOIA and/or the Privacy Act supply a meaningful standard against which the Court may assess the Executive Branch's exercise of discretion in releasing information to Congress.  But both statutes expressly disclaim their applicability in that context.  FOIA specifically states that "[t]his section is not authority to withhold information from Congress," 5 U.S.C. § 552(d),[7] and it more generally does "not limit an agency's discretion to disclose information" or create "any right to enjoin agency disclosure," *Chrysler Corp.*, 441 U.S. at 294. Likewise, the Privacy Act unequivocally authorizes disclosure of an otherwise protected record "to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee."  5 U.S.C. § 552a(b)(9); *see also Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 45 n.5 (D.D.C. 2004) ("[T]he Privacy Act clearly does not protect against disclosure to members of

---

[7] *Murphy v. Dep't of Army* dispensed with any argument that Section 552(d) applies "only to a release of information to the Congress as a body, and that when information is furnished to a legislative entity other than the entire Congress, such as a committee, or to a single Member of Congress, FOIA privileges attaching to such information must be deemed waived."  613 F.2d at 1156.  There, the D.C. Circuit explained that such a view of the congressional carve out "is not consistent with the mode of operation of the Congress," as Congress's "manifold duties in the legislative, investigative, and oversight fields are almost invariably carried out through committees, committee chairmen, individual members, and staff personnel."  *Id.*

Congress in their capacity as committee members"). Accordingly, Plaintiff is unlikely to succeed on his APA claims because Plaintiff cannot identify any statutory metric that constrains or governs the Executive Branch's provision of information to Congress as part of the constitutionally-mandated accommodation process. "In such circumstances," APA review is unavailable because "the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002).

### 3. Plaintiff cannot assert a contrary-to-law cause of action under the APA (Count III) for alleged violations of the Privacy Act.

In any event, the APA would not grant a cause of action to enforce any restriction the Privacy Act may impose because there is "[an]other adequate remedy in a court," 5 U.S.C. § 704. Section 704 of the APA "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Mass.*, 487 U.S. 879, 903 (1988). Accordingly, a plaintiff has adequate relief—and thus cannot rely on the cause of action in 5 U.S.C. § 704—"'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). The APA likewise does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702. Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme that prescribes certain forms of review and certain forms of relief, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review established by the statutory review scheme is presumed exclusive.

This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.") (citation omitted); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Under these principles, Plaintiff may not challenge purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *Cooper*, 566 U.S. at 287, and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). But relief under the Privacy Act is carefully circumscribed. Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), *id.* § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness,

21

and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D).  For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful," *id.* § 552a(g)(4)(A), and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299.

Beyond these monetary damages, the Privacy Act allows for injunctive relief in only two circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A).  But Plaintiff here is not seeking such relief.  And injunctive relief, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *see also Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).  Indeed, since the Privacy Act does not even authorize *permanent* injunctive relief for any violation in these circumstances, it cannot possibly support granting the *preliminary* injunctive relief sought here.

Because of the Privacy Act's comprehensive remedial scheme, courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation."

22

*Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. Dep't of Def.*, No. 23-1471 (JEB), 2024 WL 230289, at *13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, No. 23-2386 (RCL), 2024 WL 4227154, at *8-9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, No. 05-2269 (JR), 2006 WL 8448631, at *6 (D.D.C. Sep. 29, 2006); *Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002). That result is consistent with the principle that, "[w]here, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161-62). Congress in the Privacy Act concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages. That congressional determination forecloses all of Plaintiff's APA claims that are predicated on violations of the Privacy Act. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies") (citation omitted); see also *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005) (Roberts, J.) ("[CSRA's] remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA.").[8]

---

[8] Plaintiff notes (Mot. 34) two recent cases in which courts in this district have authorized plaintiffs to sue under the APA to enjoin proposed disclosures that are barred by the Privacy Act. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 112 (D.D.C. 2026); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, 778 F. Supp. 3d 56, 81 (D.D.C. 2025). Defendants respectfully submit that those decisions are incorrect and, in any event, they are not binding on this Court because "District Court decisions do not establish . . . the law of the district," *In re Exec. Off. of President*, 215 F.3d 20, 24 (D.C. Cir. 2000), and, as cited above, many more courts have held to the contrary.

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1158-59. Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiff brings here—"the detailed remedial scheme adopted by Congress would make little sense." *Id.* at 1160. It is "unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.*; *see also Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here.").[9]

In short, Congress specified the procedural requirements for agencies to follow when issuing rules under the APA, *see* 5 U.S.C. § 553, and also separately specified the remedies that are available for APA violations, *see id.* § 706. Congress likewise specified the procedural requirements for agencies to follow when making significant changes to a "system of records" under the Privacy Act, *see id.* § 552a(e)(4), (e)(11), and likewise separately specified the remedies that are available to individuals for Privacy Act violations, *see id.* § 552a(g). Both the substantive arguments advanced and the relief requested in this suit make a mess of those choices by mixing

---

[9] By contrast, the Supreme Court has held that the Privacy Act's remedial scheme does not displace the remedial scheme in the Fair Credit Reporting Act (FCRA) precisely because those parallel substantive statutes "are merely complementary" and "can coexist harmoniously" without the FCRA nullifying the Privacy Act's limitations. *See Dep't of Agric. Dev. Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). Enjoining Privacy Act violations through the APA, however, would have precisely that nullifying effect, rendering meaningless the limitations on remedies that Congress set forth in the Privacy Act.

and matching from different parts of different statutes.  Congress's decision to provide narrow, targeted causes of action for damages and only particular kinds of injunctive relief under the Privacy Act strongly suggests that it did not intend to allow plaintiffs to end-run that carefully constructed scheme via APA claims.  This Court should respect that congressional choice.

**B. Even assuming APA review were available, Plaintiff is not likely to succeed on the merits of his claims.**

Even assuming there existed a cause of action under the APA to challenge the Executive Branch's provision of information in response to a request from Congress, Plaintiff would still be unlikely to succeed on the merits of any of his claims.

**1. Plaintiff is unlikely to succeed on his claim that release to the Committee is contrary to the Privacy Act.**

a.  Disclosure to the Committee does not violate the Privacy Act because that statute's protections do not apply to disclosures "to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee."  5 U.S.C. § 552a(b)(9).  Plaintiff does not seriously dispute that the information considered by the Special Counsel in declining to prosecute a President falls squarely within the House Judiciary Committee's oversight jurisdiction.  And any such argument would be frivolous:  investigative materials at the core of a Special Counsel's investigation of a President fall squarely within the scope of the Committee's jurisdiction.

The House Rules establish various standing committees, including the Judiciary Committee, and delegate to each committee "jurisdiction and related functions."  *See generally* House Rule X.1., Rules of the House of Representatives, 119th Cong. (2026) (House Rules), *available at*: https://rules.house.gov/sites/evo-subsites/rules.house.gov/files/documents/houserules119thupdated.pdf.  And the Department of Justice is one of the agencies over which the Judiciary Committee has legislative oversight

25

authority.  *See* House Rule X.1(*l*)(1) ("judicial proceedings, civil and criminal); House Rule X.1(*l*)(7) ("Criminal law enforcement and criminalization.").  For nearly a century, the Supreme Court has recognized that the Constitution vests the House with authority to conduct oversight over "whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings to punish crimes and enforce appropriate remedies against the wrongdoers."  *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927).  This power has been delegated to the Committee when conducting legislative oversight of the Department of Justice.  *See* House Rule X.1.

> And as the Committee has explained, it is:
>
> using [its] authority to conduct oversight of the Department of Justice's use of special counsels during the Biden Administration, specifically, the investigations conducted by Special Counsels Jack Smith and Robert K. Hur.  The Committee has, for example, sought and obtained material regarding both Special Counsels' investigations.  Further, both Special Counsels have testified at Committee hearings. Id. Through this investigation, the Committee is considering whether legislative reforms to the Department of Justice and its use of special counsels are necessary, as well as if any changes to the laws regarding the handling, storage, and disclosure of classified materials, and criminal penalties for the unauthorized dissemination and disclosure of classified materials are needed.

Unopposed Mot. of the Comm. on the Jud. to Intervene, ECF No. 18 at 3 (cleaned up).  Information about Special Counsel Hur's investigation into the alleged mishandling of classified material by the former President of the United States sheds light on how the Department of Justice and its special counsels have performed their statutory duties.  Indeed, as the Committee further detailed, Special Counsel Hur relied in part on the materials at issue here "for his bottom-line conclusions that: (1) there was evidence that Plaintiff willfully retained and disclosed classified materials after his vice presidency; but (2) the evidence did not establish his guilt beyond a reasonable doubt." *Id.* at 3-4.  It is well within the Committee's jurisdiction to assess whether the Department and

26

special counsels performed their statutory duties, particularly given the substantial controversy over the Special Counsel's declination decision.  That should be the end of the matter.

b.  Plaintiff nevertheless claims (Mot. 35) that this exception does not apply because the Committee's request "does not involve a 'matter within [the] jurisdiction' of the Committee because it is a product of the Department's efforts to disseminate President Biden's private information, not the Committee's genuine inquiry."  But the Department's motives are entirely beside the point: a matter can be within a congressional Committee's jurisdiction even if, *arguendo*, the impetus for releasing materials related to that matter originated in the Executive Branch.  And the Executive Branch can properly suggest to Congress that potential misconduct during a prior Administration is an appropriate subject of legislative oversight, regardless of whether the Executive has other motives for inducing Congress to request information.  Indeed, the plain language of the Privacy Act exception encompasses *any* release to a congressional committee on *any* matter within that committee's jurisdiction.  *See Devine v. United States*, 202 F.3d 547, 553 (2d Cir. 2000) ("In sum, § 552a(b)(9) as written does not permit a construction that would incorporate a motive requirement into the exception.").  For this reason, courts have declined to impose any "additional conditions such as the motive requirement advocated by" Plaintiff here on the release of information to Congress.  *Id.* at 552.[10]

Plaintiff argues (Mot. 35-36) that its atextual imposition of an additional motive condition on the Privacy Act exemption for release to Congress "accords with the Department's own

---

[10] *Tijerina v. Walters*, 821 F.2d 789 (D.C. Cir. 1987) (cited at Mot. 35-36) is not to the contrary. That case concerned a different exception, and held that an agency could not release information to the Texas Board of Law Examiners under a routine-use exemption, "which permits the VA to respond to an official request of a state agency by disclosing information relevant to that agency's decision whether to issue a license to an individual." *Id.* at 798.  But that exception required the State or local agency to first make an official request.  *Id.*  That no similar requirement exists for releases to Congress only confirms that the Privacy Act has no bearing on the proposed release here.

analysis" and "courts' interpretive approach to the Privacy Act generally." Not so. The Office of Legal Counsel Opinion that Plaintiff invokes concluded only that the exemption did not apply to releases to Ranking Minority Members of congressional Committees, because "[a]s a general matter, ranking minority members are not authorized to make committee requests, act as the official recipient of information for a committee, or otherwise act on behalf of a committee." *See* Application of Privacy Act Congressional-Disclosure Exception to Disclosures to Ranking Minority Members, 25 Op. O.L.C. 289, 289 (2001). That opinion is irrelevant here, as the materials were sought by and will be provided to the Committee Chairman, acting on behalf of the Committee. *See* Compl., Ex. C, ECF No. 1-3.

Nor may the general presumption that courts should interpret the Privacy Act "in a manner that will give effect to Congress's intent to protect the individual privacy of the subjects of protected records," *Pilon v. U.S. Dep't of Just.*, 73 F. 3d 1111, 1119 (D.C. Cir. 1996), countermand the plain language of the exemption, *see Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018) (rejecting "the flawed premise" that a statute "pursues its remedial purpose[s] at all costs" and emphasizing that a statute's "exemptions are as much a part of [its] purpose" as its affirmative protections) (citation omitted). Indeed, it is particularly implausible that *Congress* intended § 552a(b)(9) to contain an unwritten motive requirement that would invite courts to second-guess the legitimacy of Congress's own motives.

\* \* \*

Accordingly, because the records to be released concern matters within the Committee's jurisdiction, the Privacy Act is inapplicable. Plaintiff is therefore unlikely to succeed on his claim that the Department's forthcoming release to Congress is contrary to law.

28

**2. Plaintiff is unlikely to succeed on his claims that release to the Committee is arbitrary and capricious or an abuse of discretion.**

Plaintiff is also unlikely to succeed on his claims that release to the Committee is arbitrary and capricious.[11]  Even assuming this Court could somehow second-guess the reasonableness of an inter-branch political accommodation (*but see supra* pp. 11-20), the Department acted well within its discretion in deciding that Plaintiff's privacy interests in the materials at issue have been greatly reduced, particularly after appropriate redactions have been made to protect those interests, and are no longer sufficient to outweigh the significant congressional interest in investigating whether prior special counsels impartially administered justice and the significant Executive Branch interest in accommodating the Legislative Branch.[12]

a.  Plaintiff's principal argument (Mot. 13-21) is that "the Department's reliance on the purported congressional request is pretextual," and therefore violates the APA, because Department purportedly solicited the request itself.  Even if that were true (and it is not, *see* May 22 Letter at 5-6), there is nothing "pretextual" about the Executive Branch inviting Congress to request information that the Executive Branch reasonably determines will aid Congress in the discharge of its Article I functions.  It is entirely appropriate for the Executive Branch to suggest that Congress engage in oversight of potential misconduct that occurred during a prior Administration and to provide information that may assist Congress in legislating to prevent the

---

[11] Plaintiff concedes (Mot. 21 n.6) that there is "rarely . . . any meaningful distinction[] between" his claim that release to Congress is arbitrary and capricious (Count I) and his claim that release to Congress is an abuse of discretion (Count II).  Accordingly, Defendant follows Plaintiff's lead (*see* Mot. 21-33) in grouping these claims together.

[12] The Winn Declaration memorializes the Department's decision.  Winn Decl. ¶ 4.  It was executed by a career DOJ official who personally participated in the Department's decision.  *Id.* ¶¶ 1, 3, 5, 16-20.  The Winn Declaration is "merely explanatory" of the decision and "contain[s] no new rationalizations." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981).  It is therefore appropriately considered by this Court in opposition to a motion for preliminary injunction.

29

repetition of any such misconduct.  Indeed, "Congress and the President maintained this tradition of negotiation and compromise" in the exchange of information for centuries following the example set by President Washington in response to the first congressional request for Executive Branch information.  *See Mazars*, 591 U.S. at 861.

Nor is there any basis to suggest that the Executive Branch sought to induce Congress to request the information just to embarrass former President Biden, wholly apart from legitimate concerns about the conduct of the Department of Justice during the investigation.  And regardless, that too is irrelevant at this point.  Whatever may have prompted the Committee to make the request, it has now made the request, wishes to obtain the information, and indeed feels strongly enough that it has intervened in this case to ensure receipt of the information.  *See* ECF No. 18.  In such circumstances, there is no plausible legal basis upon which this Court could conclude that the Department of Justice is acting arbitrarily and capriciously in accommodating the request.  Indeed, if anything, the political reasons for the Executive Branch to accommodate the Legislative Branch would be even stronger if the Executive spurred the Legislature's interest in the first place.

b.  In any event, it was entirely reasonable for the Department to conclude that Congress's significant interest in oversight, and the Department's significant interest in accommodation, outweighs any residual privacy interest that former-President Biden may maintain in the redacted records.  As explained in the Winn Declaration, the Department determined that there were significant Executive Branch interests in complying with the Committee's request for the Zwonitzer Materials as part of the accommodation process, because the provision of the information requested would facilitate Congress's discharge of its constitutional functions and maintain inter-branch dialogue on the critical issue of the impartial administration of justice.  Winn Decl. ¶ 17.  The Department further determined "determined that there were significant

congressional interests in investigating whether prior special counsels impartially administered justice." *Id.* And the Department concluded that the Committee has jurisdiction over the Department of Justice and its use of special counsels to conduct particular investigations and prosecutions, including those special counsels' administration of justice. *Id*. Indeed, the Committee has engaged in efforts to conduct oversight on that topic across the past two Congresses. *Supra* pp. 7-8. To further those oversight efforts, the Committee ultimately requested information that the Department agreed to provide. The Executive Branch reasonably chose to comply as part of its ongoing accommodation process with the Legislative Branch. Winn Decl. ¶¶ 17, 20.

Plaintiff's attempts to undercut that congressional interest are unavailing. For one, Plaintiff suggests (Mot. 18) that there can be no legitimate congressional interest in the Zwonitzer materials because they cover "private conversations from a decade ago" before Plaintiff became President. But the Zwonitzer materials "had significant evidentiary value," Hur Report, at 334, and Special Counsel Hur extensively relied upon them in his report, *see, e.g.*, *id.* at 3 ("In a recorded conversation with his ghostwriter in February 2017, about a month after he left office, Mr. Biden said, while referencing his 2009 Thanksgiving memo, that he had 'just found all the classified stuff downstairs.'"); *id.* at 64 ("Referring to his 'Foreign Policy' notebook, Mr. Biden added, '[t]hey didn't even know I have this.'"). Indeed, the conversations between then-former Vice President Biden and Zwonitzer formed the basis for the entire investigation. *See id.*

Plaintiff also argues (Mot. 19-20) that the Committee failed to provide "detailed and substantial" evidence as to how its oversight would be served by production of the Zwonitzer materials, and their request for that information therefore cannot establish the standard set out by the Supreme Court in *Mazars*, 591 U.S. at 870. But the Supreme Court in *Mazars* created that

standard to resolve the scope of Congress's power to obtain information from *unwilling* recipients—more specifically, to resolve informational *disputes between* the Executive Branch and Congress concerning information about the President, for the specific purpose of ensuring that Congress cannot "use subpoenas for institutional advantage" in its "ongoing relationship with the President" as "a rival political branch." *See id.* at 871; *see also id.* at 869 ("We therefore conclude that, in assessing whether a subpoena directed at the President's personal information is 'related to, and in furtherance of, a legitimate task of the Congress,' courts must perform a careful analysis that takes adequate account of *the separation of powers principles at stake*, including both the significant legislative interests of Congress and the 'unique position' of the President.") (emphasis added) (citations omitted).

Here, that standard is completely inapposite because the Executive Branch is willing to comply with the Committee's request. There is no risk that Congress is using the information request to enlarge its powers at the expense of the Presidency. The separation-of-powers considerations that animated the Court's decision in *Mazars* are therefore entirely absent here. The Supreme Court has never remotely suggested that there is any limit on Congress's power merely to request and obtain information from willing recipients, and this Court cannot invent such a standard through the guise of arbitrary-and-capricious review of the Department of Justice. Indeed, the Supreme Court has expressly admonished against the disruption of the "more than two centuries" of history in which "the political branches have resolved information disputes using the wide variety of means that the Constitution puts at their disposal." *Id.* at 869.

In light of legitimate congressional interest in special counsels' impartial administration of justice, the Department reasonably concluded that the Executive Branch's strong interest in protecting the privacy interests of a former President could be adequately protected by redactions,

32

such that release of appropriately-redacted records to Congress was appropriate. As detailed in the Winn Declaration, the Zwonitzer materials are largely in the public domain, Winn Decl. ¶¶ 10, 19(a), (c), (d) & (f); the materials have been redacted to withhold sensitive family health matters, *id.* ¶ 7; Plaintiff has already addressed the materials in public, *id.* ¶ 19(d); a former President has no meaningful privacy interest in his voice, *id.* ¶ 19(e); and disclosure would not impose any stigma on Plaintiff, *id.* ¶ 19(c), (f). Together, these factors all supply a rational basis for the Department's decision, which is all the APA requires. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And more to the point, even if this Court may disagree with the reasonableness of the Department's weighing of Plaintiff's privacy interests or the Committee's oversight interests, it has no basis whatsoever to second-guess the ultimate reasonableness of the balance struck by the Executive Branch's decision to accommodate an information request from the Legislative Branch. *See* Winn Decl. ¶ 17.

c. Finally, Plaintiff is incorrect (Mot. 21-33) that release to Congress violates the APA as an unreasoned change of position. It is well-established that an agency change-in-position is subject to no more searching review under the APA than any other agency action. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) ("We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review."). Accordingly, even assuming APA review were available at all, all the Department must do is "show that there are good reasons for the new policy," as is true of any administrative action. *Id.* at 515 (explaining the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates"). The

33

Department readily satisfied that requirement by acknowledging the change and explaining why it gave less weight to former-President Biden's privacy interests and greater weight to Congress's oversight interest and its own interest in accommodating Congress. Winn Decl. ¶¶ 17, 20. And as explained *supra* pp. 30-32, the decision is sufficiently reasoned to withstand APA review.

## II.    Plaintiff cannot establish irreparable harm.

"[T]he irreparable injury requirement erects a very high bar for a movant." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (citation omitted); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("This court has set a high standard for irreparable injury."). "The party seeking injunctive relief must demonstrate that the claimed injury is 'both certain and great' and that the alleged harm is 'actual and not theoretical.'" *Sierra Club*, 990 F. Supp. 2d at 38-39 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Moreover, "[t]he injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm" and "beyond remediation." *Chaplaincy*, 454 F.3d at 297.

Plaintiff cannot make that showing here. Plaintiff claims (Mot. 41-42) that the disclosure of sensitive and personal materials constitutes irreparable harm. But a disclosure to Congress does not amount to a disclosure to the general public—rather, as the D.C. Circuit has consistently recognized, "disclosure of information to Congress" is not "disclosure to the whole world" in the manner of a release under FOIA. *Murphy*, 613 F.2d at 1155–56. And Plaintiff makes no effort to show that release to Congress alone would cause any harm in the circumstances of this case.

Moreover, the Privacy Act creates a scheme of monetary damages for precisely the harm asserted here. *Cooper*, 566 U.S. at 291; *see also Mulhern v. Gates*, 525 F. Supp. 2d 174, 181 (D.D.C. 2007) ("To prevail on a claim of nonconsensual disclosure for monetary damages, a plaintiff must show that '(1) the disclosed information is a record contained within a system of

34

records; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff.'").  If Plaintiff is correct that release to Congress harms a legal right that the Privacy Act protects (and he is not), that harm can be remedied through a Privacy Act claim for monetary damages as Congress intended.  And a harm that is "remediable through monetary damages" is, by definition, not irreparable. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025).  To be clear, the government does not concede that damages would be available even if the Privacy Act were violated in these circumstances.  But any restrictions on damages and injunctions imposed by the Privacy Act reflect a Congressional judgment about the appropriate "remedies available," which precludes a court in equity from deeming those remedies "inadequate" and granting broader equitable relief. *eBay Inc. v. Mercexchange, LLC*, 547 U.S. 388, 391 (2006); *see also Cassell v. Taylor*, 243 F.2d 259, 261 (D.C. Cir. 1957) ("equity follows the law and the equitable remedy will be withheld if the local statute of limitations would bar the concurrent legal remedy").

In any event, much of the information has already been made public because the Hur Report quoted extensively from the materials at issue. *See, e.g.*, Hur Report, at 3 ("In a recorded conversation with his ghostwriter in February 2017, about a month after he left office, Mr. Biden said, while referencing his 2009 Thanksgiving memo, that he had 'just found all the classified stuff downstairs.'"); *id.* at 64 ("Referring to his 'Foreign Policy' notebook, Mr. Biden added, '[t]hey didn't even know I have this.'").  The release of additional information will not meaningfully invade the privacy of a former President who has already published two memoirs based on the conversations memorialized on the Zwonitzer materials. *Cf. Comm. on Oversight & Gov't Reform v. Lynch*, 156 F. Supp. 3d 101, 114 (D.D.C. 2016) ("What harm to the interests advanced by the privilege would flow from the transfer of the specific records sought here to the Committee when

35

the Department has already elected to release a detailed Inspector General report that quotes liberally from the same records?"). And the risk of any harm to Plaintiff's privacy interest is further reduced by redactions to sensitive family and health information. *See* Winn Decl. ¶ 7.

**III.    The equitable factors strongly disfavor preliminary injunctive relief.**

Even if Plaintiff could satisfy one or both of the first two factors necessary to obtain preliminary relief, the equitable factors weigh in Defendant's favor and are sufficient to deny injunctive relief. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors."). Here, the public interest strongly disfavors judicial interference after the Executive Branch has agreed to provide information sought by Congress through an accommodation that satisfies both political branches.

To start, such a compromise is the very goal of the accommodation process. Indeed, political compromise is its defining feature, not some defect to be removed or avoided. *See Mazars*, 591 U.S. at 854 ("Congress and the President—the two political branches established by the Constitution—have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity.") (citations omitted). The process of negotiation and accommodation that follows from efforts by Congress to obtain information from and conduct oversight of the Executive Branch protects the political branches from excessive judicial interference and the Judiciary from the undue politicization that would result from "repeated use of [its] power to negate the actions of the representative branches." *Walker v. Cheney,* 230 F. Supp. 2d 51, 65 (D.D.C. 2002).

And those principles carry even greater force in this case, where the political branches reached an accommodation that serves vital congressional interests. As the Committee has explained, whether "special counsel investigations during the Biden-Harris Administration . . . le[]d to fair and impartial justice" has significant implications for whether the Congress "may

36

consider legislative reforms to address this problem including . . . 'changing certain procedures governing the Department's special counsel investigations to better ensure that the Department pursues impartial justice.'" May 22 Letter at 5. Few matters are of greater public import than ensuring the Department of Justice administers fair and impartial justice in the high-profile investigation of a sitting President.

Plaintiff's sole response (Mot. 43) is to assert that there is "no public interest in the perpetuation of unlawful agency action." But that is precisely why release to Congress is necessary—to ensure that Congress can consider whether legislative reforms are necessary to preserve or promote the fair and impartial administration of justice, *supra* pp. 7-8.

## IV.     Plaintiffs should post security in connection with any emergency relief.

Finally, if the Court grants any injunctive relief, the Court should also order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). If any preliminary injunctive relief issues here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such emergency order. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (court wields "broad discretion . . . to determine the appropriate amount of an injunction bond").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: June 8, 2026                    Respectfully submitted,

                                       BRETT A. SHUMATE
                                       Assistant Attorney General

                                       ELIZABETH J. SHAPIRO
                                       Deputy Director, Federal Programs Branch

                                       */s/ Alexander W. Resar*
                                       ALEXANDER W. RESAR
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L St. NW
                                       Washington, DC 20530
                                       Tel:  (202) 616-8188
                                       E-mail: alexander.w.resar@usdoj.gov

                                       *Counsel for Defendants*

38